## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 25-14239-CIV-CANNON

JOHN TEXTOR,

    Plaintiff,

v.

ICONIC SPORTS EAGLE INVESTMENT LLC, JAMES G. DINAN and ALEXANDER KNASTER,

    Defendants.

_____/

## FIRST AMENDED COMPLAINT

## NATURE OF THE ACTION

1.    Plaintiff John Textor ("Textor" or "Plaintiff"), by and through his attorneys, Wiggin and Dana LLP, makes this Amended Complaint against defendants Iconic Sports Eagle Investment LLC ("ISEI"), James G. Dinan ("Dinan"), and Alexander Knaster ("Knaster") (collectively, "Defendants"), and demands a jury trial on all claims.

2.    This is an action for securities fraud and fraudulent misrepresentation in connection with the purchase of a put option by Defendants from Plaintiff. Defendants defrauded Plaintiff into selling ISEI a put option for far less than it was worth, by deceiving Plaintiff about their ability to take Plaintiff's company, Eagle Football Holdings Limited ("Eagle"), public. Specifically, the security at issue here is a put option agreement executed on November 16, 2022 (the "Put Option Agreement") that grants Defendants the right to force Plaintiff to purchase certain shares for more than $75 million, if a defined "Option Trigger Event" occurs, provided certain conditions are met and ISEI follows the required procedure under the Put Option Agreement upon the occurrence of an Option Trigger Event. Plaintiff agreed to the Put Option Agreement because Defendants defrauded Plaintiff into believing that their Special Purpose Acquisition Company, Iconic Sports

1

Acquisition Corp ("ISAC"), could merge with Eagle to form a publicly-traded company. In reality, as Defendants well knew and did not disclose to Plaintiff, Defendant Knaster's close financial ties with Russian individuals and assets that were the subject of international sanctions made such a transaction impossible.

## PARTIES

3. Plaintiff, a resident of Martin County in the Southern District of Florida, is the Chief Executive Officer, Chairman of the board of directors, and majority shareholder of Eagle, a company incorporated under the laws of England and Wales. Eagle is a privately held company whose shares are not traded on any exchange.

4. Eagle is the majority owner of a network of football clubs referred to generally as Eagle Football, and owns interests in soccer clubs all over the world, including FC Florida in the United States; Olympique Lyonnais ("OL") in Lyon, France; Daring Brussels (known until recently as "RWD Molenbeek") in Brussels, Belgium; and Botafogo de Futbol e Regatas in Rio De Janeiro, Brazil ("Botafogo"). Eagle also owned a significant interest in the club Crystal Palace F.C. in London, but it is currently in the process of selling its interest in that club.

5. Defendant Dinan, a resident of Palm Beach County in the Southern District of Florida, is the chairman and CEO of the hedge fund York Capital Management, and a part-owner of the Milwaukee Bucks, an NBA Basketball team. Dinan is a member of the board of directors of Iconic Sports Management, LLC. ("ISM"), a company organized under the laws of England and Wales, and a member of the board of directors of Eagle. On June 25, 2025, Dinan sent a letter to the Eagle affiliate "Eagle Football Group," which has a controlling interest in OL, resigning from the board of that entity with immediate effect. However, upon information and belief, he has not resigned from the board of Eagle, or any other Eagle affiliated entity.

6. Defendant ISEI, which is organized under the laws of the Cayman Islands, is an affiliate of ISM. Defendant Dinan is a Manager of ISEI.

7. ISAC is a Special Purpose Acquisition Company ("SPAC") organized under the laws of the Cayman Islands, sponsored by ISM. Defendants Dinan and Knaster are both members of the board of directors of ISAC.

8. Defendant Knaster is, upon information and belief, a resident of London, England, and is the owner of Pamplona Capital Management ("Pamplona"), an investment firm. He is a member of the boards of directors of ISAC and Eagle, and he conducts business in the Southern District of Florida through his role as a director of ISAC and Eagle. This lawsuit arises out of business Knaster, among others, conducted in the Southern District of Florida, specifically, the negotiation of the Put Option Agreement with Textor while Textor was physically present in the Southern District of Florida, through his role as a director of ISAC and Eagle.

## JURISDICTION AND VENUE

9. This action arises out of, inter alia, violations of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 enacted thereunder and codified at 17 C.F.R. 240.10b-5. Accordingly, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 78aa.

10. This Court has supplemental jurisdiction over Plaintiff's state and common law claims for relief pursuant to 28 U.S.C. § 1367(a), because these claims arise from a common nucleus of operative facts and are so intertwined with the federal claims for relief as to make an exercise of the Court's jurisdiction appropriate.

11. Venue is proper pursuant to 28 U.S.C. § 1391(b) because the Plaintiff and at least one of the individual Defendants are residents of this District, the sale of the security that is the

subject of this action was consummated in this District, and a substantial part of the acts or omissions giving rise to this action occurred in this District.

## FACTS COMMON TO ALL CAUSES OF ACTION

### The Formation of Eagle

12. Prior to the formation of Eagle, between August of 2021 and January of 2022, Textor purchased significant interests in several professional soccer teams, including Crystal Palace, RWD Molenbeek, and Botafogo.

13. In late 2022, Textor learned that a controlling interest in OL was available for purchase.

14. In order to purchase a controlling stake in OL, in November 2022 Textor formed Eagle and funded it with capital contributions from several sources, including Defendant ISEI.

15. The transaction by which Eagle was created and funded closed on December 19, 2022, and the parties memorialized it in a "Subscription and Shareholders' Agreement relating to Eagle Football Holdings Limited" ("Subscription Agreement").

16. As per the Subscription Agreement, Defendant ISEI invested $75 million in Eagle, and in exchange it obtained 8,520 shares, or approximately 15.7% of Eagle ("the Iconic Shares"). While there were other investors as well, Textor maintained majority control of Eagle.

17. The Subscription Agreement further provided that Eagle and ISAC would immediately take active steps to prepare for and pursue a business combination (the "De-SPAC Transaction") to take Eagle public using ISAC, at a valuation of approximately $1.2 billion.

18. The Subscription Agreement provided that the De-SPAC Transaction would be subject to, inter alia, additional financing on acceptable terms.

### The De-SPAC Process

19.     A SPAC is a publicly traded company formed with the sole purpose of acquiring or merging with a private company in order to take the private company public. A SPAC is an alternative to an Initial Public Offering ("IPO") as a method for taking a privately held company public, and a SPAC offers a privately held company a faster path to public trading with lower transaction costs than a traditional IPO.

20.     A "de-SPAC" or "de-SPAC transaction" refers to the process by which a SPAC merges with or acquires a private company, resulting in a publicly traded company.

### The Put Option Agreement

21.     On November 16, 2022, at the initiation of the Defendants, Textor and Defendant ISEI agreed to and executed the Put Option Agreement.

22.     The Put Option Agreement is a security within the meaning of the Securities Exchange Act of 1934. *See* 15 U.S.C. § 78c(10) (including both puts and options in the definition of security).

23.     An "option" is an option to buy or sell shares of a company at a set price on or by a certain future date. A "call option" is an option to buy shares at a certain price on or by a certain future date, and a "put option" is an option to sell shares at a certain price on or by a certain future date. The Put Option Agreement granted Defendant ISEI, in exchange for £1, a put option to sell all of the Iconic Shares to Textor at a set total price of $75 million, plus interest of 11% per annum, accruing from the date that ISEI delivered notice that it was exercising the put option. However, under the terms of the Put Option Agreement, ISEI could only exercise such an option upon the occurrence of a defined "Option Trigger Event," and only if certain conditions were met and ISEI followed the required procedure under the Put Option Agreement upon the occurrence of an Option Trigger Event.

24. One Option Trigger Event identified in the Put Option Agreement was if ISEI did not exercise, by April 26, 2023, its De-SPAC Option as set forth in the Subscription Agreement entered by, among others, Textor and ISEI. Under the terms of the Shareholders Agreement, as amended, ISEI could only exercise the De-SPAC Option if certain conditions were satisfied: (a) the SPAC had a firm commitment of additional equity financing committed from Private Investment in Public Equity ("PIPE") investors of at least $60,000,000 through the issuance of ordinary shares at no less than $8.50 per share, (b) a business combination agreement must have first been executed between the SPAC and Eagle, which would value Eagle at a valuation of approximately $1.2 billion, and (c) the SPAC would achieve a minimum cash condition of at least $175 million, as required by the senior lender which was also funding the purchase of OL.

25. Prior to November 16, 2022, Defendants represented to Textor that the Put Option Agreement was an "insurance policy" for them against the possibilities, which the Defendants further represented to Textor were highly unlikely, that (a) ISEI would decline to exercise the De-SPAC Option, or (b) that the De-SPAC Transaction would not occur. If Eagle went public through the De-SPAC Transaction, ISEI would be able to sell its stake in Eagle on a publicly-traded exchange and Textor's 61% ownership position would be worth more than $500 million; and if Eagle did not go public, the insurance policy of the Put Option Agreement ensured that ISEI could at least get its investment back, plus interest. This representation was made to Textor by ISEI through Defendant Dinan, and by Defendant Knaster, while Textor was physically located within the Southern District of Florida.

26. Textor agreed to both the 11% interest rate and the £1 price of the put option because (a) he perceived, based on the information provided to him at the time by the Defendants, that the De-SPAC Option would be exercised by ISEI and that the De-SPAC Transaction was very

likely to occur and (b) ISEI stated, upon making its investment in Eagle, that as the CEO of Eagle, Textor was the single person with the most control over whether the De-SPAC Transaction would occur. Had he known, contrary to these representations, that ISEI could not exercise the De-SPAC Option and the De-SPAC Transaction itself was in fact very unlikely to occur, Textor would not have sold the put option for such a low price or with such a high interest rate.

27. Defendants knew these representations, described at paragraphs 25 and 26, above, to be untrue or were reckless as to the truth of the representations, due to their knowledge of the close financial ties between Knaster, another principal of Iconic, and sanctioned Russian individuals, as described below.

28. The Put Option Agreement further provided that if ISEI exercised the put option but Textor did not buy the Iconic Shares at the option price of $75 million (plus contemplated interest), ISEI had the right to initiate a fair market value ("FMV") sale process to sell its shares in Eagle to a third party, and as part of that process, and only under certain conditions where the FMV yielded to ISEI an amount less than their option price, to compel Textor to sell a portion of his shares in Eagle as well, only as necessary to help ISEI recover its investment. In such a scenario, the Put Option Agreement appointed ISEI as Textor's agent and proxy with full power and authority to vote and exercise control of Textor's shares "in the manner which [ISEI] in its absolute discretion considers reasonably necessary in order for [Textor] to comply with and perform his obligations" under the Default Provisions clause of the Put Option Agreement.

29. ISEI did not exercise the De-SPAC Option by April 26, 2023, and on July 26, 2023, ISEI provided Textor with notice that it was purporting to invoke the Put Option, which required Plaintiff to purchase the Iconic Shares.

**The Share Charge Agreement**

30.     On December 8, 2022, Textor and ISEI entered into another agreement (the "Share Charge Agreement").

31.     The Share Charge Agreement provides that under certain conditions, if ISEI exercises its rights under the Put Option Agreement to require Textor to buy the Iconic Shares, Textor grants ISEI a secured interest in all of Textor's shares in Eagle.

32.     In the event that ISEI exercises the Put Option and Textor fails to buy the Iconic Shares, the Share Charge Agreement further provides, under certain conditions, that ISEI can declare a default, which gives it the right to exercise the powers and rights exercisable by the legal or beneficial owner of the shares (meaning Textor), subject to certain limitations.

33.     Plaintiff did not purchase the Iconic Shares, and ISEI claims it has rights under the Share Charge Agreement to inhibit Textor from exercising control over Eagle.

**Defendants' Fraudulent Conduct**

34.     One of the necessary preconditions for the De-SPAC Transaction to occur was having in place Private Investment in Public Equity ("PIPE") financing. Unlike shares in other companies, shares in a SPAC come with the right to sell the shares back to the SPAC for the purchase price if the shareholder does not approve of the company being acquired. PIPE financing is necessary to have in place so that even if some or all shareholders redeem their shares, the SPAC will still have sufficient funds to close the transaction.

35.     In fact, the De-SPAC Transaction was unlikely to be completed because of what Defendants then knew, but did not disclose, and Textor did not—Defendant Knaster, as well as another major investor in ISAC, Edward Eisler ("Eisler"), had close financial ties with Russian

individuals and assets that, since at least the fall of 2022, were and are subject to severe sanctions imposed by, among others, the United States, the United Kingdom, and the European Union.

36. Such close financial ties include that Defendant Knaster's London-based investment firm, Pamplona, and Eisler's London-based hedge fund management firm, Eisler Capital, received significant funding prior to 2022 from sanctioned individuals, including Mikhail Fridman, Petr Aven, German Khan, and Alexey Kuzmichev, via an investment firm in Luxembourg known as LetterOne Holdings in which the sanctioned individuals were major shareholders.

37. Knaster and Eisler's close financial ties with sanctioned individuals and assets made obtaining PIPE financing practically impossible, because any financial institution would be wary of commingling funds with Knaster's or Eisler's funds, due to their association with sanctioned individuals and assets.

38. At no point did Defendants disclose to Textor any difficulties that Knaster, Eisler, or ISAC were encountering with obtaining financing, or even securing an investment bank sponsor (underwriter) for the De-SPAC transaction, as a result of their ties to sanctioned individuals and assets, nor did they raise with him the possibility that there would be an issue obtaining PIPE financing. On the contrary, Defendants falsely represented to Textor that they were having no difficulties conducting business with respected financial institutions and no trouble obtaining financing.

39. Defendants knew these representations to be untrue or were reckless as to the truth of the representations, given Defendant Knaster and Eisler's close financial ties to sanctioned individuals as described above.

40. Plaintiff was not aware of the extent of Knaster's or Eisler's ties with sanctioned individuals and assets at the time he agreed to the Put Option Agreement, nor was he aware of any difficulties Knaster or Eisler were having obtaining financing for their SPAC.

41. Had Plaintiff been aware of the extent of Knaster's or Eisler's close financial ties with sanctioned Russian individuals, and the difficulties that those ties caused Knaster and Eisler (and entities such as ISAC) in conducting business with respected financial institutions, or obtaining financing for the SPAC, he would have realized that the De-SPAC Transaction was highly unlikely to occur, and for that reason he would not have agreed to sell the put option for £1.

42. Defendants intended that Textor should act in reliance on their false representations by executing the Put Option Agreement and the Share Charge Agreement, and Textor did so rely on Defendants' false representations in executing those agreements.

43. Indeed, Textor was also informed by underwriters at UBS, which had recently acquired Credit Suisse (originally the investment bank underwriter of the ISEI SPAC) that they were unwilling to be involved, and put its name on, a De-SPAC transaction connected to Defendant Knaster. UBS also stated its belief that no other leading investment bank would be likely to do so, especially since no major financial institution would be likely to invest in ISAC.

44. When Textor raised concerns about the inability to secure the support of an investment bank underwriter, or to obtain PIPE financing with ISEI, ISEI, through its agents, continued to misrepresent its ability to obtain financing by stating that the De-SPAC Transaction was pre-approved, and by denying that either market conditions or Knaster's ties with sanctioned Russian individuals posed an issue for obtaining financing. ISEI's representative went so far as to refer to a senior banker at UBS as a "rogue banker" that was misinformed, though Textor was then hearing of this problem from several different sources within UBS. ISEI also, even after Textor

10

raised the concern about Knaster's close ties with sanctioned Russian individuals, still failed to disclose that Eisler also had those same ties.

45. ISEI did not exercise the De-SPAC Option and could never have exercised the De-SPAC Option, because it lacked the necessary PIPE financing.

46. Thus, Defendants committed fraud in connection with the Put Option Agreement, by failing to disclose the material fact of the extent to which Defendant Knaster or Eisler and/or their assets were closely associated with sanctioned Russian individuals and/or assets, and the effect that association had on ISAC's ability to obtain financing. If Textor had known that information, he would have been able to properly assess the risk that the De-SPAC process outlined in the Put Option Agreement would not be completed, and he would not have sold a put option that would require him to buy the Iconic Shares plus 11% annual interest for £1.

47. In seeking and negotiating the Put Option Agreement, then, Defendants were engaging in a scheme that, by purposefully withholding material information from Textor, and by fraudulently misrepresenting, inter alia, their ability to obtain PIPE financing, would result in Defendants obtaining either a guaranteed return on their investment of 11% annual interest directly from Textor, or rights in Textor's shares in Eagle, all in consideration for a mere £1.

## COUNT I

**Violations of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 Promulgated Thereunder Against All Defendants**

48. Plaintiff realleges and incorporates the allegations set forth above in paragraphs 1-47 as though fully set forth herein.

49. This Count is asserted against all Defendants and is based upon Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC").

50. Based on the allegations set forth above, the Put Option Agreement is a security within the meaning of the Exchange Act. 15 U.S.C. § 78c(10).

51. Defendants engaged in a plan, scheme, conspiracy, and course of conduct, pursuant to which they knowingly or recklessly made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, in connection with the purchase of a security, specifically the Put Option Agreement.

52. Pursuant to the above plan, scheme, conspiracy, and course of conduct, each of the Defendants participated directly or indirectly in the negotiations and discussions regarding the Put Option Agreement, presenting the false narrative that its purpose was to insure against Textor taking or not taking certain actions that would prevent the De-SPAC Transaction from being completed, and omitting the material information that because of the close connection between sanctioned Russian individuals and assets and Defendant Knaster and Eisler and their assets, the De-SPAC Transaction arranged by Defendants was likely never going to be completed, making the Put Option Agreement an insurance policy against the occurrence of something that was certain to occur.

53. Defendant Knaster, and by virtue of his partnership with Knaster and Eisler, Defendant Dinan, had knowledge of the source of Knaster's and Eisler's funds and the problems that would cause in securing PIPE financing for the De-SPAC Transaction, yet did not disclose this information to Textor, all in order to induce Textor to sell the $75 million put option for only £1.

54. At the time that Defendants purchased the put option from Textor by signing the Put Option Agreement, the true value of the put option—which in essence entitled ISEI to a

guaranteed 11% annual interest rate on an investment of $75 million with no downside risk—was substantially higher than the price paid by Defendants, due to the near certainty that the De-SPAC Transaction would not be completed.

55. Defendants' fraudulent conduct has caused Textor economic loss in that he was defrauded into selling the put option for substantially less than its true market value.

56. By reason of the conduct alleged herein, Defendants, knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

57. Textor is entitled to recission of the Put Option Agreement pursuant to 15 U.S.C. § 78cc(b), which states that every contract made in violation of the Exchange Act, or any rule or regulation promulgated thereunder, shall be void.

58. Additionally, Textor is entitled to recission of the Share Charge Agreement, because if the Put Option Agreement is void, the "Secured Obligations" for which the Share Charge agreement seeks to provide security cease to exist.

## COUNT II

**Violations of Florida Securities Law, Chapter 517.301 of the Florida Statutes, Against All Defendants**

59. Plaintiff realleges and incorporates the allegations set forth above in paragraphs 1-47 as though fully set forth herein.

60. The Put Option Agreement is also a security within the meaning of Florida Securities Law. Fla. Stat. § 517.021(25)(t).

61. As described above, Defendants employed a "device scheme, or artifice to defraud" in connection with the "purchase of any investment or security" in violation of Fla. Stat. § 517.301(1)(a)(1).

13

62. As described above, Defendants obtained property, to wit, the put option, by means of an "untrue statement of a material fact or [an] omission to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading" in violation of Fla. Stat. § 517.301(1)(a)(2).

63. Fla. Stat. § 517.211(2) provides that any person purchasing a security in violation of § 517.301, and every director, officer, partner, or agent for the purchaser if they have personally participated or aided in making the purchase, is jointly and severally liable to the person selling the security to such person in an action for recission, if the transaction has not been consummated.

64. Textor has not purchased the Iconic Shares, so pursuant to this statute he is entitled to recission of the Put Option Agreement.

65. Additionally, Textor is entitled to recission of the Share Charge Agreement, because if the Put Option Agreement is void, the "Secured Obligations" for which the Share Charge agreement seeks to provide security cease to exist.

## COUNT III

### Fraudulent Misrepresentation / Deceit under English Law
### (Plaintiff v. all Defendants)

66. Plaintiff realleges and incorporates the allegations set forth above in paragraphs 1-47 as though fully set forth herein.

67. The Put Option Agreement has a choice of law provision specifying that claims related to that agreement would be adjudicated under the laws of England.

68. As described above, Defendants Dinan and Knaster falsely represented to Textor that: (a) they had no, and would not have, difficulties obtaining the PIPE financing that was a necessary precondition for the De-SPAC Transaction to occur; (b) the Put Option Agreement was an "insurance policy" for them against the possibility, which Defendants further represented to

Textor was highly unlikely, that the De-SPAC Transaction would not occur; and (c) as the CEO of Eagle, Textor was the single person with the most control over whether the De-SPAC Transaction would occur following ISEI's investment in Eagle.

69. The false representations made to Textor by ISEI were made by Defendant Dinan, in his capacity as Manager of ISEI.

70. Defendants knew the representations to be untrue or were reckless as to the truth of the representations because they were aware that Defendant Knaster, as well as another major investor in ISAC, Edward Eisler, had close financial ties with Russian individuals who, since at least the fall of 2022 were and are subject to severe sanctions imposed by, among others, the United States, the United Kingdom, and the European Union, which would have, and did, prevent Defendants from obtaining the necessary PIPE financing referred to above.

71. Defendants intended that Textor should act in reliance on the false representations by executing the Put Option Agreement and the Share Charge Agreement.

72. Textor did act in reliance on the false representations by executing the agreements described at paragraph 74, above.

73. Defendants have caused Textor to suffer loss as their fraudulent misrepresentations induced Textor into selling Iconic a put option for far less than it was worth, by deceiving Textor about Defendants' ability to take Textor's company, Eagle, public through the De-SPAC Transaction.

74. Accordingly, Plaintiff is entitled to recission of the Put Option Agreement and the Share Charge Agreement, and/or damages.

\* \* \*

**WHEREFORE**, Plaintiff requests the following relief:

a. Recission of the Put Option Agreement and Share Charge Agreement;

b. Actual damages;

c. Compensatory damages;

d. Punitive damages;

e. Pre-judgment interest;

f. Post-judgment interest;

g. Reasonable Attorney's Fees; and

h. Such other relief as this Court deems just and proper.

Dated: July 11, 2025

        Respectfully Submitted,

/s/ *Tamara Van Heel*
Tamara Van Heel
Florida Bar No. 107104
TVanHeel@wiggin.com
Wiggin and Dana, LLP
251 Royal Palm Way, Ste. 601
Palm Beach, FL 33480
Telephone: (561) 701-8706

Paul Tuchmann (admitted PHV)
PTuchmann@wiggin.com
Wiggin and Dana, LLP
One Century Tower
265 Church Street
New Haven, CT 06510

Nathan Denning (admitted PHV)
NDenning@wiggin.com
Wiggin and Dana, LLP
437 Madison Avenue
35th Floor
New York, NY 10022

Daniel Passeser (admitted PHV)
DPasseser@wiggin.com
Wiggin and Dana, LLP
One Century Tower
265 Church Street
New Haven, CT 06510

Attorneys for Plaintiff John Textor