**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 25-14239-CIV-CANNON**

JOHN TEXTOR,

      Plaintiff,

v.

ICONIC SPORTS EAGLE INVESTMENT
LLC, JAMES G. DINAN and ALEXANDER
KNASTER,

      Defendants.

_____/


## EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

# <u>TABLE OF CONTENTS</u>

Notice of Emergency Motion for a Temporary Restraining Order and Preliminary
Injunction ................................................................................................................. 1

Memorandum of Law In Support of Emergency Motion for Temporary Restraining Order
and Preliminary Injunction ...................................................................................... 5

   I.    Introduction .................................................................................................. 5

   II.   Statement of Facts ........................................................................................ 6

   III.  Legal Standard ........................................................................................... 10

   IV.  Argument .................................................................................................... 11

      A.   Textor has a Substantial Likelihood of Success on the Merits ..................... 11

      B.   Textor Will Suffer Irreparable Harm If the TRO and Injunction Are Not
          Granted ...................................................................................................... 15

      C.   Removing Eagle's Founder and CEO in a Disorderly Fashion Easily Outweighs
          Any Potential Minor Harm to Defendants That Could Result From Maintaining
          the Status Quo ............................................................................................ 18

      D.   The Injuction Is in the Public Interest ......................................................... 19

      E.   A Bond Pursuant to Rule 65 Should Be Set at Zero Dollars ......................... 19

   V.    Conclusion.................................................................................................. 20

## NOTICE OF EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Soon after Plaintiff John Textor ("Plaintiff" or "Textor") filed his Complaint in this matter on July 4, 2025, Defendants sent at least two letters to the Board of Directors (the "Board") of Plaintiff's company, Eagle Football Holdings Limited ("Eagle"), purporting to take immediate control of Eagle solely by virtue of the same fraudulent contracts Defendants induced Plaintiff to sign and which are the subject of this lawsuit. In particular, Defendants cited the parties' disagreement over whether Defendants are entitled to payment under the at-issue contracts—a fundamentally legal dispute about the payment of money—as a basis to claim what would be, in effect, an immediate, out-of-court foreclosure on Plaintiff's controlling shareholdings in Eagle pursuant to the fraudulently obtained Share Charge Agreement (as defined below) and, as a result of the purported foreclosure, expropriation from Plaintiff of his authority as majority shareholder.

Pursuant to this new strategy, Defendants are now asserting for the first time ever that they, not Plaintiff, are the controlling shareholders in Eagle. In this purported capacity, Defendants are demanding that the Board immediately remove all members who had been appointed by Plaintiff and are threatening legal action against the Board if it fails to comply. Given that Defendants were just days ago taking the position that Plaintiff was required to repurchase their shares, which would have left them with *no interest whatsoever* in Eagle, it is apparent that this dramatic about-face is nothing more than an attempt to create leverage in the parties' dispute over the monetary payments, and not a genuine claim that Defendants really are (or even ultimately seek to be) controlling shareholders in Eagle. Nevertheless, if the Board accedes to Defendants' pressure campaign of aggressive and unlawful demands, which it may feel forced to do at any time, the damage to Eagle, to Plaintiff, to Eagle's other shareholders, and to the millions of fans worldwide who root for Eagle-controlled teams would be drastic and irreparable.

1

Accordingly, for the reasons set forth herein, on July 22, 2025, or as soon as the matter may be heard in the United States District Court for the Southern District of Florida, Plaintiff moves this Court for a preliminary injunction and temporary restraining order against Defendants ICONIC SPORTS EAGLE INVESTMENT ("ISEI"), JAMES DINAN ("Dinan"), and ALEXANDER KNASTER ("Knaster") pursuant to Federal Rule of Civil Procedure 65, requiring and enjoining Defendants and all those acting at their direction or in concert with them, to do and refrain from the acts set forth in the accompanying proposed order (the "Proposed Order")— namely, ordering Defendants to:

1. Cease and refrain from representing that they have any, or purporting to or otherwise attempting to exercise any, rights over Textor's shares in Eagle (including, but not limited to, all shares in Eagle that Defendants claim to have foreclosed on or otherwise transferred away from Textor in any manner, collectively, the "Textor Shares") pursuant to the Put Option Agreement dated November 16, 2022, by and between Textor and ISEI (the "Put Option Agreement"), or the Share Charge Agreement, dated December 8, 2022, by and between Textor and ISEI (the "Share Charge Agreement" and, together with the Put Option Agreement, the "Fraudulently Obtained Agreements"); and

2. Not take or permit any action or inaction intended to, or which could reasonably be expected to, interfere with Textor's exercise of control (including, but not limited to, exclusive voting control) over the Textor Shares.

This motion is made on the grounds that: (1) Textor has a substantial likelihood of success on the merits of his claims; (2) absent a preliminary injunction and temporary restraining order, Textor and other innocent third parties are likely to suffer irreparable harm; (3) the balance of equities tips in Textor's favor; and (4) the public interest would not be harmed, and in fact would

be served, by an injunction. This motion is based upon: the Amended Complaint; this Notice of Motion and the accompanying Memorandum of Law; the Affidavit of John Textor and the exhibit attached thereto; all matters with respect to which this Court may take judicial notice; such oral and documentary evidence as may be presented to the Court; and the Proposed Order.

Pursuant to Southern District of Florida Local Rule 7.1(d), this is an emergency motion, a ruling on which is needed as soon as possible, because Defendants have already purported to obtain the right to control Eagle using the Fraudulently Obtained Agreements and are actively and aggressively pressuring the Board to reconstitute itself and remove all directors appointed by Plaintiff. Defendants have gone so far as to advise the Board members to seek independent legal counsel to advise them of their obligation to follow Defendants' directive.

If the Board acquiesces to Defendants' demands, which Defendants have instructed the Board to do immediately, and which the Board may feel pressured to do at any moment, Plaintiff will effectively lose control of his company on at least a temporary basis—a harm which cannot later be remedied at law. *See Head Kandy, LLC v. McNeill*, No. 23-CV-60345, 2024 WL 1528810, at *1 (S.D. Fla. Apr. 9, 2024) ("Bona fide emergencies involve . . . the immediate, threatened loss of an entire business . . . .") (quoting *Companhia Energetica Potiguar v. Caterpillar Inc.*, No. 14-CV-24277, 2016 WL 7469993, at *3 (S.D. Fla. Apr. 13, 2016)). If Defendants succeed in forcing the Board to follow Defendants' unlawful instructions within the next seven days, which could easily occur, Plaintiff would effectively lose control of Eagle based solely on purported rights under contracts that Defendants obtained through fraud. Even though a court will likely find such a change of control was achieved through improper means, Defendants' reckless change of control would have already had a material adverse effect on Eagle and its business that would be irreparable, including as a result of default on indebtedness, breaches of contract resulting from

3

the failure to obtain necessary consents, loss of talented officers and employees, potential adverse action in the various leagues in which Eagle's football teams operate, destruction of reputation and goodwill value, derailment of a planned Initial Public Offering, and other harms further described below.

If the Board acquiesces to Defendants' demands prior to the Court's decision on this motion, which seeks an injunction preventing Defendants from interfering with Textor's control over the Textor Shares, the motion would become moot because then even a successful motion would not return to him the same company from which he was ejected. As discussed in the memorandum of law, Textor's loss of control over the company he founded, even if temporary, would cause irreparable harm.

## MEMORANDUM OF LAW IN SUPPORT OF EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

### I.   INTRODUCTION

Emergency relief is necessary to prevent irreparable harm arising from Defendants' attempts to use the Fraudulently Obtained Agreements that are the subject of this case to unilaterally effect a change of control over Plaintiff's company, Eagle. The issue in this case is whether Defendants fraudulently obtained certain rights with respect to Plaintiff's interest in Eagle. Instead of litigating this issue on the merits, Defendants—who have not yet responded to the Amended Complaint and who have brought their own litigation in England seeking to compel Textor to buy out their position in Eagle, to which Plaintiff has not yet been required to respond— are now asserting to Eagle's Board that they "control" the entirety of Plaintiff's majority stake in Eagle. The Court may wonder why, in the English action, ISEI is suing to force Textor *out of its position* in Eagle while, at the same time, claiming to control Textor's shares and *be the majority owner of* Eagle. The obvious conclusion is that Defendants do not actually want to control Textor's shares, but are instead attempting to create leverage to force Textor to buy out their shares—essentially threatening irreparable harm to Textor if he does not settle the English case on their terms.

On the basis that they now control a majority stake in Eagle, Defendants have "directed" the Board of Eagle to register a transfer of stock from Plaintiff to ISEI "as soon as reasonably practical" and to remove all board members appointed by Plaintiff. Absent an immediate Order preserving the status quo—where Plaintiff retains and controls a majority stake in Eagle, while Defendants retain and control their minority shares—Defendants would effectively be able to steal Plaintiff's majority interest in Eagle (and, by extension, effect a change of control in Eagle) *before* this Court has any opportunity to address the merits of Plaintiff's claims. These are precisely the

5

circumstances for which temporary emergency relief is both necessary and appropriate. The requested temporary restraining order ("TRO") and preliminary injunction seek only to preserve the status quo as it has existed since the formation of Eagle in 2022 through July 15, 2025, before Defendants engaged in self-help in lieu of litigating the pending lawsuits on the merits.

## II.   STATEMENT OF FACTS[1]

In the fall of 2022, ISEI invested $75 million in Eagle, and in exchange, ISEI received a minority shareholding interest in Eagle. (Textor Aff. ¶ 6.) This investment was premised on an agreement between the parties to take Eagle public. (*Id.* ¶¶ 5-6.) At the time, Defendants controlled a Special Purpose Acquisition Company ("SPAC"), Iconic Sports Acquisition Corp. ("ISAC"). (*Id.* ¶ 6.) A SPAC is a publicly traded company formed for the sole purpose of acquiring or merging with a private company in order to take the private company public. A SPAC is an alternative to an Initial Public Offering ("IPO") as a method for taking a privately held company public, and a SPAC offers a privately held company a faster path to public trading with lower transaction costs than a traditional IPO. (*See* Am. Compl. ¶ 19 (verified by Textor Aff. ¶ 2).)

Defendants agreed to use ISAC to take Eagle public via a merger, known as a "De-SPAC Transaction." (Textor Aff. ¶ 6.) If the company went public, ISEI would be able to sell its shares in Eagle on a publicly traded exchange. But ISEI also induced Textor, through false statements made by Defendant Dinan, which were echoed by Knaster, an investor in and board member of ISAC, to personally sell ISEI an insurance policy—the Put Option Agreement—for the price of 1£. (Am. Compl. ¶ 23.) As set forth in the Put Option Agreement, if the De-SPAC Transaction did not occur by a certain date, ISEI could exercise a put option to require Textor to purchase all of

---

[1] The facts in this section are drawn from the First Amended Complaint (Docket No. 20) (the "Amended Complaint"), which was verified by the Affidavit of Plaintiff John Textor (the "Textor Aff."), as well as other facts sworn to in that affidavit, and in the letter from ISEI to the Board of Eagle, annexed to the Textor Aff. as Exhibit 1.

ISEI's shares in Eagle at the original investment price, plus interest (the "Put Option").[2] (*Id.* ¶ 6.) Defendants told Textor, falsely, that the chances of the De-SPAC Transaction not occurring were very low—representations that were false because Defendants did not disclose the extent of their ties to sanctioned Russian individuals and assets, as described further below. Defendants also misrepresented to Textor, in sum and substance, that he would be in control over whether or not the De-SPAC Transaction occurred. (Am. Compl. ¶¶ 25-26, Textor Aff ¶ 7.) In light of these representations, Textor believed that the De-SPAC Transaction would occur, and the Put Option would never be exercised. (Am. Compl. ¶ 26.) He therefore agreed to sell Defendants the Put Option for 1£. (*Id.*) He also believed, based on Defendants' same misrepresentations, that the De-SPAC Transaction would occur when he agreed to the Share Charge Agreement, dated December 8, 2022, which provided that if ISEI exercised the Put Option, but Textor did not repurchase its shares, then ISEI would obtain certain rights in Textor's shares in Eagle, including Textor's power of attorney for certain purposes related to those shares. (Textor Aff. ¶ 10, Am. Compl. ¶¶ 30-33.)

What Defendants did not tell Textor, was that they knew, or at the very least recklessly should have known, that the De-SPAC Transaction was extremely unlikely to ever occur. (Am. Compl. ¶ 35.) Two of the major investors in ISAC, the publicly traded company that would merge with Eagle to take Eagle public, were Knaster and Edward Eisler ("Eisler"). (*Id.*) Both of those individuals had deep financial ties to Russian nationals, including Mikhail Fridman, Peter Aven, German Khan, and Alexey Kuzmichev. (*Id.* ¶¶ 35-36.) After Defendants created ISAC using money from Knaster and Eisler, but, critically, ***before*** they negotiated the Fraudulently Obtained Agreements with Textor and represented that they controlled a viable SPAC that could take Eagle

---

[2] The right to exercise the Put Option is contingent upon certain conditions being met and ISEI following the required procedure under the Put Option Agreement. Whether the option was properly invoked is at issue in the English case.

public, Russia invaded Ukraine, leading to international sanctions against all the above-named Russian individuals and assets associated with them. (*Id.*)

The sanctions essentially rendered the SPAC unviable. (Am. Compl. ¶¶ 37-40.) One of the necessary preconditions for a De-SPAC Transaction to occur is having in place Private Investment in Public Equity ("PIPE") financing. (*Id.* ¶ 34.) Unlike shares in other companies, shares in a SPAC come with the right to sell the shares back to the SPAC for the purchase price if the shareholder does not approve of the company being acquired. PIPE financing is necessary to have in place so that even if some or all shareholders redeem their shares, the SPAC will still have sufficient funds to close the transaction. (*Id.*) Knaster's and Eisler's close financial ties with sanctioned individuals and assets made obtaining PIPE financing practically impossible, because no respected financial institution would be willing to commingle its funds with Knaster's or Eisler's funds. (*Id.* ¶ 37.) To do so would be to commingle its funds with funds associated with sanctioned Russian individuals—a risk no respected financial institution would take. (*Id.*)

Prior to and even after the Fraudulently Obtained Agreements were executed, Defendants never disclosed the depth of their economic ties to sanctioned individuals and assets, nor did they disclose that they were having any problems obtaining financing. (*Id.* ¶ 38.) To the contrary, Defendants knowingly misrepresented that they were having no difficulties conducting business with respected financial institutions or obtaining financing. (*Id.*) Had Plaintiff been aware of the extent of Knaster's or Eisler's close financial ties with sanctioned Russian individuals, and the difficulties those ties caused Knaster and Eisler (and entities in which they invested such as ISAC) in obtaining financing for the SPAC, he would have realized that the De-SPAC Transaction was highly unlikely to occur, and for that reason he would not have agreed to sell the Put Option for £1. (*Id.* ¶¶ 40-41.)

Predictably, given Knaster's and Eisler's ties, ISAC was unable to obtain PIPE financing, and the SPAC failed. (*Id.* ¶ 45.) ISEI purports to have exercised the Put Option. Textor has not purchased ISEI's shares in Eagle, and ISEI has now purported to exercise certain rights in the Share Charge Agreement. (*Id.* ¶ 29, 33.) On June 25, 2025, ISEI sent Textor a letter stating that it would be seeking specific performance of the Put Option Agreement and intended to complete the sale of ISEI's shares in Eagle to Textor on July 2, 2025. (Textor Aff. ¶ 11.) On June 30, Textor responded by asking several questions challenging the basis of ISEI's claim that it had the right to seek specific performance. (*Id.*)

Rather than respond to those questions, on July 3, 2025, ISEI filed a claim in the courts of England, seeking to force Textor to purchase ISEI's shares in Eagle pursuant to the Put Option Agreement. (*Id.*) On July 4, 2025, Plaintiff filed the Complaint in this case, seeking rescission of the Fraudulently Obtained Agreements based on securities fraud and fraudulent misrepresentations.[3] For the reasons set forth above and in the Amended Complaint, Textor was defrauded into entering into the Fraudulently Obtained Agreements, and he therefore seeks rescission of the Fraudulently Obtained Agreements.

Not content to litigate this issue on the merits, on July 15, 2025, ISEI sent a letter to the Eagle's Board, stating that ISEI had transferred Textor's shares in Eagle to itself by executing a stock transfer form using Textor's power of attorney, which it claims was granted to ISEI under the Share Charge Agreement in the event of a default by Textor on his obligation to purchase ISEI's shares in Eagle. (Textor Aff. ¶ 12; ISEI Letter, annexed to the Textor Aff. as Exhibit 1, at 2.) In effect, after learning that Textor had filed a lawsuit seeking rescission of the Fraudulently

---

[3] On July 11, 2025, the Court dismissed the complaint as a shotgun pleading, without prejudice to Plaintiff filing an amended complaint. That same day, Plaintiff timely filed an Amended Complaint in accordance with the Court's instructions.

Obtained Agreements, ISEI attempted to use the rights it purports to have under those Agreements to take over Eagle, before this Court can render a decision on Plaintiff's claim for rescission. The Board could act on Defendants' demand to remove all of the directors appointed by Textor at any time, and ISEI has told them they have a fiduciary obligation to do so immediately and advised the Board members to seek independent legal counsel. (Textor Aff. ¶¶ 23-24.) Because Textor will be irreparably harmed if the Board follows Defendants' instructions, Plaintiff seeks a TRO and a preliminary injunction to stop them from purporting to exercise any rights in Textor's shares.

## III.   LEGAL STANDARD

"Pursuant to Federal Rule of Civil Procedure 65(b), the Court may enter a preliminary injunction or a temporary restraining order ("TRO")." *Bonilla v. Librati*, 21-cv-21588 (KMM), 2021 WL 2580552, at *2 (S.D. Fla. Apr. 26, 2021). In order to obtain a TRO, a party must demonstrate: "(1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered if the relief is not granted; (3) that the threatened injury outweighs the harm the relief would inflict on the non-movant; and (4) that entry of the relief would serve the public interest." *Schiavo ex. rel. Schindler v. Schiavo*, 403 F.3d 1223, 1225–26 (11th Cir. 2005) (citation omitted). This mirrors the standard for a preliminary injunction, for which the movant must demonstrate that: "(1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Iksa Exim, Inc. v. Allouche*, 20-cv-23159 (AMC), 2022 WL 457842, at *2 (S.D. Fla. Jan. 18, 2022) (citing *Wreal, LLC v. Amazon.Com, Inc.*, 840 F.3d 1244, 1247 (11th Cir. 2016)). "A substantial likelihood of success on the merits requires a showing of only likely or probable, rather than certain, success." *Schiavo*, 403 F.3d at 1232.

"To support a preliminary injunction, a district court need not find that the evidence positively guarantees a final verdict in a plaintiff's favor." *Alston v. www.calculator.com*, 476 F. Supp. 3d 1295, 1317 (S.D. Fla. 2020) (quoting *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 985 (11th Cir. 1995)). "Rather, the court must determine whether the evidence establishes each of the four prerequisites." *Id.* (quoting *Developers Sur. & Indem. Co. v. Bi-Tech Const., Inc.*, 964 F. Supp. 2d 1304, 1308-09 (S.D. Fla. 2013)). In so doing, the court "may rely on affidavits and hearsay materials which would not be admissible evidence for a permanent injunction, if the evidence is appropriate given the character and objectives of the injunctive proceeding." *Id.* "When considering a motion for preliminary injunction, a district court may assess the relative strength and persuasiveness of the evidence presented by the parties," but "is not required to resolve factual disputes in favor of the non-moving party." *Id.* at 1317-18.

## IV.    ARGUMENT

### A.  TEXTOR HAS A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS

What Defendants did was akin to purchasing a home insurance policy on a house that was currently on fire, while telling the insurance company that the house was in perfect condition. Defendants knew, or recklessly should have known, and concealed from Textor, that they could not obtain an underwriter or PIPE financing for their SPAC, which doomed any chance of taking Eagle public, yet induced him to agree to the Fraudulently Obtained Agreements on the premise that the SPAC was healthy and the contingency of the Put Option was unlikely to ever be triggered. This is a straightforward case of securities fraud. Rule 10b-5, codified at 17 C.F.R. § 240.10b-5, makes it unlawful to "omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security." The Rule was promulgated under the 1934 Securities

11

Exchange Act. *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 728 (1975).[4] The Supreme

Court has held that Rule 10b-5 creates a private right of action. *Id.* at 730.

To plead securities fraud in violation of Section 10(b), a plaintiff must sufficiently allege

the following elements: "(1) a material misrepresentation or omission; (2) made with scienter; (3)

a connection with the purchase or sale of a security; (4) reliance on the misstatement or omission;

(5) economic loss; and (6) a causal connection between the material misrepresentation or omission

and the loss." *Brophy v. Jiangbo Pharms., Inc.*, 781 F.3d 1296, 1301-02 (11th Cir. 2015) (internal

citation and quotation marks omitted).

As for the first two elements, Defendants each made material misrepresentations to Textor

prior to the execution of the Fraudulently Obtained Agreements, including: (1) that ISAC was a

viable SPAC that could take Eagle public; and (2) that they would have no trouble obtaining

financing for the De-SPAC Transaction, so the likelihood that the De-SPAC Transaction would

go forward or not was dependent upon Textor. (Textor Aff. ¶¶ 7-8; *see also* Am. Compl. ¶ 68.)

They also omitted to tell Textor that two of the investors in the SPAC, Knaster and Eisler, had

significant financial ties to sanctioned Russian individuals and assets, which was material because

it would have alerted Textor to the likelihood that the SPAC would be unable to get financing.

---

[4] Although both the Fraudulently Obtained Agreements contain a forum selection clause specifying the courts of England as the exclusive forum for resolving disputes about those agreements, actions under the 1934 Securities Exchange Act or rules and regulations promulgated thereunder can only be brought in United States federal court. 15 U.S.C. § 78aa(a); *see also Seafarers Pension Plan v. Bradway*, 23 F.4th 714, 717 (7th Cir. 2022) (en banc) (holding that a shareholder derivative securities fraud case under the Exchange Act could be brought in federal court even though a company bylaw required shareholder derivative suits to be brought in Delaware Chancery Court, because the Exchange Act "gives federal courts exclusive jurisdiction over actions under it [and] applying the bylaw to this case would mean that plaintiff's derivative Section 14(a) action may not be heard in any forum"). The Exchange Act further provides that "[a]ny condition, stipulation, or provision binding any person to waive compliance with any provision of this chapter or of any rule or regulation thereunder . . . shall be void." 15 U.S.C. § 78cc(a).

With respect to scienter, Defendants were aware of their own trouble securing financing, and were certainly aware of their own SPAC's ties to sanctioned Russian individuals. Nevertheless, they chose not to disclose that information to Textor, in order to induce him to sign the Fraudulently Obtained Agreements, which gave them a guarantee that when the SPAC failed, they would nonetheless reap a substantial return on their "investment."

As to the third element, a stock is a security within the meaning of the Securities Exchange Act of 1934, 15 U.S.C. § 78c(10) (defining "security" to include "any stock"). A put option on a stock is also a security. *Id.* (defining "security" to include "any put, call, straddle, option, or privilege on any security"). The Put Option Agreement is, unsurprisingly, a put option, even though it can only be invoked under certain circumstances. The Second Circuit and the Ninth Circuit have both held that the "attachment of a contingency to a contractual right to receive stock" does not "remove that right from securities law coverage simply because it increases the risk that the plaintiff will not obtain the shares." *Griggs v. Pace Amer. Grp., Inc.*, 170 F.3d 877, 880 (9th Cir. 1999) (citing *Yoder v. Orthomolecular Nutrition Inst., Inc.*, 751 F.2d 555, 559 n.4 (2d Cir. 1985)). The Share Charge Agreement is similarly a security, as it, among other things, creates an interest in the Textor Shares and provides for a contingent "privilege" (subject to conditions that have not been satisfied) to effectively call the Textor Shares as nominee and with respect to their voting rights. § 78c(10) (defining "security" to include a "privilege on any security").

Additionally, Eagle's shares are covered by Rule 10b of the 1934 Securities Exchange Act notwithstanding that Eagle is a privately held company whose shares are not traded on any public exchange. Rule 10b applies to purchases and sales of private securities, so long as the security is traded within the United States. (Am. Compl. ¶ 3); *Morrison v. Nat'l. Australia Bank Ltd.*, 561 U.S. 247, 268 (2010). The Eleventh Circuit determines whether a sale occurred in the United States

by looking at where title to the security is transferred, *i.e.*, where the transaction is consummated. *Quail Cruises Ship Mgmt. Ltd. v. Agencia de Viagens CVC Tur Limitada*, 645 F.3d 1307, 1310-11 (11th Cir. 2011). In *Quail Cruises*, the court held that plaintiff met his burden because he alleged that the parties submitted the stock transfer documents by express courier into Miami. *Id.* at 1310. Here, Textor and Dinan were both physically present in the Southern District of Florida when they negotiated and executed the Fraudulently Obtained Agreements. (Am. Compl. ¶ 5, 8, 11.)

The fourth element, reliance, is met as well. As alleged in the Amended Complaint and verified by Textor in his affidavit, had Plaintiff known of Knaster's or Eisler's close ties with sanctioned Russian individuals and assets, and the difficulties that those ties caused ISAC in obtaining financing for the SPAC, "he would have realized that the De-SPAC Transaction was highly unlikely to occur, and for that reason he would not have agreed to sell the Put Option for £1." (Am. Compl. ¶ 41.)

As to economic loss, this case is the mirror image of the quintessential securities fraud case. In the majority of securities frauds, the defendant is a seller of a security, and is accused of lying to inflate the security's value in order to convince a buyer to buy it at a higher price than they would have otherwise. There, the economic loss is the difference between what the plaintiff paid and what they would have paid had they known the truth. In this case, we have the reverse. The **buyer** of the Put Option lied to make the seller believe that the value of the option being sold was **lower** than it would otherwise have been. By analogy, an insurance policy that pays out $75 million but has a vanishingly small chance of doing so might be worth £1, but an insurance policy that is virtually certain to pay out the same $75 million plus interest is worth far more. Textor suffered

economic loss because he sold a security for far less than he would otherwise have sold it for had he known the truth about the viability of ISAC.[5]

The final element, causation between the misrepresentation and the economic loss, is also met. Had Defendants not misrepresented the viability of their SPAC and concealed its ties to sanctioned Russian individuals and assets, Textor would not have agreed to the Fraudulently Obtained Agreements, and therefore would not have suffered the economic loss. (Textor Aff. ¶ 9.)

## B. TEXTOR WILL SUFFER IRREPARABLE HARM IF THE TRO AND INJUNCTION ARE NOT GRANTED

"A showing of irreparable injury is the sine qua non of injunctive relief." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (internal quotation marks and citation omitted). An injury is "irreparable" only if it cannot be undone through monetary remedies. *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 896 F.2d 1283, 1285 (11th Cir. 1990). "The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Sampson v. Murray*, 415 U.S. 61, 90, 94 (1974).

If the TRO is not granted, ISEI will continue to claim to own Textor's shares in Eagle based on the Share Charge Agreement and the Put Option Agreement for which Textor is currently seeking rescission. This will allow ISEI to continue to put the Board in an untenable position of having to choose whether to follow ISEI's contested instructions, without any court order deciding whether or not ISEI has the right to issue them. Absent the relief requested, the Board may acquiesce to ISEI's instructions at any time, at which point Defendants will gain control of Eagle

---

[5] In the English case, Textor will dispute that the Fraudulently Obtained Agreements permit ISEI's actions. But Defendants should not be heard to dispute that Textor has suffered an economic loss from signing the Fraudulently Obtained Agreements while they take the position that those agreements gave Defendants the right to take all of Textor's shares in Eagle—a majority stake in a company valued at approximately $2 billion.

during the pendency of this lawsuit, despite the fact that Eagle is rightfully under Textor's control as majority shareholder and CEO. In that case, even if Textor ultimately prevails in this lawsuit, a judgment in his favor will be too late to put him back in the position he is currently in. (Textor Aff. ¶ 18.) This is because Textor would be unable to undo everything ISEI has done in the interim. *See, e.g.*, *Cooperstown Capital, LLC v. Patton*, 60 A.D.3d 1251, 1253 (N.Y. App. Div. 3d Dep't. 2009) ("An opportunity for defendants to shift the balance of power and wrest complete control over the company can constitute irreparable injury.") (collecting cases).

This is particularly true because Textor is not only the majority shareholder, chairman of the Board, Chief Executive Officer and founder of Eagle, but also the President and principal operator of the football clubs Eagle owns, and he makes all key operating and football-related decisions. (Textor Aff. ¶ 16.) Textor has developed a successful model of collaboration between Eagle's football clubs, specifically as it relates to the competitive optimization of Eagle's player rosters, resulting in the immediate resurrection of insolvent clubs to become champions of their leagues, continental champions, and more recently, achieving success in the Club World Cup with Botafogo beating Paris Saint Germain, which is widely considered to be the best club in the world. (*Id.* ¶ 14.) This victory occurred only a few years after Textor personally acquired Botafogo (soon before Eagle was formed) and lifted the club up from the Brazilian second division in 2022 to champion of Brazil and champion of South America in less than three years, increasing its revenue from $21 million to over $150 million in that period of time. (*Id.*) In France, Eagle acquired an insolvent club in 2022, and, beginning in May of 2023 when Textor took over management of the

club, it rose from the bottom of its competitive table in the French league to qualify for the esteemed UEFA/Europa League Competition in each of the last two years. (*Id.* ¶ 15.)

The Defendants have no such track record of success running large, globally-relevant football clubs. (*Id.* ¶ 17.) Thus, even after Textor ultimately regains control of Eagle, in the meantime, ISEI could irreparably damage Eagle through resulting events such as default of the debts of Eagle and its subsidiaries, breaches of various contracts at Eagle and its subsidiaries requiring change of control consents, the departure of employees recruited by or loyal to Textor (or who otherwise are uncomfortable remaining at a company undergoing a hostile takeover), destruction of reputation and goodwill value, failing to acquire certain players and coaches (or acquiring the wrong players and coaches) for the teams it controls, incurring unsustainable debt, or otherwise causing the teams to perform poorly, which could cost them fans, sponsorships, or even cause them to be relegated to less lucrative leagues. (*Id.* ¶¶ 17-18.) Under the status quo, Textor, as majority owner and CEO of Eagle, has the ability to and does direct the strategic operations of the football teams it controls. If Defendants are allowed to exercise control over his shares and remove board members he appointed, then they will be able to remove him as CEO and lead the company in a manner entirely inconsistent with Textor's successful leadership during the last two and a half years, during which time he has grown Eagle's value from $400 million to over $2 billion. (*Id.* ¶ 13.)

Removal of Eagle's founder, majority shareholder, and CEO in a disorderly transition of power will irreparably damage Eagle (and therefore Textor, its majority shareholder, as well as all of its other shareholders, of which there are more than just Iconic and Plaintiff). (*Id.* ¶ 17.) Right now, Eagle is a highly valuable company. Furthermore, Textor is currently leading Eagle's efforts to go public via an IPO. (*Id.* ¶¶ 19-21.) One of the world's most respected financial institutions,

UBS, has agreed to underwrite the IPO, and Eagle has submitted the required S-1 paperwork to the United States Securities and Exchange Commission ("SEC") and received positive feedback that the SEC has requested only relatively minor changes. (*Id.*) A material change to the ownership of Eagle, especially involving the majority shareholder who also leads the management team of Eagle, would make it impossible to complete the IPO. (*Id.* ¶ 22.)

### C. REMOVING EAGLE'S FOUNDER AND CEO IN A DISORDERLY FASHION EASILY OUTWEIGHS ANY POTENTIAL MINOR HARM TO DEFENDANTS THAT COULD RESULT FROM MAINTAINING THE STATUS QUO

A grant of the TRO/injunction will maintain the status quo. If Defendants ultimately prevail in court and the Fraudulently Obtained Agreements are found to be enforceable and to mean what Defendants say they do, then Textor's shares will still be there when the case is over. Textor is not damaging the value of those shares; rather, it is ISEI who is doing so by attempting to unlawfully remove the successful founder and leader of Eagle, the value of which is tied to Textor's continued leadership of the company. In the status quo, which the TRO would maintain, Textor has been leading Eagle in the direction of significant growth, an increasing valuation of all of Eagle's shares (including those owned by ISEI) and toward a successful IPO. Defendants will not be harmed by Textor continuing to lead Eagle into profitability.

Moreover, ISEI, through a lawsuit filed against Textor in England, is seeking specific performance of the Put Option Agreement, which would require Textor to purchase ISEI's shares. Now, without even waiting for an answer to their suit, let alone a ruling on the merits, ISEI is attempting to take Textor's shares. ISEI is simultaneously attempting to force Textor to buy their shares, so they can exit their position in Eagle, and are now also claiming Textor's shares, so they can become the majority owner of Eagle. Defendants' strategy, to force a purchase of their own shares in the English case while simultaneously claiming to own Textor's own shares, makes no sense except as a strategy to sue Mr. Textor on whatever pretext they can muster. ISEI's attempt

to take Textor's shares—prior to any determination that the contracts under which they claim authority to do so is valid—is designed to force Textor to give Defendants what they want and purchase their shares, or risk being left with no shares at all. It is not borne out of a genuine desire to have more shares in Eagle, and Defendants will not be harmed if the status quo is maintained.

### D.  THE INJUCTION IS IN THE PUBLIC INTEREST

An injunction ensures that Textor's securities fraud claims can be fully litigated, vindicating the public's interest in preventing and punishing securities fraud. *See Alpine Sec. Corp. v. Fin. Indus. Regul. Auth*., 121 F.4th 1314, 1330 (D.C. Cir. 2024), cert. denied sub nom. *Alpine Sec. Corp. v. Fin. Indus. Auth.*, No. 24-904, 2025 WL 1549780 (U.S. June 2, 2025). Indeed, it is contrary to the public interest if a party can induce another to sign contracts through fraud, and then use those contracts to obtain rights to which they are not entitled before the other party can litigate the claim of fraud. That undermines the very purpose of the statutes and regulations prohibiting securities fraud.

Additionally, Eagle's football clubs have millions of fans all over the world, all of whom would be harmed if Eagle's chaotic change in control adversely affected football operations, as it no doubt would given that Textor is currently in charge of football operations at all those clubs. (Textor Aff. ¶ 16.) By contrast, there would be no harm to the public caused by Textor continuing to control the company he founded and continuing to perform his role directing the football operations of Eagle's clubs in the way he has for more than two years.

### E.  A BOND PURSUANT TO RULE 65 SHOULD BE SET AT ZERO DOLLARS

Fed. R. Civ. P. 65(c) allows courts to "issue a preliminary injunction" but the Court must evaluate the need for a bond to pay any potential "costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The Eleventh Circuit "has stated previously, in dicta, that 'before a court may issue a preliminary injunction, a bond must be

posted.'" *BellSouth Telecommunications, Inc. v. MCIMetro Access Transmission*, 425 F.3d 964, 971 (11th Cir. 2005) (quoting *Piambino v. Bailey,* 757 F.2d 1112, 1143 (11th Cir. 1985)). But "it is well-established that 'the amount of security required by the rule is a matter within the discretion of the trial court [and] the court may elect to require no security at all.'" *Id.* (quoting *City of Atlanta v. Metro. Atlanta Rapid Transit Auth.,* 636 F.2d 1084, 1094 (5th Cir. Unit B 1981)); *Peter Brasseler Holdings, L.P. v. Gebr. Brasseler GmbH & Co. KG*, 407-cv-00025 (BAE), 2007 WL 4481521, at \*4 (S.D. Ga. Dec. 17, 2007) (setting Rule 65(c) bond of zero dollars).

If the Court maintains the status quo, then the relief sought by the Defendants in the English case, i.e., specific performance of Textor's obligation to purchase ISEI's shares in Eagle, would still be available, if Defendants are entitled to it. The requested relief does no more than temporarily prevent Defendants from exercising their purported rights under contracts, the validity of which is the subject of this action. Therefore, the bond should be set at zero dollars.

## V. CONCLUSION

For the reasons set forth above, the Court should grant Plaintiff's request for a TRO and preliminary injunction and order Defendants to:

1. Cease and refrain from representing that they have any, or purporting to or otherwise attempting to exercise any, rights over the Textor Shares pursuant to the Fraudulently Obtained Agreements; and

2. Not take or permit any action or inaction intended to, or which could reasonably be expected to, interfere with Textor's exercise of control (including, but not limited to, exclusive voting control) over the Textor Shares.

After reviewing the facts and researching applicable legal principles, I certify that this motion in fact presents a true emergency (as opposed to a matter that may need only expedited treatment) and requires an immediate ruling because the Court would not be able to provide meaningful relief to a critical, non-routine issue after the expiration of seven days. I understand that an unwarranted certification may lead to sanctions.

Dated: July 22, 2025

                                          Respectfully Submitted,

/s/ *Tamara Van Heel*
Tamara Van Heel
Florida Bar No. 107104
TVanHeel@wiggin.com
Wiggin and Dana, LLP
251 Royal Palm Way, Ste. 601
Palm Beach, FL 33480
Telephone: (561) 701-8706

Paul Tuchmann (admitted PHV)
PTuchmann@wiggin.com
Daniel Passeser (admitted PHV)
DPasseser@wiggin.com
Wiggin and Dana, LLP
One Century Tower
265 Church Street
New Haven, CT 06510

Nathan Denning (admitted PHV)
NDenning@wiggin.com
Wiggin and Dana, LLP
437 Madison Avenue, 35th Floor
New York, NY 10022

Julie Edelstein (admitted PHV)
JEdelstein@wiggin.com
Wiggin and Dana, LLP
600 Massachusetts Ave., NW, Suite 375
Washington, DC 20001

*Attorneys for Plaintiff John Textor*