**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. 25-14239-CIV-CANNON**

JOHN TEXTOR,

    Plaintiff,

v.

ICONIC SPORTS EAGLE INVESTMENT LLC, JAMES G. DINAN and ALEXANDER KNASTER,

    Defendants.

_____/

## AFFIDAVIT OF PLAINTIFF JOHN TEXTOR

I, John Textor, being duly sworn, hereby declare under penalty of perjury that the following is true and correct:

1. I am the Plaintiff in this action. I am over eighteen years of age and believe in the obligations of an oath.

2. I have reviewed the Amended Complaint filed in this action, Docket No. 20, and the allegations set forth therein are true and correct to the best of my knowledge.

3. I am the founder, majority shareholder, and Chairman and Chief Executive Officer of Eagle Football Holdings Limited. ("Eagle").

4. Eagle owns interests in various football clubs around the world, including: FC Florida in the United States; Olympique Lyonnais in Lyon, France; RWDM Brussels in Brussels, Belgium; and SAF Botafogo ("Botafogo") in Rio De Janeiro, Brazil. Eagle also owned a significant interest in the club Crystal Palace F.C. in London but is currently in the process of selling its interest in that club.

1

5. For years, my goal has been to make Eagle a publicly traded company, by which I mean make shares in the company available for purchase by the public on an exchange such as NASDAQ or the New York Stock Exchange.

6. In the fall of 2022, I negotiated a deal with the Defendants in this action to take Eagle public via a "De-SPAC transaction." The terms of that deal, set forth in a Subscription and Shareholders' Agreement, were that Defendant Iconic Sports Eagle Investment ("ISEI") invested $75 million into Eagle in exchange for approximately 15.7% of Eagle, and the parties agreed to take active steps toward taking Eagle public via a merger with an existing Special Purpose Acquisition Company ("SPAC") Defendants controlled, Iconic Sports Acquisition Corp. ("ISAC"). As part of the overall agreement by which ISEI would make its SPAC available to Eagle, I entered into the "Put Option Agreement" with defendant ISEI. The Put Option Agreement provided that, if the De-SPAC Transaction (the successful merger between Eagle and ISAC to make Eagle a publicly-traded company) did not occur, then, under certain conditions, ISEI could exercise a put option that purportedly requires me to purchase ISEI's stake in Eagle for $75 million, plus 11% annual interest.

7. I agreed to the Put Option Agreement because, based on Defendants' representations, I believed that Defendants controlled a viable SPAC that would be able to obtain the required additional Private Investment in Public Equity ("PIPE") financing that was necessary for the De-SPAC transaction to occur. Indeed, based on Defendants' representations to me regarding the viability of the SPAC and the cash already invested in the SPAC, I believed that the likelihood that the De-SPAC transaction would go forward was dependent upon me. Therefore, due to those representations, I had no reason to suspect that the merger between Eagle and ISAC would not occur.

2

8. Defendants Dinan and Knaster both represented to me on multiple occasions before I signed the Put Option Agreement that the SPAC was viable and that they would have no problems obtaining financing for it, representations which I later learned were false.

9. Had I known that ISAC was not in fact a viable SPAC, but rather one that could not obtain the required PIPE financing due to the close financial ties between certain of its investors and sanctioned Russian individuals and assets, as further set forth in the Amended Complaint, I would not have agreed to the Put Option Agreement.

10. On December 8, 2022, I entered into another agreement with ISEI known as the "Share Charge Agreement." The Share Charge Agreement provides that under certain conditions, if ISEI exercises its rights under the Put Option Agreement to require me to buy ISEI's shares in Eagle and I did not do so, I would grant ISEI a secured interest in all of my shares in Eagle. The Share Charge Agreement further provides that, under certain conditions, ISEI can declare a default, which gives it the right to exercise the powers and rights exercisable by the legal or beneficial owner of the shares (meaning me), subject to certain limitations.

11. On June 25, 2025, ISEI sent me a letter stating that it would be seeking specific performance of the Put Option Agreement and intended to complete the sale of ISEI's shares in Eagle to me on July 2nd. On June 30th, I responded, asking a number of questions challenging the basis of ISEI's claim that it had the right to seek specific performance, including on what basis ISEI claims it is entitled to require me to purchase ISEI's shares given that ISEI had not performed its obligations under the Put Option Agreement and the time period for doing so had lapsed, and on what basis ISEI remains entitled to exercise a supposedly irrevocable put option in light of its repeated indications that it is interested in participating in Eagle's Initial Public Offering. Rather than respond to those questions, on July 3, 2025, ISEI filed a claim against me in the courts of

England seeking specific performance to force me to purchase its shares in Eagle pursuant to the Put Option Agreement. While I will contest this claim, my deadline to respond to the claim has not yet arrived. I filed the original complaint in this case on July 4, 2025, seeking rescission of the Put Option and Share Charge Agreements due to Defendants' misrepresentations about the viability of their SPAC.

12.     Without even waiting for a response to their claim in the English case, let alone getting a judgment that their position is correct, and without responding to the Amended Complaint in this case, on July 15, 2025, ISEI submitted a letter to the board of directors of Eagle (the "Board"). (Exhibit 1 annexed hereto). In that letter— notwithstanding this lawsuit, which challenges the validity of the Share Charge Agreement, and the English lawsuit, which will establish that no default occurred—ISEI informed the Board that it is using rights it purports to have under the Share Charge Agreement to transfer the legal title of my shares in Eagle to ISEI. The letter also enclosed a signed stock transfer form, which ISEI executed in my name pursuant to a power of attorney it claims was granted to it under the Share Charge Agreement. ISEI further demanded that the Board register the stock transfer "as soon as reasonably practical following the date of this letter" and remove all of the directors I appointed to the Board. This puts the Board in an untenable position of having to choose whether or not to follow ISEI's contested instructions. For a variety of reasons, ISEI does not have the right to do this under the terms of any agreement.

13.     Removing me from Eagle would materially and irreversibly harm Eagle. Since acquiring interests in various football clubs beginning in 2021 and consolidating my personal interest in these clubs to form Eagle Football Holdings, I have increased the equity valuation of Eagle from $400 million, based on the value of the initial investors' investment in 2022, to more

than $2 billion, based on current estimates of our recently-obtained IPO valuation as described further below.

14. In particular, I have developed a successful model of collaboration between our football clubs, specifically as it relates to the competitive optimization of our player rosters, resulting in the immediate resurrection of insolvent clubs to become champions of their leagues, continental champions, and more recently, achieving success in the Club World Cup with Botafogo beating Paris Saint Germain, which is widely considered to be the best club in the world. This victory occurred only a few years after I personally acquired Botofogo (soon before Eagle was formed), and lifted the club up from the Brazilian second division in 2022 to become champion of Brazil and champion of South America in less than three years, increasing its revenue from $21 million to over $150 million in that period of time.

15. With respect to Olympique Lyonnais, in 2022 Eagle acquired an insolvent club and, under my management beginning in May 2023, the club rose from the bottom of its competitive table in the French league to qualify for the esteemed UEFA/Europa League Competition in each of the last two years.

16. I executed both of these projects not only as the CEO of Eagle, but also as the President and principal operator of the football club subsidiaries themselves, making all key operating and football related decisions.

17. Defendants have no similar track record of success running large, globally-relevant football clubs. If Defendants are permitted to wrest control of the company from me, as the CEO of Eagle, that change in control would harm Eagle and all of its shareholders (including me, its majority shareholder). Even putting aside my unique experience and track record of success in the industry, from my experience in business generally, any contested removal of a successful founder,

5

resulting in a disorderly transition process, would cause instability, disrupt a company's business, and harm the value of its shares.

18. If Defendants are permitted to oust me from my control of Eagle, and I later win this lawsuit and obtain a judgment stating that the contracts upon which Defendants are relying were the product of fraud and should be rescinded, it will be too late to put me, and Eagle, back in the position we are currently in. That is because even if I am able to use that judgment to regain my shares, Defendants would still have been wrongfully in control of Eagle for the time period between now and whenever I regain control. While in control, ISEI would be able to sign (or fail to sign) players, incur unsustainable debt, cause the teams in Eagle's portfolio to perform poorly, thereby causing them to lose fans and sponsors and/or be relegated to less lucrative leagues. Employees loyal to me or whom I recruited may resign. The reputation and goodwill value of Eagle and the clubs in its portfolio may be destroyed, and Eagle could be harmed in any number of other ways. The difference in value between an Eagle under my control and an Eagle under Defendants' control, even if only for a limited period of time, cannot be calculated or recovered in a subsequent suit for damages.

19. Finally, after the De-SPAC transaction failed because of ISAC's inability to obtain the necessary PIPE financing, I did not give up on taking Eagle public and instead led Eagle's ongoing efforts to go public via an Initial Public Offering ("IPO"). Those efforts are very close to coming to fruition, for the benefit of all Eagle shareholders.

20. I have taken multiple companies public through an IPO before, often from the position as leading shareholder, and I have significant recent experience in doing so successfully, even in extremely difficult market environments.

21. To successfully execute an IPO on a U.S. stock exchange, a company must obtain approval from the Securities Exchange Commission ("SEC"). As part of that approval process, Eagle submitted an S-1 form to the SEC on June 13, 2025, and received comments back from the SEC on July 10, 2025. Based on my experience with the IPO process, the SEC's comments are relatively minor and can be easily addressed. The comment letter provides a clear signal that this IPO, subject to market conditions, can be completed prior to the end of the third quarter of 2025. The IPO market is very strong right now, and Eagle's IPO is being led by UBS, one of the world's leading underwriters.

22. Based on my extensive experience taking companies public through an IPO, a material change to the ownership of Eagle, especially involving the majority shareholder who also leads the management team of Eagle, would make it impossible to complete the IPO.

23. On July 17, 2025, ISEI sent another letter to the Board, falsely stating that my allegations in this case are "baseless" and that the Board has an obligation to register the stock transfer and remove all directors I had appointed, including directors who have, within the past thirty days, made significant investments in the company. The letter further advised the board members to seek independent legal counsel to advise them on their fiduciary duties with respect to these matters.

24. At any moment, the Board could act on ISEI's demand to remove all directors appointed by me, which would effectively give ISEI control of Eagle and give them the authority to remove me as C.E.O. ISEI has demanded that the Board immediately execute its request to do so. Since ISEI sent these documents to the Board on July 15, 2025, the Board has given no indication about whether it will or will not record the transfer of shares or remove the directors I have appointed.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 20, 2025
Hobe Sound, Florida

_____
John Textor