# EXHIBIT B

*Execution Version*

DATED             16 November             2022

**THE INVESTORS**

**and**

**THE FOUNDER**

**and**

**THE COMPANY**

**and**

**BIDCO**

---

**SUBSCRIPTION AND SHAREHOLDERS' AGREEMENT**

**relating to Eagle Football Holdings Limited**

---



**DLA Piper UK LLP** is part of DLA Piper, a global law firm, operating through various separate and distinct legal entities.
A list of offices and regulatory information can be found at dlapiper.com

*Execution Version*

## Index

| Clause No. | | Page No. |
|---|---|---|
| 1. | Definitions | 1 |
| 2. | Interpretation | 10 |
| 3. | Subscriptions | 11 |
| 4. | Completion | 13 |
| 5. | Warranties | 15 |
| 6. | Limitations on Claims | 16 |
| 7. | Management Incentive Plan | 17 |
| 8. | The Board, the Founder Directors and the Investor Directors | 17 |
| 9. | Information rights | 22 |
| 10. | Matters requiring consent | 23 |
| 11. | Business undertakings | 24 |
| 12. | IPO | 24 |
| 13. | Further issue and transfer of shares | 25 |
| 14. | Confidentiality | 26 |
| 15. | De-SPAC Transaction | 28 |
| 16. | Ares Rights | 31 |
| 17. | No Effect on Lending Relationship | 33 |
| 18. | Tax Matters | 33 |
| 19. | Announcements | 34 |
| 20. | Costs and expenses | 34 |
| 21. | Effect of ceasing to hold Equity Securities | 35 |
| 22. | Cumulative remedies | 35 |
| 23. | Waiver | 35 |
| 24. | Entire agreement | 35 |
| 25. | Variation and termination | 36 |
| 26. | No partnership | 36 |
| 27. | Assignment and transfer | 37 |
| 28. | Rights of third parties | 37 |
| 29. | Conflict between agreements | 37 |
| 30. | Counterparts; No originals | 38 |
| 31. | Notices | 38 |
| 32. | Severance | 38 |
| 33. | Governing law | 39 |
| 34. | Jurisdiction | 39 |
| 35. | Confirmation by the Investors | 39 |
| 36. | Regulatory matters | 39 |

**37.  US securities laws requirements** .......................................................................39

SCHEDULE 1 ........................................................................................................41

SCHEDULE 2 ........................................................................................................45

SCHEDULE 3 ........................................................................................................47

SCHEDULE 4 ........................................................................................................48

SCHEDULE 5 ........................................................................................................49

SCHEDULE 6 ........................................................................................................53

SCHEDULE 7 ........................................................................................................56

SCHEDULE 8 ........................................................................................................58

SCHEDULE 9 ..........................................................................................................1

SCHEDULE 10 ........................................................................................................2

Schedule 11 ............................................................................................................3

Schedule 12 ............................................................................................................4

*Execution Version*

**DATE**                                    16 November                    2022

**PARTIES**

(1)     **THE PERSONS WHOSE NAMES AND ADDRESSES** are set out in part 1 of schedule 1 (the "**Investors**" and each an "**Investor**");

(2)     **THE PERSON WHOSE NAME AND ADDRESS** is set out in part 2 of schedule 1 (the "**Founder**");

(3)     **EAGLE FOOTBALL HOLDINGS LIMITED** (company number 14379286 incorporated under the laws of England and Wales) whose registered office is at 57-59 Beak Street, London, United Kingdom, United Kingdom, W1F 9SJ (the "**Company**"); and

(4)     **EAGLE FOOTBALL HOLDINGS BIDCO LIMITED** (company number 14385313 incorporated under the laws of England and Wales) whose registered office is at 57-59 Beak Street, London, United Kingdom, United Kingdom, W1F 9SJ ("**Bidco**").

**INTRODUCTION**

A.     The Company is a company limited by shares, brief particulars of which are set out in part 1 of schedule 2.

B.     Details of the legal and beneficial ownership of the share capital of the Company are set out in parts 1 and 2 of schedule 3.

C.     The Investors wish to subscribe for shares in the capital of the Company on and subject to the terms of this agreement.

D.     The Founder wishes to transfer to Bidco 39.87% of Crystal Palace Football Club via his holding of shares in the capital of Palace Holdco UK Limited (the "**Crystal Palace Equity Interests**").

E.     As at the date of this agreement, the Bidco directly holds equity interests in the following Clubs:

      a.   90% of Botafogo de Futebol e Regatas via his holding of shares in the capital of S.A.F. Botafogo (the "**Botafogo Equity Interests**"); and

      b.   80.04% of RWD Molenbeek via his holding of shares in Racing White Daring Molenbeek Future NV (the "**RWD Molenbeek Equity Interests**" and together with the Crystal Palace Equity Interests and the Botafogo Equity Interests, the "**Founder Football Club Equity Interests**").

**AGREED TERMS**

**1.     Definitions**

      In this agreement, except where a different interpretation is necessary in the context, the words and expressions set out below shall have the following meanings:

"**Act**" means the Companies Act 2006;

"**Additional Shares**" means up to 17,040 additional Ordinary Shares to be subscribed by one or more Other Equity Investors at (or more than) the Subscription Price pursuant to clause 3.6;

"**Affiliate**", in relation to:

a. a company, means any other company directly or indirectly controlling, controlled by or under common control with such company, and "**control**" for these purposes means: (i) holding the majority of the voting rights or share capital of such company; or (ii) otherwise having the power to direct the management and policies of such company; and

b. with respect to any Investor, includes any Fund, managed account or syndicate now or hereafter existing that is managed, controlled or advised (directly or indirectly) by any person which, directly or indirectly, manages, controls or advises such Investor, or by any Affiliate of such person as set out in paragraph (a) above;

"**Agreed Costs**" means the payment of costs fees and expenses set out in schedule 10;

"**Agreed-Form BCA**" has the meaning given to it in clause 15.1;

"**Ancillary Documents**" has the meaning given to it in clause 15.1;

"**Ares**" means the Investor(s) identified as such in schedule 1;

"**Ares Lender**" has the meaning given to it in clause 17.1;

"**Ares Put Option**" has the meaning given to it in clause 16.3;

"**Ares Restructure Trigger Event**" means the occurrence of any of the following:

(a) Ares being deemed by the English Premier League to hold a Significant Interest in Crystal Palace;

(b) the subscription for or holding of Equity Securities in the Company by Ares otherwise causes any Club in which it has invested to be disqualified from being able to compete in any material professional football competition (including without limitation any UEFA-regulated European competition); or

(c) Ares' being a shareholder in the Company precludes it from investing (or having any other involvement) in another Club;

"**Ares Warrant Instrument**" means the instrument to be issued by the Company in the form set forth in Schedule 11;

"**Ares Warrants**" means together the Investment Warrant and the Note Warrants;

"**Associate**" has the same meaning as set out in the New Articles;

"**Authority**" means any supra-national, national or sub-national authority, commission, department, agency, regulator, regulatory body, court, tribunal or arbitrator (including without limitation any Football Authority);

"**Board**" means the board of directors of the Company as constituted from time to time;

"**Board Consent**" means the prior written consent of more than 50 per cent. of the directors of the Board from time to time;

"**Botafogo**" means Botafogo de Futbol e Regatas;

"**Botafogo Equity Interests**" has the meaning given to it in Recital D;

"**Botafogo SPA**" means the share purchase agreement dated 11 November 2022 and entered into between the Founder and the Company respect of the transfer of the Founder's Botafogo Equity Interests to the Company;

"**Business Day**" means any day, except Saturday, Sunday or any day on which banks are generally not open for business in the United Kingdom and the United States;

"**Claim(s)**" means any claim(s) for breach of any Warranty;

"**Club**" means any professional association football club which is governed by the rules of any Football Authority;

"**Code**" means the Internal Revenue Code of 1986, as amended;

"**Completion**" means completion by the parties of their respective obligations in accordance with clauses 4.1, 4.2, 4.3 and 4.4 (*Completion*);

"**Completion Conditions**" means the conditions set out in schedule 4;

"**Completion Date**" means the date which is [5 Business Days] after the Completion Conditions are all satisfied;

"**CONMEBOL**" means the South American Football Confederation (*Confederación Sudamericana de Fútbol*) of Luque, Paraguay;

"**Crystal Palace**" means Crystal Palace Football Club;

"**Crystal Palace Equity Interests**" has the meaning given to it in Recital D;

"**Crystal Palace SPA**" means the share purchase agreement dated on or prior to the Completion Date and entered into between the Founder and the Company in respect of the transfer of the Founder's Crystal Palace Equity Interests to the Company;

"**CTA 2010**" means the Corporation Tax Act 2010;

"**Debt Investment**" means the debt financing provided to Bidco pursuant to the Notes Purchase Agreement;

"**Deed of Adherence**" means a deed of adherence to this agreement substantially in the form set out in schedule 7;

"**De-SPAC Condition**" has the meaning given to it in clause 15.2;

"**De-SPAC Closing**" has the meaning given to it in clause 15.1;

"**De-SPAC Transaction**" has the meaning given to it in clause 15.1;

"**Elmwood**" means the Investor(s) identified as such in schedule 1;

"**Encumbrance**" means any mortgage, charge, security, interest, lien, pledge, assignment by way of security, equity, claim, right of pre-emption, option, covenant, restriction, reservation, lease, trust, order, decree, judgment, title defect (including without limitation any retention of title claim), conflicting claim of ownership or any other encumbrance of any nature whatsoever (whether or not perfected other than liens arising by operation of law);

"**English Premier League**" means the association football league of leading English professional association football clubs operated and managed by The Football Association Premier League Limited or any replacement thereof;

"**Enterprise Value**" means $1,218,000,000;

"**Equity Securities**" has the same meaning as set out in the New Articles;

"**Exchange Rate**" means the USD to GBP conversion rate of USD$1/£0.8508;

"**Expert**" means a member of a "Big 4" firm of chartered accountants who has relevant experience appointed in accordance with schedule 8 to resolve any dispute between the parties concerning the calculation of the Put Option FMV;

"**FIFA**" means Fédération Internationale de Football Association of FIFA-Strasse 20, P.O. Box 8044, Zurich, Switzerland;

"**Financial Year**" means a financial year as determined in accordance with section 390 of the Act;

"**Financing Party**" means any person who has agreed at any time to provide *bona fide* third party debt finance facilities to an Investor (or any of that Investor's Associates) (and any agent or trustee of such person) from time to time;

"**First Tranche Shares**" means the Ordinary Shares to be subscribed by Iconic, Ares and Elmwood pursuant to clause 3.1;

"**Football Authority**" means UEFA, FIFA, and any other relevant and properly constituted governing body or authority of any league or competition in which any Owned Club participates from time to time;

"**Founder Directors**" means the directors appointed by the Founder in accordance with clause 8.2;

"**Founder Football Club Equity Interests**" has the meaning given to it in Recital D;

"**Founder Football Club Equity Interests SPAs**" means each of the Botafogo SPA, the Crystal Palace SPA and the RWD Molenbeek SPA;

"**Fully Diluted Basis**" means calculated on the assumption that all Equity Securities then capable of being issued on the exercise of conversion rights, options, warrants and other contractual rights have been issued by the Company, irrespective of whether or not such rights are then exercisable;

**"Fund"** means any unit trust, investment trust, investment company, limited partnership, limited liability partnership, general partnership or other collective investment scheme, pension fund, insurance company or any body corporate or other entity;

"**Group Companies**" means the Company and each and any of the Subsidiaries from time to time (and "**Group Company**" and "**Group**" shall be construed accordingly);

"**Iconic**" means the Investor identified as such in schedule 1;

"**Intellectual Property**" means copyrights, trade and service marks, including the trade marks, trade names, rights in logos and get-up, inventions, confidential information, trade secrets and know-how, registered designs, design rights, patents, utility models, semi-conductor topographies, all rights of whatsoever nature in computer software and data, all rights of privacy and all intangible rights and privileges of a nature similar or allied to any of the foregoing, in every case in any part of the world and whether or not registered; and including all granted registrations and all applications for registration in respect of any of the same;

"**Investment Term Sheet**" means the equity term sheet entered into between Iconic, Ares, the Company and the Founder dated 29 October 2022;

**"Investment Warrants"** means the Series B2 Warrants (as defined in the Ares Warrant Instrument) entitling Ares to invest $25,000,000 (twenty five million dollars) in the Company in return for the issue of Ordinary Shares in accordance with the Warrant Instrument;

"**Investor Director Consent**" means the prior written consent of more than 50 per cent. of the Investor Directors, in each case, then appointed by Investors who hold at least 8 per cent. of the Equity Securities in the Company (excluding Treasury Shares) on a Fully Diluted Basis;

"**Investor Directors**" means the directors then appointed by the Investors in accordance with clauses 8.3, 8.4 and 8.5;

"**Investor Rights Agreement**" has the meaning ascribed thereto in the Agreed-Form BCA;

"**Investors**" means the persons whose names and addresses are set out in part 1 of schedule 1 and any other person to whom any of them transfer their shares or who subscribes for Ordinary Shares and who becomes a party as an "Investor" by signing a Deed of Adherence in accordance with clause 3.6 and is named therein as an "**Investor**";

**"Investor's Knowledge Group"** means:

   a. in respect of Iconic, Tommy Aylmer, Fausto Zanetton, James Dinan, Alexander Knaster and Edward Eisler;

   b. in respect of Ares, Mark Affolter, William Hendrickson, Thomas Vosbeek and Gus Kerin; and

   c. in respect of Elmwood, Andrew Rubenstein and Gordon Rubenstein;

"**IPO**" means the admission of all or any of the Shares or other Equity Securities representing those shares (including without limitation depositary interests, American depositary receipts, American depositary shares and/or other instruments) on NASDAQ, the New York Stock Exchange or on the Official List of the United Kingdom Listing Authority or the AIM Market operated by the London Stock Exchange Plc or on any other recognised investment exchange (as defined in section 285 of the Financial Services and Markets Act 2000);

"**Listco**" means the company set forth in the Agreed-Form BCA that will be listed on NASDAQ, the New York Stock Exchange or on the Official List of the United Kingdom Listing Authority or the AIM Market operated by the London Stock Exchange Plc or on any other recognised investment exchange (as defined in section 285 of the Financial Services and Markets Act 2000);

"**Long-Stop Date**" means 26 July 2023;

"**Management Incentive Plan**" means the management incentive plan to be established by the Company pursuant to clause 7;

"**Member of the same Fund Group**" has the same meaning as set out in the New Articles;

"**Member of the same Group**" has the same meaning as set out in the New Articles;

"**Midco**" means Eagle Football Holdings Midco Limited (CRN: 14383202) whose registered office is at 57-59 Beak Street, London, United Kingdom, United Kingdom, W1F 9SJ;

"**NASDAQ**" means the NASDAQ Stock Market of the NASDAQ OMX Group Inc.;

"**New Articles**" means the new articles of association of the Company in the agreed form to be adopted on or prior to Completion as attached in Schedule 12 as amended or superseded from time to time;

"**NED Director**" means the director appointed by the Founder in accordance with clause 8.7**;**

"**New Shares**" means the First Tranche Shares and the Additional Shares (if any);

"**Notes**" has the meaning given to it in the Notes Purchase Agreement;

"**Note Issuer**" means the issuer of the Notes from time to time, as at the date of this agreement being Bidco;

"**Notes Purchase Agreement**" means the notes purchase agreement dated 25 October 2022 between Midco, Bidco, the Original Guarantors (as defined therein), the Original Noteholders (as defined therein), and Ares Capital Corporation (as agent and security agent);

"**Note Warrants**" means the Series A Warrants (as defined in the Ares Warrant Instrument) and the Series B1 Warrants (as defined in the Ares Warrant Instrument) warrants entitling Ares to subscribe for such number of Ordinary Shares representing up to 8 per cent. of the Ordinary Share capital of the Company calculated on a Fully Diluted Basis in accordance with the terms of the Ares Warrant Instrument;

"**OL Closing Acquisition**" has the meaning given to it in clause 11.1(a);

"**OL SPA**" means the sale and purchase agreement dated 7 July 2022 between PATHE, SOJER, OJEJ, IDG, Holnest (as such terms are defined therein) and the Company, as Purchaser (as such term is defined therein) as amended on 21 October 2022;

"**Olympique Lyonnais**" means Olympique Lyonnais Groupe S.A.;

"**Operating Board**" has the meaning given to it in clause 8.22;

"**Ordinary Equity Investment**" means an equity capital increase of up to $250,000,000 approved by the Company;

"**Ordinary Shares**" means ordinary shares of £0.01 each in the capital of the Company from time to time having the rights set out in the New Articles;

"**Other Equity Investors**" has the meaning given to it in clause 3.6;

"**Owned Club**" means any of Crystal Palace, Olympique Lyonnais, Botafogo and RWD Molenbeek;

"**Palace Holdco SHA**" means the amended and restated shareholders' agreement in connection with Palace Holdco UK Limited (the holding company of Crystal Palace) dated 19 August 2016, as amended, supplemented or novated from time to time;

"**Permitted Transferees**" has the same meaning as set out in the New Articles;

"**Permitted Security**" means a Security granted by an Investor in favour of a Financing Party, to the extent required in order to satisfy its obligations under the finance documents governing any such indebtedness;

"**PIPE**" means a private investment in public equity;

"**Premier League Rules**" means the Premier League Rules of The Football Association Premier League Limited as amended and effective at the relevant time;

"**Put Option Completion**" means the performance by Ares and the Put Option Transferee of the obligations assumed by them respectively under clauses 16.11 and 16.12;

"**Put Option Event**" means the occurrence of any of the following:

(a)     an Ares Restructure Trigger Event;

(b)     the date on which the Debt Investment (together with any interest and fees accrued thereon) has been repaid in full; or

(c)     the tenth anniversary of the OL Closing Acquisition;

"**Put Option FMV**" has the meaning given to it in clause 16.7;

"**Put Option Notice**" means a notice exercising the Ares Put Option;

"**Put Option Shares**" has the meaning given to it in clause 16.3;

"**Put Option Transfer Terms**" means on the following terms:

   a) that the entire legal and beneficial interest in all the Put Option Shares is sold and purchased with full title guarantee free from any encumbrance and together with all rights attaching to them as at Put Option Completion (other than rights to receive dividends which shall have been paid before then) or at any time after that; and

   b) that the consideration for the Put Option Shares shall be an amount equal to the Put Option FMV;

"**Put Option Transferee**" has the meaning given to it in clause 16.3;

"**Released Group Company" and "Released Group Companies**" has the meaning given to it in clause 15.10(b);

"**Reserved Rights**" means the Ares Warrants and Ares rights pursuant to clauses 16.2 to 16.13 (inclusive);

"**Resolutions**" means the resolutions in agreed form to be passed by the Company by written resolution as specified in paragraph 1 of schedule 4;

"**RWD Molenbeek**" means Racing White Daring Molenbeek Future NV;

"**RWD Molenbeek Equity Interests**" has the meaning given to it in Recital D;

"**RWD Molenbeek SPA**" means the share purchase agreement dated 11 November 2022 and entered into between the Founder and the Company in respect of the transfer of the Founder's RWD Molenbeek Equity Interests to the Company;

"**Sanctions Authority**" means: (i) the United Nations Security Council; (ii) the United States government; (iii) the European Union; (iv) the United Kingdom government; (v) the respective governmental institutions and agencies of any of the foregoing, including the Office of Foreign Assets Control of the United States Department of Treasury, the United States Department of State and Department of Commerce and His Majesty's Treasury; or (vi) any other governmental institution or agency with responsibility for imposing, administering or enforcing Sanctions Laws with jurisdiction over any party;

"**Sanctions Laws**" means any economic, sectoral, financial or trade sanctions laws, regulations, embargoes or other restrictive measures adopted, enacted, imposed, administered or enforced from time to time by an applicable Sanctions Authority;

"**Security**" means a mortgage, charge, pledge, lien or other security interest securing any obligation of any person or any other agreement or arrangement having similar effect;

"**Series B2 Notes**" has the meaning given to it in the Notes Purchase Agreement;

"**Significant Interest**" has the meaning given to it in Section A (*Definitions and Interpretation*) of the Premier League Rules;

"**Shareholder**" means any holder of Equity Securities in the Company from time to time who is a party to this agreement (but excludes the Company holding Shares as Treasury Shares from time to time);

"**Shareholder Exchange Agreement**" has the meaning ascribed thereto in the Agreed-Form BCA;

"**Shares**" means any shares issued by the Company;

"**Sponsor**" means Iconic Sports Management LLC, a Cayman Islands limited liability company;

"**Sponsor Warrants**" means the 17,025,000 private placement warrants held by the Sponsor in the SPAC;

"**Subscription Price**" means a subscription price per Ordinary Share of $8,802.8169 (which shall be deemed to be £7,489.4366 as converted at the Exchange Rate);

"**Subsidiary**" means any subsidiary of the Company as defined in section 1159 of the Act from time to time which as at date of this agreement include those, brief particulars of which, are set out in part 2 of schedule 2;

"**Successor Entity**" means an entity which, shortly before an IPO of such entity, shall have acquired all of the Shares or the assets of the Company and the ownership of which, following such acquisition, is substantially the same as that of the Company immediately prior to such acquisition (disregarding any new investors or selling shareholders as a result of such IPO or any related fundraising);

"**Tax**" means all forms of taxation, duties, imposts, rates, charges, levies or other governmental charges (national or local) of whatever nature and whenever and wherever imposed, which are collected or assessed by, or payable to, a Tax Authority or any other person as a result of any enactment relating to tax including by way of deduction or withholding, in respect of any person whether their liability is a primary or secondary liability and any associated interest, penalty, surcharge, cost, charge or fine, including but not limited to income tax and social security contributions (including, for the avoidance of doubt, any National Insurance contributions) or any equivalent outside the United Kingdom;

"**Tax Authority**" means any local, provincial, municipal, governmental, state, federal or other taxing, fiscal, revenue, customs or excise authority body or official competent to impose any liability in respect of Tax or responsible for the administration and/or collection of Tax or enforcement of any law in relation to Tax including, for the avoidance of doubt, His Majesty's Revenue & Customs or such authority as may succeed it in its functions relating to Tax;

"**Tax Structure Memorandum**" means the tax structure memorandum prepared by DLA Piper LLP in respect of the transactions contemplated, as agreed between the parties to this agreement and as amended from time to time;

"**Tax Warranties**" means the Warranties set out in paragraph 7 of Schedule 6, and "**Tax Warranty**" shall be construed accordingly;

"**Treasury Shares**" means shares in the capital of the Company held by the Company as treasury shares within the meaning set out in section 724(5) of the Act;

"**UEFA**" means Union des Associations Européennes de Football of Route de Genève 46, Case postale, CH-1260, Nyon 2, Switzerland; and

"**Warranties**" means the warranties given pursuant to clause 5 (references to a particular "**Warranty**" being, unless specified, to a statement set out in Schedule 6).

## 2.    Interpretation

2.1    The clause and paragraph headings and the table of contents used in this agreement are inserted for ease of reference only and shall not affect construction.

2.2    References to an Investor Director or a Founder Director shall include any alternate appointed to act in his place from time to time.

2.3    References to persons shall include bodies corporate, unincorporated associations and partnerships, in each case whether or not having a separate legal personality.

2.4    Reference to a party or parties is to a party or parties of the agreement.

2.5    References to documents "**in the agreed form**" are to documents in terms agreed on behalf of the Company, the Founder and the Investors.

2.6    References to any English statute or other legislation or legal term for any action, remedy, method of judicial proceeding, legal document, legal status, court, official or any legal concept or thing shall, in respect of any jurisdiction other than England, be deemed to include a reference to that which most nearly approximates to the English legal term in that jurisdiction.

2.7    References to those of the parties that are individuals include their respective legal personal representatives.

2.8    References to "**writing**" or "**written**" email but not any other methods of electronic messaging.

2.9    References to "**USD", "$**" and "**dollars**" means the lawful currency of the United States of America and references to "**GBP", "£**" and "**pounds**" means the lawful currency of the United Kingdom;

2.10    All cash amounts payable by any Investor to the Company pursuant to clauses 3 and 4 of this agreement shall, unless the Company and the Investors otherwise agree in writing, be paid in USD.

2.11    Notwithstanding clause 2.10 above, all Ordinary Shares to be subscribed for by any Investor under this agreement shall be denominated and issued in GBP. For these purposes, where this agreement refers to the subscription price per share or the aggregate subscription amounts in USD (or any equivalent expression), such amounts shall be converted into GBP using the Exchange Rate on the relevant payment date.

2.12    References to the word "**include**" or "**including**" (or any similar term) are not to be construed as implying any limitation and general words introduced by the word "**other**" (or any similar term) shall not be given a restrictive meaning by reason of the fact that they are preceded or followed by words indicating a particular class of acts, matters or things.

2.13    Reference to "**issued Shares**" of any class or Shares of any class "**in issue**" shall exclude any Shares of that class held as Treasury Shares from time to time, unless stated otherwise.

2.14   Reference to the "**holders**" of a class of Shares shall exclude the Company holding Shares of that class as Treasury Shares from time to time, unless stated otherwise.

2.15   Except where the context specifically requires otherwise, words importing one gender shall be treated as importing any gender, words importing individuals shall be treated as importing corporations and vice versa, words importing the singular shall be treated as importing the plural and vice versa, and words importing the whole shall be treated as including a reference to any part thereof.

2.16   References to statutory provisions, enactments shall include references to any amendment, modification, extension, consolidation, replacement or re-enactment of any such provision, enactment (whether before or after the date of this agreement), to any previous enactment which has been replaced or amended and to any regulation, instrument or order or other subordinate legislation made under such provision, enactment unless any such change imposes upon any party any liabilities or obligations which are more onerous than as at the date of this agreement.

2.17   Section 1122 of the CTA 2010 shall apply to determine whether one person is connected with another for the purposes of this agreement.

2.18   References in clause 1 (Definitions) (in so far as they are used in the clauses and schedules referred to in this clause), 8 (The Board and the Investor Directors), 9 (Information rights), 10 (Matters requiring consent of the Investors or the Investor Directors), 10.2(a) (Business undertakings), 13.5 (Confidentiality) and schedule 5 (Consent matters) to the Company and the Board shall include, where appropriate in the context, each of the subsidiaries of the Company and any Successor Entity and the directors for the time being of those subsidiaries and any Successor Entity respectively.

2.19   Reference to a time of day shall be references to that time of day in London, United Kingdom.

2.20   Any references in this agreement to persons procuring the doing of any act, matter or thing (or any variations thereof) by any other person are references to the person doing such act, matter or thing so far as they are legally able in their capacity as a shareholder including, by exercising voting rights and such other power of control available to them in relation to such other person, appointing or removing directors, passing resolutions and giving consents or approvals (and procure and procurement shall be construed accordingly).

3.   **Subscriptions**

   *First Tranche*

3.1   Subject to the provisions of clauses 4.1, 4.2, 4.3 and 4.4, the Investors apply for the allotment and issue to them at Completion of certain Ordinary Shares at the Subscription Price and the Company accepts such application in the proportions as set out below:

| Investor | No. of Ordinary Shares | Total subscription monies ($) |
|---|---|---|
| Iconic | 8,520 | 75,000,000 |

| Investor | No. of Ordinary Shares | Total subscription monies ($) |
|---|---|---|
| Elmwood | 2,840 | 25,000,000 |
| **Total** | **11,360** | **100,000,000** |

3.2     On Completion, the Company shall issue the Ares Warrants to Ares.

3.3     Within 30 days following the Completion Date, the Founder shall subscribe, or shall cause or procure the subscription of, a sum of USD$5,000,000 for the allotment and issue of to him (or to anyone he may so direct) of certain Ordinary Shares at the Subscription Price and the Company shall accept such application.

3.4     If Completion does not occur, the Company shall return, and each Party shall procure the return, to each Investor of the sum set out against their names in column 3 of the table in clause 3.1 (being the aggregate subscription price for the First Tranche Shares) as soon as reasonably practicable following the date on which Completion was scheduled to take place, and in any event by no later than five Business Days following such date.

3.5     If the OL Closing Acquisition does not occur, the Company shall, and each Party shall exercise their rights as Shareholders to cause the Company to, take all appropriate steps legally permissible, so that each Investor receives the sum set out against their names in column 3 of the table in clause 3.1 (being the aggregate subscription price for the First Tranche Shares), whether as a distribution, redemption, capital reduction or other means, as soon as reasonably practicable following the date on which the OL Closing Acquisition was scheduled to take place.

*Additional Shares - Second Tranche*

3.6     No later than one year from the Completion Date (unless the Company (with Investor Director Consent) and the Founder have agreed in writing to extend such date), the Company may allot and issue the Additional Shares to one or more additional investors that have been approved by the Company (with Investor Director Consent) and the Founder (the **Other Equity Investors**) or any existing Investor, provided that (i) such Additional Shares shall be issued for at least the Subscription Price (or such higher price as can be achieved by the Company), (ii) any such Other Equity Investors who is not already a party to (nor has adhered to) this agreement shall execute a Deed of Adherence prior to such allotment and issue and (iii) such issue shall be subject to coordination between the Company and Iconic in case a financing for the De-SPAC Transaction is underway.

3.7     The Investors shall be entitled to direct that the First Tranche Shares allotted to them shall instead be issued and registered in the name of any nominee or custodian holding such shares on its behalf as bare nominee and the provisions of clauses 3.1, 3.6 and 4 (Completion) shall be interpreted accordingly.

3.8     The Founder agrees to vote in favour of the Resolutions and hereby irrevocably waives (or confirms that he has procured the waiver of) all and any pre-emption rights he or his nominees may have pursuant to the articles of association of the Company or otherwise so as to enable the issue of any shares in the capital of the Company contemplated by this agreement to proceed free of any such pre-emption rights.

*Investment Warrant Exercise*

3.9     On exercise of the Investment Warrants by Ares in accordance with the provisions of the Ares Warrant Instrument:

(a)     the Company shall allot and issue to Ares or to any nominee, custodian or Permitted Transferee of Ares (as nominated in writing by Ares on or prior to exercise of the Investment Warrant) the Ordinary Shares to be issued under the Ares Warrant Instrument upon exercise of the Investment Warrants; and

(b)     each Shareholder hereby irrevocably waives all and any pre-emption rights that they may have, now or in the future, and agrees to vote in favour of all and any shareholder resolutions as may be required so as to enable the issue of such Ordinary Shares free of any pre-emption rights.

*Note Warrant Exercise*

3.10    On exercise of the Note Warrants by Ares in accordance with the provisions of the Ares Warrant Instrument:

(a)     the Company shall allot and issue to Ares or to any nominee, custodian or Permitted Transferee of Ares (as nominated in writing by Ares on or prior to exercise of the Note Warrant) the Ordinary Shares to be issued under the Ares Warrant Instrument upon exercise of the Note Warrants; and

(b)     each Shareholder hereby irrevocably waives all and any pre-emption rights that they may have, and agrees to vote in favour of all and any shareholder resolutions as may be required, so as to enable the issue of such Ordinary Shares free of any pre-emption rights.

*Period prior to Completion and completion of the OL Closing Acquisition*

3.11    The parties agree that between the date hereof and the OL Closing Acquisition, unless all parties agree, the OL SPA, the Notes Purchase Agreement, Tax Structure Memorandum and the New Articles shall not be amended without the prior approval of all parties.

3.12    All parties undertake to use their reasonable endeavours to meet the Completion Conditions.

3.13    The Founder undertakes and agree to manage the Company with a view to implement the Completion and the OL Closing Acquisition in accordance with the terms of the Tax Structure Memorandum, the OL SPA and the principles of this agreement, it being specified that any decision of the Board or the shareholders of the Company shall require the prior written approval of all the Investors, who shall however not be authorized to withhold their consent to all decisions necessary to perform the Company's rights or obligations under this agreement, the OL SPA or to implement the Tax Structure Memorandum. The Founder undertakes, during the period commencing on the date of this agreement and ending on the Completion Date, to use those rights, powers and entitlements that the Founder possesses (directly or indirectly) not to do, or permit to be done, any of the matters set out in schedule 5 of this agreement in relation to the Founder Football Clubs without the prior written consent of each Investor.

## 4.    Completion

4.1     Subject to the Completion Conditions having been satisfied or waived by the Investors, Completion shall take place on the Completion Date once the events set out in clauses 4.2, 4.3 and 4.4 have occurred.

4.2   Prior to Completion, the Founder shall (i) transfer to Bidco the Crystal Palace Equity Interest in accordance with the Tax Structure Memorandum and (ii) notify within 1 Business Day the Investors upon obtaining the Premier League Consent.

4.3   Immediately prior to Completion, the Board shall pass resolutions authorising and directing that the Company shall:

(a)   subject to receipt of the subscription funds from the Investors, issue the First Tranche Shares credited as fully paid to them and enter their names in the register of members in respect thereof;

(b)   authorise the future issue and allotment of Ordinary Shares pursuant to Warrants issued under the Ares Warrant Instrument;

(c)   authorise the future issue and allotment of the Additional Shares subject to receipt of the relevant subscription monies and the conditions in clause 3.7 being met;

(d)   execute and deliver to the Investors certificates for the First Tranche Shares;

(e)   appoint the Founder and JP Conte as a Founder Directors;

(f)   subject to receipt of the subscription funds from Iconic, appoint Jamie Dinan and Alex Knaster as Investor Directors on behalf of Iconic;

(g)   appoint Mark Affolter and James Miller as Investor Directors on behalf of Ares;

(h)   subject to receipt of the subscription funds from Elmwood, appoint Gordon Rubenstein as an Investor Director on behalf of Elmwood;

(i)   appoint Jean-Michel Aulas as the NED Director;

(j)   adopt the New Articles as the articles of association of the Company with immediate effect in substitution for and to the exclusion of the existing articles of association of the Company; and

(k)   pass any such other resolutions as may be necessary or desirable to carry out the obligations of the Company under this agreement.

4.4   At Completion, the Investors shall pay the sum set out against their names in column 3 of the table in clause 3.1 (being the aggregate subscription price for the First Tranche Shares) by electronic funds transfer to the bank account of the Company as set out below and payment made in accordance with this clause 4.3 shall constitute a good discharge for the Investors of their obligations under this clause 4.3:

Account Name: Eagle Football Holdings Bidco CIC-CM USD($) Account

Bank: Crédit Industriel et Commercial

IBAN: FR76 3006 6343 1800 0425 9560 395

BIC: CMCIFRPP

4.5   Immediately following Completion, the fully diluted share capital of the Company shall be as set out in part 2 of schedule 3.

4.6   Within 20 Business Days of Completion:

(a)     the Company shall deliver to each Investor Director a deed of indemnity in the agreed form in respect of his/her appointment; and

(b)     the Company (with Investor Director Consent) shall procure a directors' and officers' insurance policy is placed in respect of each of the Directors, and shall provide each Director with a copy of the insurance terms and conditions and proof of the premium payment.

## 5.     Warranties

5.1     Each party warrants to each of the other parties that, as at the date of this agreement and as at the Completion Date:

(a)     it is entering into or adhering to the terms of this agreement (as the case may be) solely as principal and not on behalf of any other person;

(b)     it has the power and authority to enter into and perform its obligations under this agreement without requiring the consent or approval of any other person;

(c)     when executed, its obligations under this agreement will be binding on it; and

(d)     execution and delivery of, and performance by it of its obligations under this agreement will not result in any breach or constitute any default of applicable law, agreement, instrument, judgment or other restriction.

5.2     The Company warrants to the Investors (subject to the limitations in clause 6), as at the date of this agreement and as at the Completion Date, that each and every Warranty set out in schedule 6 is true, accurate and not misleading at the date of this agreement and at the Completion Date subject to any exceptions expressly provided for under this agreement.

5.3     Each Warranty is a separate and independent warranty and, save as otherwise expressly provided, no Warranty shall be limited by reference to any other Warranty or by the other terms of this agreement.

5.4     An Investor shall not be entitled to make a Claim if and to the extent that the facts, matters, events or circumstances giving rise to the Claim or are within the actual knowledge of that Investor's Knowledge Group at the date of this agreement, whether arising as a result of their investigation of the Company or otherwise.

5.5     Where any Warranty is qualified by the expression "**so far as the Company is aware**" or words having similar effect, such Warranty shall be deemed to include a statement that such awareness means the actual knowledge of the director of the Company.

5.6     The Investors agree among themselves that the following provisions shall apply in relation to the bringing of any Claim:

(a)     any Investor (**Claiming Investor**) can choose to bring a Claim on its own behalf, but before doing so must notify those all other Investors, such notice to include any reasonable information in its possession to enable the other Investors to determine whether or not it also has a Claim;

(b)     the Claiming Investor must give each of the other Investors at least 20 Business Days to allow the other Investors to choose whether or not they wish to join the Claim;

(c)     no Claim shall be brought by any of the Investors without the consent of Investors holding of a majority of the Shares held by all Investors;

(d)     where the decision to bring a Claim is approved pursuant to clause 5.6(c) above, each Investor is entitled to decide whether or not it wishes to participate in the Claim;

(e)     the costs incurred by the Investors in bringing a Claim shall be borne by all of the Investors who have agreed to participate in the Claim proportionately to the number of the Equity Securities held by each of them; and

(f)     any damages obtained as a result of any Claim will, after deduction of all costs and expenses, be divided amongst the Investors in proportion to their holdings of Equity Securities.

and, for the avoidance of doubt, an Investor who has waived its right to bring and/or participate in a Claim pursuant to this clause 5.6 shall not be liable to bear any of the costs referred to in 5.6(e) above, nor entitled to any of the damages referred to in 5.6(f) above.

## 6.     Limitations on Claims

6.1     The limitations set out in this clause 6 shall not apply to any Claim which is the consequence of fraud by or on behalf of the Company.

6.2     No Claim may be made against the Company unless written notice of such Claim is served on the Company giving reasonable details of the Claim by no later than the date which is twelve (12) months after the Completion Date.

6.3     The aggregate liability of the Company in respect of all and any Claims made by an Investor shall be limited to an amount equal to the aggregate amount subscribed for by that Investor pursuant to clause 3.1.

6.4     The Company shall not be liable in respect of any Claim unless the aggregate liability for all Claims by all Investors (excluding all claims disregarded pursuant to clause 6.5) exceeds USD$ 1,000,000, in which case the Company shall be liable for the entire amount and not merely the excess.

6.5     In calculating liability for Claims for the purposes of clause 6.4 above, any Claim which is less than USD$ 250,000, (excluding interest, costs and expenses) shall be disregarded. For these purposes, a number of Claims arising out of the same or similar subject matter, facts, events or circumstances shall be aggregated and form a single Claim.

6.6     Any Claim (other than a Claim relating to a breach of a Tax Warranty) notified in accordance with clause 6.2 shall (if not previously satisfied, settled or withdrawn) be deemed to have been irrevocably withdrawn six months after the date on which notice of the relevant Claim was given (and no new equivalent Claim may be made in respect of the same facts) unless on or before that date, legal proceedings have been issued and served on the Company in respect of the relevant Claim.

6.7     The Company shall not be liable for any Claim if the alleged breach which is the subject of the Claim is capable of remedy and is remedied to the reasonable satisfaction of the Investors within 30 (thirty) days of the date on which the notice in clause 6.2 is received by the Company.

6.8     Nothing in this agreement shall prejudice each Investor's duty under common law to mitigate any loss or liability which is the subject of a Claim.

6.9     None of the Investors shall be entitled to recover damages, or obtain payment, reimbursement, restitution or indemnity more than once in respect of the same loss, shortfall, damage, deficiency, breach or other event or circumstance.

## 7.      Management Incentive Plan

The Company may adopt a Management Incentive Plan in a form acceptable to the Board (with Investor Director Consent) whereby Equity Securities (subject to a maximum amount equal to 10 per cent. of the Equity Securities in the Company (excluding Treasury Shares) on a Fully Diluted Basis) may be granted or issued (as applicable pursuant to the Management Incentive Plan to directors, employees and consultants of the Company and in such number as may be determined by the Board (with Investor Director Consent), provided that any such issuance shall dilute all holders of Ordinary Shares on a pro-rata basis. Any further expansion of the Management Incentive Plan shall require the approval of the Board (with Investor Director Consent).

## 8.      The Board, the Founder Directors and the Investor Directors

*Composition of the Board*

8.1     The members of the Board immediately following Completion shall be the Founder, the Founder Directors and the Investor Directors (if appointed).

8.2     For so long as the Founder and his Permitted Transferees hold Equity Securities in the Company (excluding Treasury Shares), he shall have the right to appoint and maintain in office one natural person for each 8 per cent. of the Equity Securities in the Company held by him on a Fully Diluted Basis (up to a maximum of five natural persons) as he may from time to time nominate as directors of the Company (and as a member of each and any committee of the Board) and to remove any director so appointed and, upon his removal, to appoint another director in his place. The Founder and JP Conte shall be deemed to be the first Founder Directors appointed pursuant to this clause 8.2.

8.3     For so long as Iconic (and each of its Permitted Transferees) holds not less than 8 per cent. of the Equity Securities in the Company (excluding Treasury Shares) on a Fully Diluted Basis, it shall have the right to appoint and maintain in office two natural persons as it may from time to time nominate as a director of the Company (and as a member of each and any committee of the Board) and to remove any director so appointed and, upon his removal whether by that party or otherwise, to appoint another director in his place. Jamie Dinan and Alex Knaster shall be deemed to be the first Investor Directors appointed by Iconic pursuant to this clause 8.3.

8.4     For so long as:

(a)     Ares (and each of its Permitted Transferees) holds not less than 8 per cent. of the Equity Securities in the Company (including the Ares Warrants, but excluding Treasury Shares) on a Fully Diluted Basis, it shall have the right to appoint and maintain in office one natural person; and

(b)     the Debt Investment remains outstanding, Ares shall have the right to appoint and maintain in office two natural persons,

as it may from time to time nominate as a director of the Company (and as a member of each and any committee of the Board) and to remove any director so appointed and, upon his removal whether by that party or otherwise, to appoint another director in his place; provided for the avoidance of doubt that Ares shall not be able to appoint and maintain in office more than two natural persons as directors of the Company (and as a member of each and any committee of the Board). Mark Affolter and James Miller shall be deemed to be the first Investor Directors appointed by Ares pursuant to this clause 8.4.

8.5     For the period of twelve months from the Completion Date and thereafter for so long as (i) Elmwood and its Permitted Transferees collectively holds not less than eight percent (8%) of the Equity Securities in the Company (excluding Treasury Shares) on a Fully Diluted Basis  or (ii) Elmwood or its representatives are providing material strategic, financial, fundraising or other assistance to the Company, it has the right to appoint and maintain in office one natural person as it may from time to time nominate as a director of the Company (and as a member of each and any committee of the Board) and to remove any director so appointed and, upon his removal, to appoint another director in his place. Gordon Rubenstein shall be deemed to be the first Investor Director appointed by Elmwood pursuant to this clause 8.5.

8.6     The appointment and removal of a Founder Director in accordance with clause 8.2, an Investor Director in accordance with clauses 8.3, 8.4  and 8.5 shall be by written notice from the appointing Founder or Investor (as applicable) to the Company which shall take effect on delivery at the Company's registered office or at any meeting of the Board or committee thereof, provided that if any such appointment shall require consent, clearance or approval of any Authority: (i) the Company agrees to cooperate with the appointing party and agrees to use all reasonable endeavours to obtain any such required consent, clearance or approval; and (ii) such appointment shall take place at 9.00 am on the Business Day following the date when all such consents, clearances or approvals have been obtained.

8.7     Subject to clause 8.8, for so long as the Founder and his Permitted Transferees hold at least 40 per cent. of the Equity Securities in the Company (excluding Treasury Shares), he shall have the right (in addition to the right set out in clause 8.2) to appoint and maintain in office an independent non-executive director of the Company (a **NED Director**) (and as a member of each and any committee of the Board) and to remove any director so appointed and, upon his removal, to appoint (subject to clause 8.8) another NED Director in his place.

8.8     To appoint a NED Director in accordance with clause 8.7, the Founder shall give written notice to the Investor Directors, nominating three potential candidates (**NED Candidates**) who are not connected with the Founder for the role of NED Director. The NED Director shall be selected and appointed by the Investor Directors from the NED Candidates by Investor Director Consent. Jean-Michel Aulas shall be deemed to be the first NED Director appointed pursuant to this clause 8.8.

8.9     For so long as Elmwood does not qualify to appoint a Director in accordance with clause 8.5:

(a)     Ares and Iconic shall be entitled to appoint and maintain in office an independent person with relevant board level experience to become a Director in a non-executive capacity (the **Investor Ned**). In order to appoint the Investor

Ned, Iconic and Ares shall jointly provide the Board, in writing, with three (3) potential candidates to consider for the Investor Ned, including a comprehensive curriculum vitae relating to each candidate. Upon presentation of the proposed Investor Ned candidates, the Founder Directors then appointed shall be entitled to select one candidate to become the Investor Ned. For the avoidance of doubt, the candidates for the Investor Ned, shall not be an employee, partner, associate, or personally connected to either Ares or Iconic. The Founder Directors shall be entitled to remove the nominated Investor Ned so appointed at any time by notice in writing to the Company served at its registered office and the aforementioned process shall be repeated by the Board to appoint another person to act in his place.

(b)   Elmwood shall have the right to appoint and remove a representative to attend as an observer (**Elmwood Observer**) at any meetings of directors (and committees of directors) of the Company. The Elmwood Observer may not be an existing director of the Company. To appoint or remove an Elmwood Observer, Elmwood must give written notice signed by, or on behalf, of it to the Company specifying the identity of the person to be appointed or removed. The appointment or removal shall take effect on the date on which such notice is received by the Company or, if a later date is given in the notice, on that date.

8.10   The Company shall send to the directors (in electronic form if so required):

(a)   reasonable advance notice of each meeting of the Board (being not fewer than five Business Days) and each committee of the Board, such notice to be accompanied by a written agenda specifying the business to be discussed at such meeting together with all relevant papers; and

(b)   as soon as practicable after each meeting of the Board (or committee of the Board) a copy of the minutes.

8.11   The Board shall hold no fewer than four meetings per annum at such intervals as may be appropriate and any director shall have the right to convene additional Board meetings on a specific agenda in accordance with the notice requirements pursuant to clause 8.10(a). The parties shall use reasonable endeavours to ensure that all board meetings are held in the United Kingdom.

8.12   Save with Investor Director Consent, no business shall be transacted at any meeting of the Board (or committee of the Board) save for that specified in the agenda referred to in clause 8.10.

8.13   The Company will reimburse the directors with pre-authorised reasonable costs and out of pocket expenses incurred by them in respect of attending meetings of the Company or carrying out authorised business on behalf of the Company.

*Chair*

8.14   The Founder shall be entitled to nominated any Director to be the chair of the Board. The first chair of the Board shall be the Founder.

8.15   For the avoidance of doubt, the chair shall not have a casting vote.

*Observer*

8.16   For so long as the Investors (and each of their Permitted Transferees) together hold not less than 8 per cent. of the Equity Securities in the Company (excluding Treasury

Shares) on a Fully Diluted Basis, they shall have the right together to jointly appoint and remove a representative to attend as an observer (**Observer**) at any meetings of directors (and committees of directors) of the Company. The Observer may not be an existing director of the Company.

8.17    In addition to any Observer appointed pursuant to clause 8.16, for so long as Iconic (and each of its Permitted Transferees) holds not less than 8 per cent. of the Equity Securities in the Company (excluding Treasury Shares) on a Fully Diluted Basis, it shall have the right to appoint and remove a representative to attend as an observer (**Iconic Observer**) at any meetings of directors (and committees of directors) of the Company. The Iconic Observer may not be an existing director of the Company. To appoint or remove an Iconic Observer, Iconic must give written notice to the Company specifying the identity of the person it wishes to appoint or remove. The appointment or removal shall take effect on the date on which such notice is received by the Company or, if a later date is given in the notice, on that date.

8.18    To appoint or remove an Observer in accordance with clause 8.16, the Investors must give written notice signed by, or on behalf, of each of them to the Company specifying the identity of the person they wish to appoint or remove. The appointment or removal shall take effect on the date on which such notice is received by the Company or, if a later date is given in the notice, on that date.

8.19    Any Observer appointed pursuant to clauses 8.16, 8.17 or the Elmwood Observer appointed pursuant to clause 8.9(b) shall be permitted to attend all meetings of the Board (including all committees thereof) and to receive all written materials distributed to the members of the Board or such committees in their capacities as such, but for the avoidance of doubt, shall not be counted in the quorum of any such meetings nor entitled to vote upon any matters.

8.20    Each Investor shall be permitted to appoint an Observer to the Board in substitution for an Investor Director on such Board.  Any such appointment shall be by written notice from the appointing Investor to the Company which shall take effect on delivery at the Company's registered office or at any meeting of the Board (or of any committee thereof).

8.21    No fees or expenses shall be payable by the Company to any Observer, Iconic Observer or Elmwood Observer.

*Composition of the board of directors of other Group Companies*

8.22    The parties shall procure that the provisions of clauses 8.2 to 8.20 governing the composition of the Board (and any committees of the Board) shall apply to the composition of the board of directors (and committees of directors) of each of Midco and Bidco. For this purpose, references in clauses 8.2 to 8.13, and in defined terms as they are used in such clauses, to:

(a)    **directors** are to the directors of the relevant Group Company;

(b)    **the Board** are to the board of directors of the relevant Group Company; and

(c)    **the Company** are to the relevant Group Company.

*Appointment to the boards of other Owned Clubs*

8.23    Subject to all applicable consents, clearances or approvals required by law or regulation from any Authority (including any Football Authority), for so long as Iconic (and its Permitted Transferees) holds at least 8 per cent. of the Equity Securities in the Company (excluding Treasury Shares) on a Fully Diluted Basis, it shall have the right to appoint and maintain in office one natural person each as they may from time to time nominate as directors on the board of the primary functioning or holding company of a governing body (which for the avoidance of doubt shall not include the Board or the board of directors of each of Midco and Bidco) (the **Operating Board**) of Olympique Lyonnais, Botafogo, and RWD Molenbeek, and to remove any director so appointed and, upon their removal whether by Iconic or otherwise, to appoint another director in his place.

8.24    Subject to all applicable consents, clearances or approvals required by law or regulation from any Authority (including any Football Authority), for so long as Ares (and its Permitted Transferees) holds at least 8 per cent. of the Equity Securities in the Company (excluding Treasury Shares) on a Fully Diluted Basis, it shall have the right to appoint and maintain in office one natural person each as they may from time to time nominate as directors on the Operating Board of Olympique Lyonnais and Botafogo, and to remove any director so appointed and, upon their removal whether by Ares or otherwise, to appoint another director in his place.

8.25    Subject to all applicable consents, clearances or approvals required by law or regulation from any Authority (including any Football Authority) and provided the Company has sufficient available board seats to also enable the Founder to appoint at least one director and comply with its obligations pursuant to clauses 8.23 and 8.24 above, for so long as Elmwood (and its Permitted Transferees) holds at least 8 per cent. of the Equity Securities in the Company (excluding Treasury Shares) on a Fully Diluted Basis, it shall have the right to appoint and maintain in office one natural person each as they may from time to time nominate as directors on the Operating Board of Olympique Lyonnais, Botafogo, and RWD Molenbeek, and to remove any director so appointed and, upon their removal whether by Elmwood or otherwise, to appoint another director in his place.

8.26    Subject to clauses 8.23, 8.24 and 8.25, to appoint or remove a director to or from the relevant board of Olympique Lyonnais, Botafogo and RWD Molenbeek, Ares and Iconic must give written notice to the Company specifying the identity of the person they wish to appoint or remove. The appointment or removal shall take effect on the date on which such notice is received by the Company or, if a later date is given in the notice, on that date.

8.27    Each party acknowledges and agrees that no Investor shall have any right to appoint any person to the board of directors or have any rights of attendance at any meetings of the board of directors of Crystal Palace unless Bidco is subsequently granted additional board approval rights in Crystal Palace.

8.28    If the Company acquires:

(a)    any majority stake in any other Club, each of Elmwood, Iconic and Ares shall be entitled to appoint and maintain in office one natural person each as they may from time to time nominate as directors on the board of the primary functioning or holding company of a governing body of such Club, and to remove any director so appointed and, upon their removal, to appoint another director in his place; or

(b)     any minority stake in any other Club, and provided the Company has the right to appoint at least two directors, Elmwood, Iconic and Ares should be collectively entitled to appoint and maintain in office one natural person as they may from time to time nominate as directors on the board of the primary functioning or holding company of a governing body of such Club, and to remove any director so appointed and, upon their removal, to appoint another director in his place,

in each case subject to all applicable consents, clearances or approvals required by law or regulation from any Authority (including any Football Authority), and the rights of Iconic, Ares and Elmwood under this clause shall only apply for so long as the relevant Investor (and its Permitted Transferees) holds at least 8 per cent. of the Equity Securities in the Company (excluding Treasury Shares) on a Fully Diluted Basis (provided that in the event that any of Iconic, Ares or Elmwood (and their Permitted Transferees) do not hold at least 8 per cent. of the Equity Securities in the Company (excluding Treasury Shares) on a Fully Diluted Basis), whether at the time of acquisition of any such minority interest or at any time subsequently, such right of appointment shall accrue to whichever of Iconic, Ares or Elmwood continues to meet that minimum threshold.

8.29    An Investor who has appointed an Investor Director and/or Observer and/or any individual to the boards of any Owned Clubs pursuant to clause 8.23, 8.24 and 8.25 shall procure that such director and/or observer shall comply with clause 14 save that such director and/or observer shall be at liberty from time to time to make full disclosure to its appointing Investor of any information relating to the Company.

*Ares enforcement rights*

8.30    Notwithstanding any other provision of this Agreement, each party agrees and acknowledges that the board governance rights set out in this agreement, the New Articles and the articles of association of Bidco from time to time shall be subject to Ares' rights (including swamping rights) over the board of Bidco as provided for in the Notes Finance Documents (as defined in the Notes Purchase Agreement), including but not limited to clause 7.5 of the Debenture (as defined in the Notes Purchase Agreement). Each party agrees to cooperate with, and not to frustrate or prevent, the exercise of such rights.

## 9.     Information rights

9.1     The Company shall for each quarter in the Company's Financial Year prepare unaudited consolidated management accounts of each Group Company and shall deliver them to the Investors within 45 days after the end of each such quarter.

9.2     The audited accounts of each Group Company (consolidated to the extent applicable) in respect of each accounting period shall be completed and approved by the Board and delivered to the Investors within 120 days after the end of the accounting period to which such audited accounts relate.

9.3     The Company shall provide each Investor promptly with such other information concerning the Group Companies and its business as that Investor may reasonably require from time to time in connection with its Tax reporting obligations or the management of its Tax affairs, or the Tax reporting obligations or the management of the Tax affairs of its direct or indirect owners.

9.4     The Company shall provide to Iconic and Elmwood all such other information in relation to the Group Companies which is provided to Ares pursuant to the Notes Purchase Agreement at the same time and in the same form as such information is provided to Ares.

9.5     The time frames set out in this clause 9 may be extended by the Board with the consent of each Investor who holds at least 8 per cent. of the Equity Securities in the Company (on a Fully Diluted Basis).

## 10.     Matters requiring consent

10.1    From the Completion Date, each of the Shareholders shall exercise all voting rights and powers of control available to it in relation to the Company to procure that:

(a)     save with Board Consent, the Company shall not implement any of the matters referred to in part 1 of schedule 5;

(b)     save with Board Consent and Investor Director Consent, the Company shall not implement any of the matters referred to in part 2 of schedule 5; and

(c)     the Company shall not implement any of the matters referred to in part 3 of schedule 5 without the consent of:

(i)     any Investor holding at least 8 per cent. of the Equity Securities in the Company (excluding Treasury Shares) on a Fully Diluted Basis who is materially adversely affected by such matter;

(ii)    any Investor holding less than 8 per cent. of the Equity Securities in the Company (excluding Treasury Shares) on a Fully Diluted Basis who is materially adversely and disproportionately affected (vis à vis all other Shareholders) by such matter;

(iii)   in respect of the matters referred to in paragraph 4 and paragraph 6, each of Iconic, Ares and Elmwood; and

(iv)    in respect of the matter referred to in paragraph 3 and, to the extent that it relates to paragraph 3 of part 3 of schedule 5, paragraph 5 of part 3 of schedule 5, Iconic.

10.2    As a separate obligation, severable from the obligations in clause 10.1, from the Completion Date, the Company agrees that:

(a)     save with Board Consent, the Company shall not implement any of the matters referred to in part 1 of schedule 5;

(b)     save with Board Consent and Investor Director Consent, the Company shall not implement any of the matters referred to in part 2 of schedule 5; and

(c)     the Company shall not implement any of the matters referred to in part 3 of schedule 5 without the consent of:

(i)     any Investor holding at least 8 per cent. of the Equity Securities in the Company (excluding Treasury Shares) on a Fully Diluted Basis who is materially adversely affected by such matter;

(ii)     any Investor holding less than 8 per cent. of the Equity Securities in the Company (excluding Treasury Shares) on a Fully Diluted Basis who is materially adversely and disproportionately affected (vis à vis all other Shareholders) by such matter;

(iii)    in respect of the matters referred to in paragraph 4 and paragraph 6, each of Iconic, Ares and Elmwood; and

(iv)     in respect of the matter referred to in paragraph 3 and, to the extent that it relates to paragraph 3 of part 3 of schedule 5, paragraph 5 of part 3 of schedule 5, Iconic.

10.3    For the avoidance of doubt, Ares shall not have any approval or consent rights granted pursuant to the terms of this agreement over any matters relating to football operations of any of the Owned Clubs, including without limitation player signings and transfers, hiring and firing of any Owned Club's managers and other technical staff, and day to day football operations.

## 11.    Business undertakings

11.1    The Company shall apply the proceeds of (i) the subscription by the Investors for the New Shares and (ii) the Debt Investment for the following purposes:

(a)     the proposed acquisition of 109.1 million Olympique Lyonnais common equity shares and OSRANES, on an as converted basis, owned by IDG, Pathe and Holnest S.A.S. for an amount equal to $327.4 million (the **OL Closing Acquisition**);

(b)     the proposed $86.0 million investment in newly issued common equity shares of Olympique Lyonnais;

(c)     the proposed $21.0 million shareholder loan to Olympique Lyonnais;

(d)     the proposed acquisition of up to $69.3 million of Olympique Lyonnais common equity shares owned by public shareholders, including 1.4 million treasury shares for tender;

(e)     associated fees and costs relating to the OL Closing Acquisition, which are to be jointly agreed by the Founder, Ares and Iconic; and

(f)     for general working capital purposes.

## 12.    IPO

12.1    It is hereby agreed by the parties that, on an IPO, the Shareholders shall:

(a)     to the extent required by the applicable rules of the relevant exchange, retain such number of their shares in the Company held at the time of the IPO for such period after IPO as is required by the applicable rules of the relevant exchange; and

(b)     have regard to the recommendation of the Company's brokers on an IPO in determining their respective sale of shares upon the Company's IPO and shall make such determination with a view to ensuring the success of the IPO.

12.2    Following the consummation of the IPO, the Investors shall benefit from customary registration rights in respect of the Equity Securities held by them.

**13.     Further issue and transfer of shares**

13.1    None of the Shareholders shall effect any transfer, mortgage, charge or other disposal of the whole or any part of their interest in, or grant any option or other rights over, any shares in the capital of the Company nor shall the Company issue any Shares or Equity Securities or sell or transfer any Shares held as Treasury Shares, to any person until all applicable consents, clearances or approvals required from any Football Authority (including without limitation any consents or approvals required pursuant to the Premier League Rules) have been obtained.

13.2    None of the Shareholders shall effect any transfer, mortgage, charge or other disposal of the whole or any part of their interest in, or grant any option or other rights over, any shares in the capital of the Company nor shall the Company issue any Shares or Equity Securities or sell or transfer any Shares held as Treasury Shares, to any person who is not a party to this agreement without first obtaining from the transferee or subscriber a Deed of Adherence.

13.3    Clause 13.1 shall not apply:

(a)     in relation to the pledging of its Equity Securities in the Company by Ares (or its Permitted Transferees) to any bona fide third party lender for the purposes of securing its obligations owing to any such third party lenders in accordance with the terms governing such indebtedness; or

(b)     in respect of the grant or exercise of an option pursuant to the Management Incentive Plan, unless otherwise determined by the Board.

13.4    The Deed of Adherence shall be in favour of the Company, the Shareholders and any other parties to this agreement and shall be delivered to the Company at its registered office. Subject to clause 13.1, no Share transfer or issue of Shares shall be registered unless such Deed of Adherence has been delivered.

13.5    The Founder undertakes to the Investors that, save as set out in clause 13.7, he shall not, and shall not agree to, transfer, assign, create any trust or Encumbrance over, or otherwise dispose of the whole or any part of his legal, beneficial or other interest in any Shares to any person until the earlier of (i) the Long-Stop Date, (ii) in accordance with the De-SPAC Transaction or (iii) a Share Sale (as defined in the New Articles) (the **Lock-in Period**).

13.6    The Founder undertakes not to transfer any Shares, or do or permit the doing of anything (to the extent within his control), at any time to the extent that this would result in him ceasing to hold a "Look-Through Interest" (as defined in the Palace Holdco SHA) in Crystal Palace of at least 8 per cent. or lose the right to be appointed as a director of Crystal Palace in each case in accordance with the Palace Holdco SHA.

13.7    The provisions of clause 13.5 shall not apply to the transfer to any person of all or any of the Shares held by the Founder, up to a maximum number of Shares equal to 10% of his shareholding as at Completion, provided that such transfer of Shares may not be completed from the date on which the De-SPAC Option is exercised until the date on which the De-SPAC Transaction is completed or abandoned.

13.8    The Founder shall procure that any person who the Founder transfers Shares in the Company to pursuant to clause 13.7 shall not transfer such Shares until the expiry of the Lock-in Period and shall otherwise comply with the obligations applicable to the Founder under clause 15.

**14.    Confidentiality**

14.1    Subject to clause 14.2 and (subject to customary confidentiality obligations with respect to material non-public information) disclosures to be made as part of the preparation and the implementation of the De-SPAC Transaction, each of the parties agrees to keep secret and confidential and not to use, disclose or divulge to any third party or to enable or cause any person to become aware of (except for the purposes of the Company's business) any Confidential Information.

14.2    Each Investor shall be at liberty from time to time to make such disclosure:

(a)    to its Associates and actual and prospective investors, partners, trustees, shareholders, unitholders and other participants and/or to any Member of the same Fund Group as an Investor for the purposes of, but not limited to, reviewing existing investments and investment proposals;

(b)    to any lender to that Investor (or any of its Associates), the Company and/or to any other shareholder of the Company;

(c)    as shall be required by law or by any regulatory authority to which the Investor is subject or by the rules of any stock exchange upon which the securities of that Investor (or any of its Associates), are listed or traded (including any periodic public filing requirements under the rules and regulations promulgated by the Securities and Exchange Commission);

(d)    to any Tax Authority which is reasonably required for the purposes of the Tax affairs of that Investor (or its direct or indirect owners);

(e)    to the auditors and/or any other professional advisers of that Investor (or any of its Associates) or the Company; and

(f)    to the Investor's professional advisers and to the professional advisers of any person to whom the Investor is entitled to disclose information pursuant to this clause 14.2;

(g)    to the Investor's professional advisers and to the professional advisers of any person to whom the Investor is entitled to disclose information pursuant to this clause 14.2;

(h)    to potential purchasers in the context of a sale by an Investor of its Equity Securities;

in relation to the business affairs and financial position of the Company as it may in its reasonable discretion think fit, provided that the recipient is subject to an obligation to keep the disclosure confidential on the same basis as is required by the Investor.

14.3    The Company shall be at liberty from time to time to make such disclosure:

(a) of this agreement and/or any information regarding this agreement to any person who is considering making an investment in the Company or purchasing Shares for the purposes of evaluating any such investment or purchase;

(b) as shall be required by law or by any regulatory authority to which the Company is subject; or

(c) to the Company's auditors and/or any other professional advisers of the Company.

14.4    The Founders and the Investors shall be at liberty from time to time to make such disclosure to their respective professional advisors, or as required by law or by any regulatory authority to which a Founder or Investor is subject.

14.5    For the purposes of this clause, **Confidential Information** means any information or know-how of a secret or confidential nature relating to the Company or of any Investor, including (without limitation):

(a)    any information regarding this agreement and the investment by the Investors in the Company pursuant to this agreement;

(b)    any financial information or trading information relating to the Company or of any Investor which a party may receive or obtain as a result of entering into this agreement;

(c)    in the case of the Company, information concerning:

(i)    its finances and financial data, business transactions, dealings and affairs and prospective business transactions;

(ii)    any operational model, its business plans and sales and marketing information, plans and strategies;

(iii)    its technology or methodology associated with concepts, products and services including research activities and the techniques and processes used for development of concepts, products and services;

(iv)    its computer systems, source codes and software, including, without limitation, software and technical information necessary for the development, maintenance or operation of websites;

(v)    its current and prospective Intellectual Property;

(vi)    its directors, officers, employees and shareholders (including, without limitation, salaries, bonuses, commissions and the terms on which such individuals are employed or engaged and decisions or contents of board meetings);

(vii)    its suppliers, licensors, licensees, agents, distributors or contractors including the identity of such parties and the terms on which they do business, or participate in any form of commercial co-operation with the Company;

(viii)   information concerning or provided to third parties, in respect of which the Company owes a duty of confidence (in particular but without limitation, the content of discussions or communications with any prospective customers or prospective business partner); and

(ix)   any other information which it may reasonably be expected would be regarded by a company as confidential or commercially sensitive,

but shall not include any information which:

(A)   is, or which becomes (other than through a breach of this agreement), available in the public domain or otherwise available to the public generally without requiring a significant expenditure of labour, skill or money;

(B)   is, at the time of disclosure, already known to the receiving party without restriction on disclosure;

(C)   is, or subsequently comes, into the possession of the receiving party without violation of any obligation of confidentiality;

(D)   is independently developed by the receiving party without breach of this agreement;

(E)   is explicitly approved for release by the written consent of an authorised representative of the disclosing party; or

(F)   a party is required to disclose by law, by any securities exchange on which such party's securities are listed or traded, by any regulatory or governmental or other authority with relevant powers to which such party is subject or submits, whether or not the requirement has the force of law, or by any court order.

## 15.   De-SPAC Transaction

15.1   Immediately following the Completion, the Company and Iconic Sports Acquisition Corp. (the **SPAC**) will take active steps to prepare for and pursue a business combination (together with all related transactions, including those in clause 15.10(c), the **De-SPAC Transaction**) between the SPAC and the Company. As part of such preparation and pursuit, the Company, the Board, the Founder, and the Investors (other than Iconic) shall (i) cooperate in good faith with Iconic and the SPAC, and provide all reasonably necessary assistance with respect thereto, (ii) provide Iconic and the SPAC with such further information as is reasonably necessary, and (iii) execute such other documents, and complete such steps (before or after the consummation of the De-SPAC Transaction (the **De-SPAC Closing**)), as Iconic or the SPAC may reasonably request for the purposes of consummating the De-SPAC Transaction in a timely manner.  The parties agree that the De-SPAC Transaction shall be on customary terms, consistent with market practice, and pursuant to a business combination agreement substantially in the form attached as Schedule 9 (the **Agreed-Form BCA**) and other customary documentation (the **Ancillary Documents**). In furtherance and not in limitation of the foregoing, the parties shall (and shall cause their representatives to) cooperate and negotiate with each other in good faith to agree on final customary terms of the Agreed-Form BCA, together with the Investor Rights

Agreement, (acknowledging that all other sections of the Agreed-Form BCA are in agreed form) within fifteen (15) Business Days following Completion, (w) customary representations, warranties and interim operating covenants of the Company and the entities in which it owns or will own an equity interest (including Palace Holdco UK Limited and Olympique Lyonnais), (x) customary definitions of Adjusted Enterprise Value, Net Cash Amount, Company Cash, Company Indebtedness, Indebtedness and Working Capital Amount (each as used in the Agreed-Form BCA), (y) the Working Capital Schedule and (z) any other section of the Agreed-Form BCA bracketed or specifically identified in one or more notes to draft as subject to further discussion. In relation to the Investor Rights Agreement: (i) the board of directors of Listco at the De-SPAC Closing will include two directors designated by Ares (each of whom shall qualify as "independent" under applicable SEC and NYSE rules), to the extent Ares would have been entitled to appoint such directors pursuant to this Agreement after giving effect to the De-SPAC Closing (including any use of proceeds thereof), and Ares will continue to have the right to designate to one director (who shall qualify as "independent" under applicable SEC and NYSE rules) to the board of directors of Listco for so long as the Debt Investment remains outstanding; (ii) the Investor Rights Agreement shall contain customary registration rights entitlements in favour of all the Investors; and (iii) all Investors shall be treated equally under such agreements (including as regards the duration of any lock-up period agreed thereunder).

15.2   Iconic may only exercise the De-SPAC Option (as defined below) if the following conditions (each a **De-SPAC Option Condition** and collectively the **De-SPAC Option Conditions**) shall have been satisfied:

(a)   the SPAC shall have firm commitment of additional equity financing committed from PIPE investors of the higher of the Tranche B loan outstanding at the time of the De-SPAC Transaction and $100,000,000 through the issuance of Ordinary Shares at no less than $8.50 per share in cash without giving effect to any direct or indirect transfer of Sponsor securities including by way of surrender and reissuance (and no more than $1.00 per share of additional consideration to the PIPE investors in the form of Sponsor securities (directly or indirectly); provided, that if the price per share in the PIPE financing is less than $9.20 per share, the Sponsor agrees that, notwithstanding anything to the contrary contained in the warrant agreement governing the Sponsor Warrants, the exercise price of the Sponsor Warrants shall not be adjusted; and

(b)   the Agreed-Form BCA shall be executed at a valuation equal to the Enterprise Value.

15.3   If the cash proceeds available at the De-SPAC Closing are equal to or greater than the required PIPE equity financing amount described in Section 15.2(a) plus $50,000,000, after payment of all expenses incurred in connection with the De-SPAC Transaction, then Iconic shall have the right (in its sole discretion) to cause up to (but not more than) $50,000,000 of the proceeds of the De-SPAC Transaction to be used to repurchase Ordinary Shares it holds in the Company (for a price per share not more than the original purchase price thereof).  Iconic and its Affiliates agrees that is shall not redeem any shares held by Iconic or its Affiliates hold in the SPAC.

15.4   Iconic shall ensure that each of the Shareholders holding Ordinary Shares as of Completion (other than the Founder) are provided by the Sponsor with such number of additional SPAC shares (if any) so that, immediately after giving effect to the De-SPAC Transaction, the aggregate value of such Shareholder's Ordinary Shares (valued based on the PIPE financing, being the price per share to PIPE investors, without taking into account any direct or indirect transfer of Sponsor securities including by way

of surrender and reissuance) is not less than the value such Shareholder's would have received for their shares in the Company had the PIPE Financing been undertaken at a value of $10.00 per SPAC share.

15.5   If the De-SPAC Option Conditions are satisfied on or before 26 April 2023, Iconic shall have the option (the **De-SPAC Option**), in its full discretion, following a presentation to the Board to confirm the De-SPAC Option Conditions have been met, to procure that the Company enter into the Agreed-Form BCA and effectuate the De-SPAC Transaction.

15.6   If Iconic and the SPAC fail to satisfy any of the De-SPAC Option Conditions, Iconic and the SPAC may request a meeting of the Board and Iconic may request that the Board cause the Company to pursue the De-SPAC Transaction (in spite of the failure to satisfy the De-SPAC Option Conditions); provided, however, that the Board shall have no obligation to cause the Company to pursue or consummate the De-SPAC Transaction if any of the De-SPAC Option Conditions are not satisfied.

15.7   The De-SPAC Option shall terminate and cease to be exercisable if the De-SPAC Option Conditions have not been satisfied, or if the De-SPAC Option has not been exercised for any reason, on or before 26 April 2023.

15.8   Notwithstanding anything herein to the contrary, upon the De-SPAC Closing, this agreement shall automatically terminate in accordance with clause 25.3; provided that such termination shall be without prejudice to the rights of the parties arising prior to such termination including without limitation all rights arising pursuant to clause 15.2(b) and without prejudice to the Reserved Rights.

15.9   Each Shareholder hereby irrevocably and unconditionally agrees that, subject always to agreement by each of them to the Investor Rights Agreement that, if the De-SPAC Option is timely exercised, concurrently with the execution of the Agreed-Form BCA, each of the Shareholders shall duly execute and deliver (i) such consents and approvals as are reasonably necessary to authorize and approve the De-SPAC Transaction (including, without limitation, a shareholder written consent approving the Agreed-Form BCA and the transactions contemplated thereby), and (ii) counterparts of the Shareholder Exchange Agreement, Investor Rights Agreement and any other Ancillary Documents to which such Shareholder is a party.

15.10

(a)   Each Shareholder hereby irrevocably and unconditionally agrees that, at all times on or prior to April 26, 2023, it shall vote (or cause to be voted) the Equity Securities against and withhold consent with respect to (A) any Company Acquisition Proposal (as defined in the Agreed-Form BCA) or (B) any other matter, action or proposal that would reasonably be expected to result in (x) a breach of any of the Company's covenants, agreements or obligations under the Agreed-Form BCA or (y) any of the conditions to the De-SPAC Closing set forth in the Agreed-Form BCA not being satisfied at De-SPAC Closing.

(b)   Each Shareholder hereby agrees that, notwithstanding anything to the contrary in any such agreement, (i) each agreement to which such Shareholder is a party (other than the Reserved Rights) shall be automatically terminated and of no further force and effect (including any provisions of any such agreement that, by its terms, survive such termination) effective as of, and subject to and conditioned upon the occurrence of, the De-SPAC Closing and (ii) upon such termination neither the Company nor any of its Affiliates (including the other Released Group Companies) shall have any further obligations or liabilities

under each such agreement. This clause 15.10(b) shall not apply to the agreement between Facebank Inc. (a company in which the Founder has an interest) and Botafogo.

(c)   From the date of this Agreement until the earliest of (A) April 26, 2023, if the De-SPAC Option has not been timely exercised in accordance with the terms of this Agreement, (B) the De-SPAC Closing, or (C) the termination of the Agreed-Form BCA in accordance with its terms, each Shareholder shall not, and shall cause its representatives not to, directly or indirectly: (i) solicit, initiate, knowingly encourage (including by means of furnishing or disclosing non-public information), knowingly facilitate, discuss with any third party or negotiate, directly or indirectly, any inquiry, proposal or offer (written or oral) with respect to a Company Acquisition Proposal; (ii) furnish or disclose any non-public information to any person in connection with, or that would reasonably be expected to lead to, a Company Acquisition Proposal; (iii) enter into any contract, agreement or other arrangement or understanding regarding a Company Acquisition Proposal; (iv) prepare or take any steps in connection with a public offering of any Equity Securities of the Company, other than (A) as contemplated herein or (B) any such offering that would only be executed after the De-SPAC Closing; or (v) otherwise cooperate in any way with, or assist or participate in, or facilitate or knowingly encourage any effort or attempt by any Person to do or seek to do any of the foregoing.

15.11   Nothing in this agreement or the Articles shall restrict the ability for the Company and the SPAC to conduct the De-SPAC Transaction in accordance with the Agreed-Form BCA pursuant to a timely exercise of the De-SPAC Option. In particular, any restriction to the transfer of securities (including the pre-emption rights on transfer, tag-along, drag-along, mandatory offer on a change of control and pre-emption on new issuance rights set forth in the Articles) shall not apply to the consummation of the De-SPAC Transaction in accordance with the Agreed-Form BCA pursuant to a timely exercise of the De-SPAC Option.

The Company shall provide a draft of the Allocations Schedule required to be provided by it pursuant to the Agreed-Form BCA to the Investors and shall consult with them prior to its finalisation.

## 16.   Ares Rights

16.1   Notwithstanding any other provisions of this agreement or the New Articles, Ares shall have the right (but not the obligation), upon the earlier of (i) the date on which the Debt Investment (together with any interest and fees thereon) has been repaid in full and (ii) the seventh (7th) anniversary of the OL Closing Acquisition, with advanced written notice to the Company and subject to any regulatory requirements or commercially reasonable "know-your-client" requirements imposed by the Company, to freely assign, transfer or otherwise dispose of all of its Equity Securities in the Company to a third party.

16.2   Upon occurrence of an Ares Restructure Trigger Event, all Shareholders agree to cooperate and procure (to the extent that they are legally able) that the Group Companies cooperate with any reasonable proposal made by Ares which delivers equivalent (but no greater) economic return to Ares from their proposed ownership of Shares and Ares Warrants, including without limitation: (i) a restructuring to permit equity ownership at a lower tier in the Group structure (excluding any Owned Club participation that causes such Ares Restructure Trigger Event), with put rights on an exit to deliver equivalent economic return; (ii) an exit-triggered cash payment

obligation; or (iii) any derivative or similar structure which create an economic interest only and not an interest in shares.

16.3   At any time after the earlier of (i) completion of the De-SPAC Transaction, (ii) the giving of a put option notice pursuant to any option agreement entered into between the Founder and any Investor on the date of this agreement or (iii) 31 December 2023 and only upon the occurrence of a Put Option Event (but subject always to clause 16.4), Ares shall have the right (but not the obligation) (the **Ares Put Option**), by delivery of a Put Option Notice to the Company, to require the Company or such person nominated by the Company (**Put Option Transferee**) to purchase all of the Shares held by Ares and its Permitted Transferees (**Put Option Shares**) on the Put Option Transfer Terms. The Ares Put Option shall only be exercisable in respect of all (and not some only) of the Put Option Shares. Once given, a Put Option Notice may not be withdrawn except with the written consent of the Company.

16.4   Ares shall not give a Put Option Notice where the Put Option Event is an event occurring under either sub-paragraphs (a) or (c) of the definition of Ares Restructure Trigger Event until the earliest of the following has occurred:

(a)   Ares has sought to restructure its investment in the Company and none of its proposals are accepted as resolving the restriction on investment in other Clubs participating in the English Premier League;

(b)   Ares proposes a restructuring which would resolve the restriction on investment in other Clubs participating in the English Premier League, but the parties are in material breach of their duty of cooperation to implement such restructuring in accordance with clause 16.2; or

(c)   the prohibition on investment in other Clubs participating in the English Premier League is not capable of remedy.

16.5   On exercise of the Ares Put Option, Ares will become bound to sell and the Put Option Transferee will become bound to purchase the Put Option Shares on the Put Option Transfer Terms.

16.6   The Ares Put Option shall lapse if a Put Option Notice is not given within 12 months of a Put Option Event first occurring.

16.7   The Company and Ares shall use reasonable endeavours to agree to the fair market value of the Put Option Shares as at the date on which a Put Option Notice is given, on the basis of an arm's length transaction between a willing buyer and a willing seller with no discount to apply by reason of the Put Option Shares comprising a minority interest (**Put Option FMV**). If the Put Option FMV cannot be agreed within 20 Business Days of the date on which the Put Option Notice is given, either the Company or Ares may refer the matter to an Expert for determination in accordance with schedule 8.

16.8   Once a Put Option Notice has been given, Ares, the Company and (where applicable) the Founder, shall work collaboratively in good faith to structure the exercise of the Put Option in a manner which complies with applicable law (including without limitation the Companies Act 2006) and with no personal liability to the Founder.

16.9   If no alternative funding arrangements can be found and the Put Option Transferee is not able to finance the purchase of the Put Option Shares, Ares shall use all reasonable endeavours to provide debt funding on the same or substantially similar terms as the Debt Investment to either the Company or the Founder to enable the Put Option Transferee to complete the exercise of the Ares Put Option.

16.10   Completion of the Ares Put Option shall take place on the tenth Business Day after the day on which the Put Option FMV is agreed or determined pursuant to clause 16.7.

16.11   On Put Option Completion, Ares shall deliver to the Put Option Transferee (i) a duly executed transfer of the Put Option Shares in favour of the Put Option Transferee, (ii) the share certificate(s) in respect of the Put Option Shares, (iii) any form of consent or waiver required from Ares and (so far as it is able) any other Shareholder, to enable the transfer of the Put Option Shares to be registered in accordance with the Company's articles of association, (iv) a duly executed irrevocable power of attorney (in a form reasonably acceptable to the Put Option Transferee) in favour of the Put Option Transferee generally in respect of the Put Option Shares and in particular to enable the Put Option Transferee to approve written resolutions circulated and to attend and vote at general meetings of the Company held during the period prior to the name of the Put Option Transferee being entered on the register of members of the Company in respect of the Put Option Shares, and (v) do such other acts and things and execute such other documents as shall be necessary or as the Put Option Transferee may reasonably request to give effect to the sale of the Put Option Shares on the Put Option Transfer Terms.

16.12   Subject to Ares complying with its obligations under clause 16.11, the Put Option Transferee shall, on Put Option Completion, pay an amount equal to the Put Option FMV (as agreed or determined in accordance with clause 16.7) to Ares.

16.13   Neither Ares nor the Put Option Transferee shall be obliged to complete the sale and purchase of the Put Option Shares unless the sale and purchase of all the Put Option Shares is completed simultaneously, but completion of the sale and purchase of some of the Put Option Shares will not affect the rights of Ares or the Put Option Transferee with respect to the others.

## 17.   No Effect on Lending Relationship

17.1   Notwithstanding anything herein to the contrary, nothing contained in this Agreement shall affect, limit or impair the rights and remedies of Ares or any of its Associates that is a lender to any Group Company (each an **Ares Lender**) in such Ares Lender's capacity as a lender to the Group pursuant to the Notes Purchase Agreement. Without limiting the generality of the foregoing, any such Ares Lender, in exercising its rights as a lender, including making any decisions contemplated by the Notes Purchase Agreement, will have no duty to consider:

(a)      its status as a direct or indirect holder of Equity Securities; or

(b)      any duty it may have to any other direct or indirect holder of Equity Securities, except as may be required under the Notes Purchase Agreement or by commercial law applicable to creditors generally.

## 18.   Tax Matters

18.1   The Company shall (and the Shareholders shall use all reasonable endeavours to ensure that the Group shall) not make any investment or engage in any transaction that would cause (i) a Shareholder to earn, solely as a result of owning the Shares or (ii) Ares to earn, solely as a result of owning the Ares Warrants:

(a)      income that is "effectively connected with the conduct of a trade or business within the United States," as defined in Section 864 of the Code; or

(b)      income that is not as described in section 851(b)(2) of the Code.

18.2    If the OL Closing Acquisition, together with the proposed acquisition of the issued and outstanding Olympique Lyonnais common equity shares owned by public shareholders (and any other contemplated acquisition of stock of Olympique Lyonnais), constitutes a "qualified stock purchase" as defined in Section 338(d)(3) of the Code and the U.S. Treasury regulations thereunder, the Company shall file or cause the applicable Group Company to file an election under Section 338(g) of the Code and the U.S. Treasury regulations thereunder in respect of Olympique Lyonnais and, to the extent permitted by applicable law, any direct and indirect non-U.S. subsidiary of Olympique Lyonnais.

## 19.    Announcements

19.1    Except in accordance with clauses 14.2 or 19.2, the parties shall not make any public announcement or issue a press release or respond to any enquiry from the press or other media concerning or relating to this agreement or its subject matter (including but not limited to the Investors' investment in the Company) or any ancillary matter. Prior to the execution of the Agreed-Form BCA, no party shall make any public announcement or issue any press release with respect to the De-SPAC Transaction or the De-SPAC Option without the prior written consent of the Company, other than filings required to be made to the U.S. Securities and Exchange Commission (but not any press release or other public announcement related thereto); provided that any Shareholder proposing to make such a required filing shall reasonably consult with the Company in connection therewith and provide the Company with an opportunity to review and comment on such press release, public announcement or communication and shall consider any such comments in good faith.

19.2    Notwithstanding clause 19.1, any party may:

(a)    make any press release in the form, as mutually agreed between the parties, acting in good faith, from time to time, provided that the parties agree that a press release will be made upon Completion;

(b)    make any press release to the effect that it has made an investment in the Company and/or that it is a shareholder in the Company without obtaining the prior approval of any other parties;

(c)    make or permit to be made an announcement concerning or relating to this agreement or its subject matter or any ancillary matter with the prior written approval of the Board or if and to the extent required by:

(i)    law;

(ii)    any securities exchange on which such party's securities are listed or traded;

(iii)    any regulatory or governmental or other authority with relevant powers to which such party is subject or submits, whether or not the requirement has the force of law; or

(iv)    any court order.

## 20.    Costs and expenses

Save for the Agreed Costs, which shall be borne by Bidco and paid as set out in Schedule 10, each party shall bear its own costs and disbursements incurred in the

negotiations leading up to and in the preparation of this agreement and of matters incidental to this agreement.

## 21.    Effect of ceasing to hold Equity Securities

A party shall cease to be a party to this agreement for the purpose of receiving benefits and enforcing his rights with effect from the date he ceases to hold or beneficially own any Equity Securities (but without prejudice to any benefits and rights accrued prior to such cessation).

## 22.    Cumulative remedies

The rights, powers, privileges and remedies conferred upon the Investors in this agreement are cumulative and are not exclusive of any other rights, powers, privileges or remedies provided by law.

## 23.    Waiver

The express or implied waiver by any party to this agreement of any of its rights or remedies arising under this agreement or by law shall not constitute a continuing waiver of the right or remedy waived or a waiver of any other right or remedy.

## 24.    Entire agreement

24.1    This agreement and the documents referred to or incorporated in it (together with any agreement entered into between Iconic and the Founder on or about the date of this agreement and any other agreements related to this agreement or its subject matter entered into on the date of this agreement between some or all of the parties hereto) constitute the entire agreement between the parties relating to the subject matter of this agreement and supersede and extinguish any prior drafts, agreements, undertakings, representations, warranties and arrangements of any nature whatsoever, whether or not in writing, between the parties in relation to the subject matter of this agreement.

24.2    With effect from Completion and in consideration of the obligations of the parties to each other under this agreement, the Investment Term Sheet shall terminate and cease to have effect. Each of the parties to the Investment Term Sheet shall stand released and discharged from all obligations arising under or resulting from the Investment Term Sheet. None of the parties to the Investment Term Sheet shall be entitled to exercise (and each such party waives) any rights to make any claim against any of the others under or in relation to the Investment Term Sheet or its termination save that nothing in this clause shall release any party from liability for breaches of the Investment Term Sheet which occurred prior to Completion.

24.3    Each of the parties acknowledges and agrees that it has not entered into this agreement in reliance on any statement or representation of any person (whether a party to this agreement or not) other than as expressly incorporated in this agreement, the documents referred to or incorporated in this agreement, any agreement entered into between Iconic and the Founder on or about the date of this agreement, and any other agreements related to this agreement or its subject matter entered into on the date of this agreement between some or all of the parties hereto.

24.4    Without limiting the generality of the foregoing, each of the parties irrevocably and unconditionally waives any right or remedy it may have to claim damages and/or to rescind this agreement by reason of any misrepresentation (other than a fraudulent misrepresentation) having been made to it by any person (whether party to this agreement or not) and upon which it has relied in entering into this agreement.

24.5    Each of the parties acknowledges and agrees that the only cause of action available to it under the terms of this agreement and the documents referred to or incorporated in this agreement in respect of a Claim shall be for breach of contract.

24.6    Other than in respect of a Claim, each of the parties acknowledges and agrees that damages alone may not be an adequate remedy for the breach of any of the undertakings or obligations as set out in this agreement. Accordingly, without prejudice to any other rights and remedies the parties may have, the parties shall be entitled to seek the remedies of injunction, specific performance or other equitable relief for any threatened or actual breach of the terms of this agreement.

24.7    Nothing contained in this agreement or in any other document referred to or incorporated in it shall be read or construed as excluding any liability or remedy as a result of fraud.


## 25.    Variation and termination

25.1    No provision of this agreement may be deleted, varied, supplemented, restated or otherwise changed in any way at any time without the prior written consent of the Company, the Founder and each of the Investors.

25.2    Article 4 (Dividends), article 5 (Liquidation), article 6 (Exit provisions), article 7 (Votes in general meeting and written resolutions), article 9 (Allotment of new shares or other securities: pre-emption), article 10 (Transfer of Shares - general), article 11 (Permitted Transfers), article 12 (Transfer of Shares subject to pre-emption rights), article 15 (Mandatory Offer on a Change of Control), article 16 (Tag-along), article 17 (Drag along) and article 23 (Appointment of Directors) of the New Articles shall be incorporated into this agreement as if set out in full, and shall not be deleted, varied, supplemented, reinstated or otherwise changed in any way at any time without the prior written consent of the Company, the Founder and each of the Investors.

25.3    This agreement shall automatically terminate and cease to have effect upon the earlier of (i) an IPO, (ii) the completion of the De-SPAC Transaction in accordance with clause 15; (iii) Completion not having occurred on or prior to 31 December 2022; and (iv) termination of the OL SPA in accordance with its terms, where it has not been renewed or reinstated within 10 Business Days from such termination, save that nothing in this clause shall release any party from liability for breaches of this agreement which occurred prior to its termination.


## 26.    No partnership

Nothing in this agreement is intended to or shall be construed as establishing or implying any partnership of any kind between the parties.

27. **Assignment and transfer**

27.1   Subject to clause 27.3, this agreement is personal to the parties and no party shall:

   (a)   assign any of its rights under this agreement;

   (b)   transfer any of its obligations under this agreement;

   (c)   sub-contract or delegate any of its obligations under this agreement; or

   (d)   charge or deal in any other manner with this agreement or any of its rights or obligations.

27.2   Any purported assignment, transfer, sub-contracting, delegation, charging or dealing in contravention of clause 27.1 shall be ineffective.

27.3   Subject to clause 27.4:

   (a)   a Shareholder may assign the whole or part of any of its rights in this agreement to (i) their Permitted Transferees (it being specified that all rights of Iconic (excluding the rights contained in clause 15 of this agreement), Ares and Elmwood shall be transferred to their Permitted Transferees) or (ii) any person who has received a transfer of shares in the capital of the Company from such Shareholder in accordance with the New Articles, in each case subject to such transferee having executed a Deed of Adherence; and

   (b)   an Investor may grant Security in favour of any of its Financing Parties, limitedly to the extent required in order to satisfy its obligations under the finance documents governing any such indebtedness.

27.4   The rights of Iconic pursuant to clause 15 shall be personal to it, and may not be assigned to any person who has received a transfer of all or any part of its Equity Securities in the Company.

28. **Rights of third parties**

28.1   Subject to clause 28.2, this agreement does not confer any rights on any person or party (other than the parties to this agreement) pursuant to the Contracts (Rights of Third Parties) Act 1999.

28.2   The general partner of an Investor or the management company authorised from time to time to act on behalf of that Investor or another person or persons nominated by that Investor, shall be entitled to enforce all of the rights and benefits under this agreement at all times as if party to this agreement.

29. **Conflict between agreements**

   Subject to any applicable law, in the event of any ambiguity or conflict between this agreement and the New Articles, the terms of this agreement shall prevail as between the Shareholders and in such event the Shareholders shall procure such modification to the New Articles as shall be necessary.

30. **Counterparts; No originals**

This agreement may be executed in any number of counterparts, each of which shall constitute an original, and all the counterparts shall together constitute one and the same agreement. The exchange of a fully executed version of this agreement (in counterparts or otherwise) by electronic transmission in PDF format shall be sufficient to bind the parties to the terms and conditions of this agreement and no exchange of originals is necessary.

31. **Notices**

31.1 Any communication and/or information to be given in connection with this agreement shall be in writing in English and shall either be delivered by hand or sent by first class post or email or other electronic form:

(a) to the Company or Bidco at its registered office or john.textor@facebank.com (or such other address or email address as it may notify to the other parties to this agreement for such purpose); or

(b) to any other party to this agreement at the address of that individual shown in schedule 1 or as may be shown in a Deed of Adherence,

(or in each such case such other address as the recipient may notify to the other parties for such purpose).

31.2 A communication sent according to clause 31.1 shall be deemed to have been received:

(a) if delivered by hand, at the time of delivery;

(b) if sent by pre-paid first class post, on the second day after posting; or

(c) if sent by email at the time of completion of transmission by the sender;

except that if a communication is received between 5.30 pm on a Business Day and 9.30 am on the next Business Day, it shall be deemed to have been received at 9.30 am on the second of such Business Days.

32. **Severance**

32.1 If any provision of this agreement is held to be invalid or unenforceable by any judicial or other competent authority, all other provisions of this agreement will remain in full force and effect and will not in any way be impaired.

32.2 If any provision of this agreement is held to be invalid or unenforceable but would be valid or enforceable if some part of the provision were deleted, the provision in question will apply with the minimum modifications necessary to make it valid and enforceable.

33.     **Governing law**

This agreement (and any dispute or claim relating to it or its subject matter (including non-contractual claims)) is governed by and is to be construed in accordance with English law.

34.     **Jurisdiction**

The parties irrevocably agree that the courts of England and Wales shall have exclusive jurisdiction to settle any claim, dispute or issue (including non-contractual claims) which may arise out of or in connection with this agreement.

35.     **Confirmation by the Investors**

35.1    The Founder and the Investors confirm, for the purposes of entering into this agreement and without prejudice to any provisions of the New Articles and any option agreement entered into between the Founder and any Investor on or around the date of this agreement:

(a)     they have entered into this agreement entirely on the basis of their own assessment of the risks and effect thereof;

(b)     they owe no duty of care or other obligation by any other party to this agreement (save to the extent they are employed or engaged by any such party); and

(c)     insofar as they owe any such duty or obligation (whether in contract, tort or otherwise) by a party they hereby waive, to the extent permitted by law, any rights (save in the case of any fraud or fraudulent misrepresentation) which they may have in respect of such duty or obligation.

36.     **Regulatory matters**

No Investor or general partner of any Investor or management company authorised from time to time to act on behalf of any Investor is acting for or advising any other party to the transaction that is the subject of this agreement or undertaking any other activity in relation to that other party that implies in any way that the other party is a client and accordingly no such Investor, general partner of any Investor and/or management company of any Investor (as appropriate) shall be responsible to any other party for providing any protection afforded to any client (as defined in the Glossary to the FCA Handbook of rules and guidance) for any Investor.

37.     **US securities laws requirements**

37.1    Each Investor acknowledges and warrants separately for itself and in respect of its own position, to the Company, for the purpose of compliance with the United States Securities Act of 1933, as amended (the **"Securities Act"**) and state securities laws, as follows:

(a)     each Investor acknowledges that the New Shares have not been registered under the Securities Act, or any state securities laws on the basis that the Company is relying on an exemption from registration under such laws that depends in part on the representations made by each Investor pursuant to this clause, and that the transferability of the New Shares is therefore subject to restrictions imposed by those laws;

(b)     each Investor agrees not to sell or otherwise transfer the New Shares insofar as the Securities Act restricts such sale or transfer unless they are registered under the Securities Act and United States state securities laws of the applicable jurisdiction or unless an exemption from registration is available;

(c)     each of the Investors has either a residence or business address as set out in Part 1 of Schedule 1; all offers of the New Shares were made to the Investors at that address or elsewhere outside of the United States; no offer or solicitation was made to the Investors in any jurisdiction other than that jurisdiction or elsewhere outside of the United States; and each of the Investors accepted the offer to purchase New Shares by executing this agreement or a Deed of Adherence within that jurisdiction; and prior to such acceptance, the Investor did not accept the offer in any other jurisdiction, orally, in writing, or otherwise;

(d)     in respect of each Investor, no Disqualification Event is applicable to such Investor or any of its Rule 506(d) Related Parties, except, if applicable for a Disqualification Event as to which Rule 506(d)(2)(ii) or (iii) or (d)(3) is applicable. For the purposes of this agreement, "Rule 506(d) Related Party" shall mean a person or entity covered by the "Bad Actor disqualification" provision of Rule 506(d) of the Securities Act;

(e)     in respect of each Investor, such Investor hereby agrees that it shall notify the Company promptly in writing in the event a Disqualification Event becomes applicable to such Investor or any of its Rule 506(d) Related Parties, except, if applicable, for a Disqualification Event as to which Rule 506(d)(2)(ii) or (iii) or (d)(3) is applicable;

(f)     each Investor that is a "U.S. Person" (within the meaning of Rule 902 of Regulation S promulgated under the Securities Act) is an "accredited investor" within the definition set forth in Rule 501(a) under the Securities Act;

(g)     each of the Investors that is a "U.S. Person" acknowledges that such Investor has experience in making investments such as those in the Company and is able to bear the economic risk of the investment for an indefinite period of time because the New Shares have not been registered under the Securities Act, and therefore, must (to the extent the Securities Act restricts a transfer of New Shares) be held unless they are subsequently registered under the Securities Act or an exemption from such registration is available;

(h)     each of the Investors acquired the New Shares for its own account for investment and not for the account of another nor with a view to, or for resale in connection with, any distribution or public offering thereof within the meaning of the Securities Act, the state securities laws of any applicable jurisdiction, or the rules and regulations promulgated thereunder and, if such Investor is an entity, such Investor was not formed for the specific purpose of acquiring the New Shares; and

(i)     each Investor believes that it has received all the information it considers necessary or appropriate for deciding whether to purchase the New Shares pursuant to this agreement. Each Investor has had an opportunity to ask questions and receive answers from the Company regarding the terms and conditions of the issue of the New Shares and the business, properties and financial condition of the Company. The foregoing, however, does not in any way limit or modify the Warranties.

**SCHEDULE 1**

**Part 1**

**The Investors**

**Ares**

| Name | Address |
|------|---------|
| Ares Capital Corporation | Address: Ares Capital Corporation, 245 Park Avenue, 44th Floor, New York, NY 10167, Attention: Ares Middle Office DL<br><br>Email address: middleofficedl@aresmgmt.com |
| CION Ares Diversified Credit Fund | Address: Ares Capital Corporation, 245 Park Avenue, 44th Floor, New York, NY 10167, Attention: Ares Middle Office DL<br><br>Email address: middleofficedl@aresmgmt.com |
| Ares Credit Strategies Insurance Dedicated Fund Series Interests of the SALI Multi-Series Fund, L.P. | Address: Ares Capital Corporation, 245 Park Avenue, 44th Floor, New York, NY 10167, Attention: Ares Middle Office DL<br><br>Email address: middleofficedl@aresmgmt.com |
| Ares Sports Media and Entertainment Finance S. à.r.l | Address: Ares Capital Corporation, 245 Park Avenue, 44th Floor, New York, NY 10167, Attention: Ares Middle Office DL<br><br>Email address: middleofficedl@aresmgmt.com |
| Ares European Credit Strategies Fund IX (C), L.P. | Address: Ares Capital Corporation, 245 Park Avenue, 44th Floor, New York, NY 10167, Attention: Ares Middle Office DL<br><br>Email address: middleofficedl@aresmgmt.com |
| Ares Credit Investment Partnership (CP), L.P. | Address: Ares Capital Corporation, 245 Park Avenue, 44th Floor, New York, NY 10167, Attention: Ares Middle Office DL<br><br>Email address: middleofficedl@aresmgmt.com |
| Ares Credit Investment Partnership (MD), L.P. | Address: Ares Capital Corporation, 245 Park Avenue, 44th Floor, New York, NY 10167, Attention: Ares Middle Office DL<br><br>Email address: middleofficedl@aresmgmt.com |

| | |
|---|---|
| MC Financing SPV I, LLC | Address: 311 South Wacker Drive, Suite 6400 / Chicago, IL 60606, Attention: Alex Franky<br><br>Email address: afranky@monroecap.com |
| Monroe Capital Private Credit Fund 559 LP | Address: 311 South Wacker Drive, Suite 6400 / Chicago, IL 60606, Attention: Alex Franky<br><br>Email address: afranky@monroecap.com |
| Monroe Capital Private Credit Master Fund IV SCSp | Address: 311 South Wacker Drive, Suite 6400 / Chicago, IL 60606, Attention: Alex Franky<br><br>Email address: afranky@monroecap.com |
| Monroe Capital Opportunistic Private Credit Master Fund SCSp | Address: 311 South Wacker Drive, Suite 6400 / Chicago, IL 60606, Attention: Alex Franky<br><br>Email address: afranky@monroecap.com |
| Monroe Capital Private Credit Master Fund IV (Unleveraged) SCSp | Address: 311 South Wacker Drive, Suite 6400 / Chicago, IL 60606, Attention: Alex Franky<br><br>Email address: afranky@monroecap.com |
| Monroe Capital Insurance Fund Series Interests of the SALI Multi-Series Fund, L.P. | Address: 311 South Wacker Drive, Suite 6400 / Chicago, IL 60606, Attention: Alex Franky<br><br>Email address: afranky@monroecap.com |
| CL Note Investment LLC | Address: c/o RPTC Inc., P.O. Box 3168, 115 W. Snow King Ave., Suite 101A Jackson, Wyoming 83001, Attention: Alfred Levitt,<br><br>with a copy to: Northside Entertainment Holdings, LLC, 1101 W. Waveland Ave., Chicago, IL 60618, Attention: Office of the General Counsel<br><br>Email address: alevitt@hugollc.com |

**Iconic**

| Name | Address |
|---|---|
| Iconic Sports Eagle Investment LLC ("**Iconic**") | Walkers Corporate Limited, 190 Elgin Avenue, George Town, Grand Cayman KY1-9008, Cayman Islands<br><br>Email address: Fausto Zanetton fausto.zanetton@tifosy.com;<br><br>with a copy to (which shall not constitute notice) Tommy Aylmer tommy.aylmer@tifosy.com |

**Elmwood**

| Name | Address |
|---|---|
| Elmwood Eagle, LLC | The Corporation Trust Company, Corporation Trust Centre, 1209 Orange Street, Wilmington, New Castle County, Delaware, 19801.<br><br>Email address: andy@accelentertainment.com |

**Part 2**

**The Founder**

| Name | Address  and email address |
|------|----------------------------|
| John Textor | 100  Harbor  Way,  Hobe  Sound,  FL  33455, United States<br><br>Email address: john.textor@facebank.com |

**SCHEDULE 2**

**Part 1**

**Particulars of the Company**

| | |
|---|---|
| **Registered number:** | 14379286 |
| **Registered office:** | 57-59 Beak Street, London, United Kingdom, United Kingdom, W1F 9SJ |
| **Directors:** | The Founder |
| **Secretary:** | None |
| **Accounting reference date:** | 30 June |
| **Charges:** | None |
| **Issued share capital (including treasury shares):** | 31,240 Ordinary Shares of £0.01 each |

**Part 2**

**Particulars of the Subsidiaries**

| | |
|---|---|
| **Name of company:** | Eagle Football Holdings Midco Limited |
| **Registered number:** | 14383202 |
| **Registered office:** | 57-59 Beak Street, London, United Kingdom, United Kingdom, W1F 9SJ |
| **Directors:** | The Founder |
| **Secretary:** | None |
| **Accounting reference date:** | 30 June |
| **Charges:** | None |
| **Issued share capital (including treasury shares):** | 3,034 ordinary shares of £1.00 each |
| **Shareholder** | The Company |

| | |
|---|---|
| **Name of company:** | Eagle Football Holdings Bidco Limited |
| **Registered number:** | 14385313 |
| **Registered office:** | 57-59 Beak Street, London, United Kingdom, United Kingdom, W1F 9SJ |
| **Directors:** | The Founder |
| **Secretary:** | None |
| **Accounting reference date:** | 30 June |
| **Charges:** | None |
| **Issued share capital (including treasury shares):** | 3,034 ordinary shares of £1.00 each |
| **Shareholder** | Eagle Football Holdings Midco Limited |

**SCHEDULE 3**

**Part 1**

**Fully diluted equity of the Company**

| Member | Number of Ordinary Shares held | Number of Ares Warrants held | Percentage Equity on a Fully Diluted Basis |
|---|---|---|---|
| The Founder | 31,240 | - | 100.00% |
| **Totals** | **31,240** | **-** | **100.00%** |

**Part 2**

**Fully diluted equity of the Company – immediately post-Completion**

| Member | Number of Ordinary Shares held | Number of Ares Warrants held | Percentage Equity on a Fully Diluted Basis |
|---|---|---|---|
| | | Note Warrants | |
| The Founder | 31,240 | - | 60.13% |
| Iconic | 8,520 | - | 16.40% |
| Ares | - | 4,156 | 8.00%, excluding any Investment Warrants |
| Elmwood | 2,840 | - | 5.47% |
| Reserved for issuance under the Management Incentive Plan | - | - | 10.00% |
| **Totals** | **42,600** | **4,156** | **100.00%** |

**SCHEDULE 4**

**Completion conditions**

1.     The passing of directors' and shareholders' resolutions in the agreed form at a duly convened Board meeting and a general meeting or by shareholders' written resolution to:

   (a)     authorise the allotment of the New Shares;

   (b)     insofar as required, waive pre-emption rights in respect of the allotment and issue of the New Shares; and

   (c)     adopt the New Articles.

2.     All necessary waivers in respect of any "change of control" or similar clause applicable to its existing financing in the context of the OL Closing Acquisition have been obtained by Olympique Lyonnais.

3.     The execution of the Ares Warrant Instrument and the issue of the Ares Warrants to Ares.

4.     The Founder and the Company having provided to the Investors reasonable evidence that the Premier League has approved, on an irrevocable basis, the transfer of the Crystal Palace Equity Interest to Bidco and the investment of the Investors in the Company as contemplated in this agreement (the "**Premier League Consent**").

5.     The Founder and the Company having provided reasonable evidence that the OL Closing Acquisition will be completed within 7 Business Days of the Premier League Consent.

**SCHEDULE 5**

**Part 1**

**Matters requiring Board Consent**

1.    The approval or modification of the Group Companies' annual budget and business plan.

2.    Any issuance of securities by any Group Company and any reduction of the share capital of any Group Company.

3.    Any amendment to the articles of association of any Group Company.

4.    The audit of the financial year-end accounts, the allocation of the results and any significant changes in the accounting principles and/or methods of any Group Company.

5.    The appointment and revocation of the statutory auditors of the Company.

6.    Unless otherwise approved in the Company's annual budget and business plan, the entering into of any lease, rental or operating services agreement or purchasing contract in each case for a total value over the term of the agreement of more than €25 million.

7.    The disposal (including as a result of a merger, demerger, capital increase, transfer of securities, assets or business or other transaction) by any Group Company of any of its assets (excluding the sale of football players or an Owned Club) which exceeds €50 million in value.

8.    Any acquisition of any companies, entities, securities, assets or businesses (including by way of acquisition or subscription for securities, businesses, assets or by merger or partial contribution of securities, businesses or assets) other than an Owned Club by any Group Company, which individually or in aggregate in case of related transactions exceeds €50 million in value.

9.    Any decision relating to the appointment, hiring, dismissal or remuneration of a manager or employee of the Group Companies with a gross annual remuneration exceeding €250,000.

10.   Entry into binding agreements to do any of the matters set out in paragraphs 1 to 9 above.

11.   Permitting, to the extent within the control of the Company, the renaming of an Owned Club.

12.   The issuance, public offering or admission to trading on a regulated market of securities issued by any Group Company (other than the De-SPAC Transaction).

13.   The amendment or retraction of any Tax return by any Group Company which has previously been submitted to a Tax Authority, or amendment, disclaimer or revocation of any Tax refund or relief, or any claim, surrender or election relating to Tax which has previously been received or submitted or notified to any Tax Authority.

14.     The settlement, compromise, agreement or material negotiation of any audit, enquiry, assessment, dispute or litigation relating to Tax with any Tax Authority, entry into any closing agreement or similar agreement with any Tax Authority, or consenting to any extension or waiver of the limitation period relating to Tax.


## Part 2

### Matters requiring Board Consent and Investor Director Consent

1.      Any voluntary or solvent bankruptcy proceedings, liquidation, dissolution or winding-up or decision to vote in favour of any such bankruptcy proceedings, liquidation, dissolution or winding-up of any Group Company.

2.      Permitting, to the extent within the Company's control, the relocation of an Owned Club from its current home stadium which would result in an expenditure of greater than €10 million.

3.      Permitting, to the extent within the Company's control, an Owned Club voluntarily leaving its national league or participation in any competition not governed by FIFA, UEFA, CONMEBOL or an Owned Club's national football association or federation.

4.      Acquisition of any other Owned Club other than Crystal Palace, Olympique Lyonnais, Botafogo or RWD Molenbeek which individually, or together with related transactions, exceeds €50 million in value.

5.      Any material change in the nature of the business of the Group as a whole.

6.      Commencement or settlement of litigation over $100 million (excluding any Owned Club-level litigation).

7.      The entry into any related party transaction between a Group Company on the one hand, and the holder (or any of its Affiliates) of any Equity Securities on the other hand, other than on arm's length terms.

8.      Any modification of the terms and conditions of the securities issued by the Company.

9.      Any distribution, including of dividends, interim dividends or reserves.

10.     The entering into of a settlement agreement relating to any litigation or the initiation of legal, administrative or arbitration proceedings by any Group Company where the amount at issue exceeds €25 million.

11.     Other than the De-SPAC Transaction or the refinancing of loans relating to Olympique Lyonnais, any pledge, guarantee or other security, in any form whatsoever, other than in the normal course of business.

12.     Any amendment to the Notes Purchase Agreement and any decision requiring a prior consent under the Notes Purchase Agreement or which, in the absence of such consent, would constitute or be likely to constitute an event of default/mandatory prepayment under the Notes Purchase Agreement.

13.     The incurrence of any borrowings or other financing, except for any drawdowns under existing credit facilities (but excluding any of the foregoing at any Owned Club level operations).

14.     The implementation of any management incentive plan by a Group Company, or a change to an existing incentive plan.

15.     Any transformation or reorganisation operation (including mergers, demergers, partial contributions of assets) involving one or more Group Companies.

16.     Any change to the composition of the Board or rules applicable to the Board (other than a party deciding to replace its appointee(s)).


**Part 3**

**Matters requiring the consent of the affected Investor**

17.     Any change to the investment structure (including the rights attaching to the Ordinary Shares) which materially and adversely affects any Investor, provided that, any issuance of equity or securities convertible into equity, which may have rights which are superior and/or preferential to the Ordinary Shares (including any rights which may be attached to any such equity) shall not constitute either a material or adverse change to the investment structure.

18.     Any amendment, abrogation or waiver of any shareholders' agreement (other than this agreement) and articles of association and any agreement pertaining to the amendment of any such shareholders' agreement and articles of association of any Group Company (other than amendments which result from actions which are expressly authorised hereby) where such amendment would adversely and materially affect a particular Investor (and for the avoidance of doubt, any amendments to any such shareholders' agreement and articles of association to reflect the provisions relating to a new equity (whether or not a new class which may have rights which are superior and/or preferential to the Ordinary Shares) shall not be restricted by this right, provided that (in respect of Ares) such amendments shall extend to anything which would adversely and materially affect the rights of Ares in respect of any shares issuable upon exercise of warrants issued to it by the Company, including for the avoidance of doubt any amendments to the Ares Warrant Instrument).

19.     Prior to the later of the Long-Stop Date or, if the De-SPAC Option has been exercised, the date of the closing of the De-SPAC Transaction or earlier termination of the definitive documentation for the De-SPAC Transaction, any Board action taken:

19.1    to frustrate the ability to trigger the De-SPAC Option; or

19.2    to prevent the completion of the De-SPAC Transaction (provided that, with respect to this paragraph 3.2, such action is prohibited by the terms of the definitive agreements governing the De-SPAC Transaction),

        provided that notwithstanding the foregoing, no such consent shall be required for (1) operational decisions related to any Owned Club or (2) the refinancing of any Owned Club-level debt.

20.     Any change to the tax residence of any Group Company, or the creation or establishment of any permanent establishment by any Group Company outside of its jurisdiction of tax residence.

21.     Entry into binding agreements to do any of the matters set out in paragraphs 1 to 4 above.

22.     Any U.S. tax entity classification election to treat the Company as anything other than a corporation for U.S. federal income tax purposes.

**SCHEDULE 6**

**General Warranties**

1.      **Share capital and authority**

1.1     All of the shares set out in Part 1 of schedule 3 are fully paid and comprise the entire issued share capital of the Company. Other than the Ares Warrants, no options, warrants or other rights to subscribe for new shares in the Company have been granted or agreed to and no dividends or other rights or benefits have been declared, made or paid or agreed to be declared, made or paid thereon.

1.2     Immediately following Completion, assuming completion of the subscriptions set out in clause 3.1 of this agreement by the Investors, the capitalisation table of the Company showing the holders and holdings of all issued Shares of the Company (together with details of all Shares in respect of which options or warrants have been granted and all Shares reserved for the issue of options) in Part 1 of schedule 3 is complete and accurate and not misleading.

1.3     The execution and delivery by the Company of this agreement and the documents referred to in it, and compliance with their respective terms, shall not breach or constitute a default under the Articles, or any other agreement or instrument to which the Company is a party or by which the Company is bound, and shall not constitute a breach under any order, judgment, decree or other restriction applicable to the Company.

2.      **Group Structure**

Other than the Subsidiaries and the Founder Football Club Equity Interests, the Company does not have any subsidiary companies nor has it at any time been the holding company of any company or a member of or the beneficial owner of any shares, securities or other interest in, or required to be registered in the PSC register (or equivalent register) of, any company or other person.

3.      **Information**

The information contained or referred to in the Background and schedule 2 is true, complete and accurate and not misleading.

4.      **Litigation**

4.1     Neither the Company nor, so far as the Company is aware, any person for whose acts and defaults it may be vicariously liable, is engaged whether as claimant, defendant or otherwise in any legal action, proceeding, arbitration, or investigation by any Authority.

4.2     So far as the Company is aware, there are no circumstances known to the Company likely to lead to any such claim or legal action, proceeding or arbitration, prosecution, investigation or inquiry.

4.3     Neither the Company nor, so far as the Company is aware, any person acting for or on behalf of the Company is being prosecuted for any criminal offence, nor are they or have they been the subject of any investigation, or inquiry by, or on behalf of, any governmental, administrative or regulatory authority (including, without limitation, in respect of any offence under the Bribery Act 2010 or under applicable anti-corruption laws or regulations of any

other jurisdiction) and there are no circumstances known to the Company likely to give rise to any such prosecution, investigation or inquiry.

4.4   No Group Company is: (i) the subject or target of sanctions under Sanctions Laws; (ii) incorporated, resident or located in a country or region which is the subject or target of a comprehensive embargo under Sanctions Laws; or (iii) otherwise in violation of applicable Sanctions Laws.

## 5.      Statutory and legal requirements

6.1   The Company has not committed and is not liable for any criminal, illegal, unlawful, ultra vires or unauthorised act or breach of covenant, contract or statutory duty.

6.2   No director has:

(a)      been convicted of a criminal offence (except any road traffic offence not punished by a custodial sentence);

(b)      been disqualified from being a company director; or

(c)      given, or offered to give, a disqualification undertaking under section 1A of the Company Directors Disqualification Act 1986.

## 6.      Agreements and capital commitments

The Company:

(a)      has no material capital commitments, liabilities, loans or borrowings, other than the Notes Purchase Agreement;

(b)      is not a party to any contract, arrangement or commitment (whether in respect of capital expenditure or otherwise) which is of an unusual, onerous or long-term nature or which involves or could involve a material obligation or liability, other than the Notes Purchase Agreement or any of the Founder Football Club Equity Interests SPAs or any documents entered into in connection with the OL Closing Acquisition;

(c)      is not a party to any agreement which is or may become terminable as a result of the entry into or completion of this agreement; and

(d)      is not in default of any agreement or arrangement to which it is a party.

## 7.      Tax

(a)      All computations, returns, notices, statements, disclosures and other information, which are or have been required by law to be filed with or provided to any Tax Authority on or before Completion by each Group Company for any Tax purpose have been made on a proper basis, have been filed or provided within the requisite period and are complete, true and correct in all material respects and none of them is or as far as the Company is aware is likely to be the subject of any dispute with or investigation or enquiry by any Tax Authority.

(b)      Each Group Company has duly and timely paid all material Tax for which it is or has been liable to pay on or before Completion (including all such amounts required to be accounted for by way of withholding, deduction or retention) and has

not been, and is not, under any liability to pay any material penalty, fine, surcharge or interest in respect of Tax.

(c)    Each Group Company is and has at all times been exclusively resident for all Tax purposes and subject to Tax in its jurisdiction of incorporation only, and has not at any time been resident or had any branch, agency, fixed place of business or permanent establishment in any other jurisdiction for any Tax purpose.

(d)    There are no ongoing actions, audits, examinations, suits, claims, investigations or other legal proceedings (pending or threatened in writing) by any Tax Authority against any Group Company with respect to material Taxes.

(e)    The Company has not filed a U.S. federal tax election to be treated as other than a corporation for U.S. federal income tax purposes.

**SCHEDULE 7**

**Deed of Adherence**

**THIS DEED** is made on                                                         20[  ]


**BY** [                    ]


**INTRODUCTION**

(A)     By a [transfer]/[subscription for shares] dated [of even date herewith] [                    ] [(the "**Transferor**") transferred to the Transferee/[[          ]     (the     "**Subscriber**") subscribed for] [Ordinary] Shares of [                              ] each in the capital of [                          ]     Limited     (the     "**Company**")     (together     the     ["**Transferred Shares**"/"**Subscribed Shares**").

(B)     This deed is entered into in compliance with the terms of clause [    ] of an agreement dated [                              ] 2022 made between (1) [name parties to the agreement] and (2) the Company and others (all such terms as are therein defined) (which agreement is herein referred to as the "**Subscription and Shareholders' Agreement**").


**AGREED TERMS**

1.     Words and expressions used in this deed shall have the same meaning as is given to them in the Subscription and Shareholders' Agreement unless the context otherwise expressly requires.

2.     The [Transferee]/[Subscriber] hereby agrees to assume the benefit of the rights [of the Transferor] under the Subscription and Shareholders' Agreement in respect of the [Transferred]/[Subscribed] Shares and hereby agrees to assume and assumes the burden of the [Transferor's] obligations under the Subscription and Shareholders' Agreement to be performed after the date hereof] in respect of the [Transferred]/[Subscribed] Shares.

3.     The [Transferee]/[Subscriber] hereby agrees to be bound by the Subscription and Shareholders' Agreement in all respects as if the [Transferee]/[Subscriber] were a party to the Subscription and Shareholders' Agreement as one of the [Investors][,][Other Equity Investors] [and/or] Founder] and to perform [:

        (a)     all the obligations of the Transferor in that capacity thereunder; and

        (b)     ]all the obligations expressed to be imposed on such a party to the Subscription and Shareholders' Agreement[;]

        [in both cases], to be performed or on or after [the date hereof].

4.     This deed is made for the benefit of:

        (a)     the parties to the Subscription and Shareholders' Agreement; and

(b) any other person or persons who may after the date of the Subscription and Shareholders' Agreement (and whether or not prior to or after the date hereof) assume any rights or obligations under the Subscription and Shareholders' Agreement and be permitted to do so by the terms thereof,

and this deed shall be irrevocable without the consent of the Company acting on their behalf in each case only for so long as they hold any Ordinary Shares in the capital of the Company.

5.   [For the avoidance of doubt nothing in this deed shall release the Transferor from any liability in respect of any obligations under the Subscription and Shareholders' Agreement due to be performed prior to[the date of this deed].]

6.   Neither any of the Investors nor the Founder:

(a) makes any representation or warranty or assumes any responsibility with respect to the legality, validity, effectiveness, adequacy or enforceability of any of the Subscription and Shareholders' Agreement (or any agreement entered into pursuant thereto);

(b) makes any representation or warranty or assumes any responsibility with respect to the content of any information regarding the Company or any member of the group or otherwise relates to the [acquisition]/[subscription] of shares in the Company; or

(c) assumes any responsibility for the financial condition of the Company or any Subsidiary or any other party to the Subscription and Shareholders' Agreement or any other document or for the performance and observance by the Company or any other party to the Subscription and Shareholders' Agreement or any other document (save as expressly provided therein),

and any and all conditions and warranties, whether express or implied by law or otherwise.

7.   This deed shall be governed by and construed in accordance with the laws of England and Wales.

This deed of adherence has been executed and delivered as a deed on the date shown on the first page.

**EXECUTED** as **DEED** by                    )
[Transferee/Subscriber]                    )
in the presence of:

Witness signature:

Witness name:

Witness address:

## SCHEDULE 8

### Expert Determination

1.      Ares and the Company shall, as soon as reasonably possible and in any event within 10 Business Days of the date on which the matter is referred to an Expert pursuant to clause 16.6 use all reasonable endeavours to reach agreement regarding the identity of the Expert, and to agree terms of appointment with the Expert. Neither party shall unreasonably withhold its agreement to the terms of appointment proposed by the Expert or the other party.

2.      If Ares and the Company fail to agree on an Expert and the terms of their appointment in accordance with paragraph 1 above, either of them shall be entitled to request the President for the time being of the Institute of Chartered Accountants of England and Wales to appoint an Expert and to agree their terms of appointment on behalf of them.

3.      Ares and the Company shall co-operate with the Expert and shall provide such assistance and access to such documents, personnel, books and records as the Expert may reasonably require for the purpose of making their determination.

4.      Ares and the Company shall be entitled to make submissions to the Expert including oral submissions, and each of them shall, with reasonable promptness, supply the other with all such information and access to its documentation, books and records as the other may reasonably require in order to make a submission to the Expert in accordance with this schedule.

5.      To the extent not provided for by this schedule, the Expert may in their reasonable discretion determine such other procedures as they consider just or appropriate including (to the extent they consider necessary) instructing professional advisers to assist in reaching their determination.

6.      Unless otherwise agreed by Ares and the Company, the Expert shall be required to make their determination in writing (including the reasons for the determination) and to provide a copy to each of Ares and the Company as soon as reasonably practicable and in any event within 30 Business Days of their appointment.

7.      All matters under this schedule shall be conducted, and the Expert's decision shall be written, in the English language.

8.      The Expert shall act as an expert and not as an arbitrator. Save in the event of manifest error or fraud, the Expert's determination of any matters referred in accordance with this agreement shall be final and binding on Ares and the Company.

9.      If an appointed Expert dies or becomes unwilling or incapable of acting, or does not deliver their determination within the time required by this schedule:

9.1     Ares and the Company shall use all reasonable endeavours to agree the identity and terms of appointment of a replacement Expert;

9.2     if Ares and the Company fail to agree and appoint a replacement Expert within 10 Business Days of a replacement being proposed in writing by either of them, then either of them may apply to the President for the time being of the Institute of Chartered Accountants of England and Wales to discharge the appointed Expert and to appoint a replacement Expert; and

9.3     this schedule shall apply in relation to each and any replacement Expert as if they were the first Expert appointed.

10.     Ares and the Company shall act reasonably and co-operate to give effect to the provisions of this schedule, and shall not do anything to hinder or prevent the Expert from making their determination.

11.     Ares and the Company shall bear and pay its own costs in relation to the reference to the Expert. The Expert's fees and any costs or expenses properly incurred in making their determination (including the fees and costs of any advisers appointed by the Expert) shall be borne in such proportions as the Expert may direct.

12.     All matters concerning the process and result of the determination by the Expert shall be kept confidential among Ares and the Company and the Expert.

*Execution Version*

**SCHEDULE 9**

**Agreed-Form BCA**

**SCHEDULE 10**

**Agreed Costs**

| Party | Agreed Costs ($) |
|-------|------------------|
| Ares | 3,219,349.79 |
| Eagle | 4,000,000 |
| Iconic | 1,950,000 |
| Elmwood | 500,000 |

**Schedule 11**

**Ares Warrant Instrument**

**Schedule 12**

**New Articles**

This agreement has been executed on the date shown on the first page.

ARES CAPITAL CORPORATION

By: _____

Name: MARK HPFOLTER

Title: AUTHORIZED SIGNATORY

**ARES SPORTS, MEDIA AND ENTERTAINMENT FINANCE S.À R.L.**

By:

DocuSigned by:

D442AF7C5AED480...

Name:

Title:  Manager

By:

DocuSigned by:

F4669B7C55084EA...

Name:

Title:  Manager

**ARES CREDIT STRATEGIES INSURANCE DEDICATED FUND SERIES INTERESTS OF THE SALI MULTI-SERIES FUND, L.P.**

By: Ares Management LLC, its investment subadvisor
By: Ares Capital Management LLC, as subadvisor

By: _____

Name: MARK AFFOLTER

Title: AUTHORIZED SIGNATORY

_____

**ARES CREDIT INVESTMENT PARTNERSHIP (CP), L.P.**

By: Ares Capital Management LLC, as Manager

By: _____

Name: MARK AFFOLTER

Title: AUTHORIZED SIGNATORY

**ARES CREDIT INVESTMENT PARTNERSHIP (MD), L.P.**
By: Ares Capital Management LLC, as Manager

By: _____

Name: MARK AFFOLTER

Title: AUTHORIZED SIGNATORY

ARES EUROPEAN CREDIT STRATEGIES FUND IX (C), L.P.

By: Ares Management Limited, its manager

By: _____

Name:  Penni Roll

Title:   Authorized Signatory


**CION ARES DIVERSIFIED CREDIT FUND**

By: _____

Name:  Penni Roll

Title:   Authorized Signatory

**CL NOTE INVESTMENT LLC**

By:

Name: Thomas Ricketts

Title: Manager

**MC FINANCING SPV I, LLC**

By: *Alex Parmacek*
_____

Name: Alex Parmacek

Title: Director


**MONROE CAPITAL PRIVATE CREDIT FUND 559 LP**

By: **MONROE CAPITAL PRIVATE CREDIT FUND 559 GP LLC**
    its General Partner

*Alex Parmacek*
_____

Name: Alex Parmacek

Title: Director


**MONROE CAPITAL PRIVATE CREDIT MASTER FUND IV SCSP**

By: Monroe Capital Management Advisors LLC, as Investment Manager

*Alex Parmacek*
_____

Name: Alex Parmacek

Title: Director


**MONROE CAPITAL OPPORTUNISTIC PRIVATE CREDIT MASTER FUND SCSP**

By: Monroe Capital Management Advisors LLC, as Investment Manager

*Alex Parmacek*
_____

Name: Alex Parmacek

Title: Director

**MONROE CAPITAL PRIVATE CREDIT MASTER FUND IV (UNLEVERAGED) SCSP**

By: Monroe Capital Management Advisors LLC, as Investment Manager

*Alex Parmacek*

Name: Alex Parmacek

Title: Director

**MONROE CAPITAL INSURANCE FUND SERIES INTERESTS OF THE SALI MULTI-SERIES FUND, L.P.**

By:  *Alex Parmacek*

Name: Alex Parmacek

Title: Director

Signed for and on behalf of **Iconic Sports**
**Eagle Investment, LLC** by:                )
                                             )

Signature _____

Name (block capitals)  JAMES G. DINAN
                         **Manager**

Signed for and on behalf of **ELMWOOD EAGLE, LLC** by:

)
)

Signature _____

Name (block capitals)   ANDREW RUBENSTEIN

**Director/authorised signatory**

Signed by **John Textor**:                )    Signature   _DocuSigned by:_

_John Textor_

F2AC3D9FD449453...


Signed for and on behalf of **Eagle Football**
**Holdings Limited** by:                   )
                                           )    Signature   _DocuSigned by:_

_John Textor_

F2AC3D9FD449453...

Name (block capitals)  _____

**Director/authorised**
**signatory**


Signed for and on behalf of **Eagle Football**
**Holdings Bidco Limited** by:             )
                                           )    Signature   _DocuSigned by:_

_John Textor_

F2AC3D9FD449453...

Name (block capitals)  _____

**Director/authorised**
**signatory**