# EXHIBIT G



**Private and confidential**

FAO : Richard Boynton  
Kirkland & Ellis International LLP  
30 St Mary Axe  
London  
EC3A 8AF  

D:   +44 20 3060 6418  
E:   Jonathan.Cary@rpclegal.com  

**By Email**

Our ref:   AM27/JC05/TEX14.2                                                                                                21 July 2025

Dear Kirkland & Ellis International LLP

**Put Option Agreement between John Textor and Iconic Sports Eagle Investment LLC dated 16 November 2022**

We refer to: (i) your client's letter to the Board of Directors of Eagle Football Holdings Limited (**Eagle**) (the **Board**) dated 15 July 2025; (ii) our letter to the Board dated 16 July 2025; (iii) your letter to the Board dated 17 July 2025; and (iv) your letter dated 17 July 2025 received by email at 23:53. Unless otherwise specified, we adopt the terms defined in that correspondence.  Please also note that this letter is copied to the Board.

1. As you are aware, the validity of the Put Option Agreement and the Share Charge Agreement is disputed in the Florida proceedings.  This letter is written entirely without prejudice to our client's position in those proceedings.

2. However, even if, contrary to our client's position in the Florida proceedings, the Put Option Agreement and Share Charge Agreement are valid and enforceable, it is clear that the contractual obligation to pay the option price never arose. Our client is not therefore in breach of his obligations under the Put Option Agreement and your client, accordingly, has no right to enforce the security under the Share Charge. As to this, and without prejudice to the other arguments our client may advance in due course by way of response to your client's Particulars of Claim dated 3 July 2025[1], we note:

    a) Clause 3.3 of the Put Option Agreement provides:

        "*Subject to Iconic complying with its obligations under clause 3.2, JT shall, on Completion, pay the Aggregate Option Price to Iconic on or before the Repayment Date.*"

---

[1] For example, but not limited to, those points raised at paragraph 11 of our letter to the Board dated 16 July 2025.

**rpclegal.com**

RPC is the trading name of Reynolds Porter Chamberlain LLP, a limited liability partnership registered in England and Wales with registered number OC317402 and is authorised and regulated by the Solicitors Regulation Authority (number 440566). Our UK registered office is Tower Bridge House, St Katharine's Way, London E1W 1AA.

    b)    The wording of Clause 3.3 makes clear that our client's obligation to pay the Aggregate Option Price to your client on or before the Repayment Date was conditional upon your client complying with its own obligations under Clause 3.2 of the Put Option Agreement – our client's obligation was "*subject to*" compliance by your client with Clause 3.2.

    c)    Pursuant to Clause 3.2 of the Put Option Agreement, your client was required to deliver specified documents to our client by no later than 26 July 2024. Your client, however, failed to deliver those documents by that date.

    d)    Given your client's failure to comply with Clause 3.2 of the Put Option Agreement, our client was not under any obligation to make payment of the Aggregate Option Price. It follows that our client was not in default under the Put Option Agreement and your client is not entitled to exercise any rights under the Share Charge Agreement.

    e)    The attempt to deliver the relevant documents almost a year later on 25 June 2025 was obviously ineffective and did not trigger any obligation on our client to pay the Aggregate Option Price. Not only were those documents not the documents actually required by Clause 3.2, they were also delivered out of time by a considerable margin. In particular, Clause 3.1 provides that, absent agreement on an earlier date, Completion was to take place on the Repayment Date. There was no extension of the Completion Date under Clause 3.4. The right to complete lapsed on 26 July 2024 because your client failed to deliver the necessary documents by that date.

    f)    It follows that your client's claim in the English Commercial Court for specific performance is unsustainable, and the steps purportedly taken under the Share Charge Agreement are invalid and ineffective on any view because they are based on the false legal premise that the obligation to pay the Aggregate Option Price was triggered.

3.    It appears that you and your client are well aware of this fundamental deficiency in your client's position. Doubtless, that is the reason why – at paragraph 22(4)-(5) of your client's Particulars of Claim – it is suggested that your client's obligations under Clause 3.2 and our client's obligation under Clause 3.3 were concurrent conditions. With respect, that argument is hopeless:

    a)    As outlined above, the wording of the Put Option Agreement is clear and unequivocal. Clause 3.3 makes our client's obligation to make payment of the Aggregate Option Price conditional upon your client's compliance with Clause 3.2.

    b)    In a commercial contract negotiated with the involvement of professional lawyers (including your firm), the wording of the relevant clauses is to be given its natural meaning and effect. That is so on our client's construction of the Put Option Agreement.

    c)    By contrast, your client's construction denudes the opening words of Clause 3.3 of any content or effect.

    d)    Further, the suggestion that a term is to be implied that the obligation to provide the documents set out in Clause 3.2(a) only arises if our client was ready and willing to countersign and pay the Aggregate Option price is hopeless. That is inconsistent with the express wording of the Put Option Agreement. In any event, the proposed term is not necessary in the relevant sense. It is not necessary to give business efficacy to the Put Option Agreement (such being perfectly workable without implying such an imprecise qualification to the clear terms and structure of the Put Option Agreement). Nor is it so

4. In light of the above, we invite your client to discontinue its claim against our client before the Commercial Court. Your client is not entitled to specific performance of the Put Option Agreement even if (which is denied) the Put Option Agreement is valid and effective. It further follows that your client is not entitled to enforce the Share Charge Agreement. On that basis, we invite your client to: (i) desist from any further assertions that our client is in default under the Put Option Agreement or that your client is entitled to exercise any rights under the Share Charge Agreement; and (ii) confirm to the board of Eagle that our client is not in default under the Put Option Agreement and that your client is not entitled to exercise any rights under the Share Charge Agreement.

5. If, however, your client is unwilling to take the steps requested at paragraph 4 above, we will seek the determination of the issue of whether your client's compliance with Clause 3.2 of the Put Option Agreement was a condition precedent to any obligation on the part of our client to pay the Aggregate Option Price. At present, that issue appears to be suitable to determination by the Court on an application for reverse summary judgment in the Michaelmas term of 2025.

6. In circumstances where your client's actions risk irreversible prejudice to our client's interests and those of Eagle, and in order to hold the ring pending the hearing of any such application, we invite your client to provide the following undertakings by way of Consent Order:

    1. Iconic will not take any further steps to exercise or enforce any rights under the Share Charge Agreement until further order.

    2. Iconic will notify the Board of its undertakings not to take any further steps to exercise or enforce any rights under the Share Charge Agreement until further order.

    3. Iconic will withdraw its letters to the Board of 15 and 17 July 2025 and associated demands.

7. Such undertakings should be provided by 5pm on Tuesday, 22 July 2025 failing which our client will issue an application with the Commercial Court seeking an interim injunction to the same effect.

8. Further, we note your client's conduct threatens imminent and irreversible harm to both our client and to Eagle. Our client reserves his rights in respect of claims against your client in respect of any losses suffered due to your client's actions in circumstances where your client is on notice that it has no entitlement to specific performance of the Put Option Agreement or right to enforce security under the Share Pledge Agreement for, amongst other things, the reasons addressed above. Our client specifically reserves its position in relation to "fault, gross negligence or wilful misconduct" under Clause 12.1 of the Share Charge Agreement (on the hypothesis that the agreement is, contrary to the claim in the Florida proceedings, valid and effective).

9. Our client agrees that the Board should obtain independent legal advice (although it is not understood on what basis it is suggested that its existing solicitors, Weil, Gotshal & Manges LLP are not independent). The advice sought should include the question of whether Eagle has remedies against your client for (amongst other things) jeopardising the IPO process and causing any other loss to the company through taking unlawful steps with regard to our client's shares.

10. For the avoidance of doubt, our client disputes the proposition that the Board would be obliged to register any transfer of shares to your client or remove any Founder Directors even if your client had any right to enforce the security (which is denied for the reasons outlined above). Regarding paragraph 2 of your letter to the Board dated 15 July 2025:

   a) You refer to Article 11.11 of the Articles of Association. This plainly has no application, since it is concerned with "*transfer of any Shares pursuant to any option agreement*" – *i.e.*, the transfer of Iconic's shares, not our client's shares.

   b) You purport to give notice to remove Founder Directors under clause 8.6 of the SSHA. This requires a notice from the appointing Founder. Your client therefore fails to satisfy the express terms of that provision.

   c) Article 23.9 of the Articles of Association is irrelevant, because it deals with appointment and removal of Investor Directors (not Founder Directors).

   d) Article 23.1 of the Articles of Association entitles only the Founder (and not your client) to remove the Founder Directors.

11. Fundamentally, however, for the reasons already explained, your client is not entitled to enforce the security under the Share Charge Agreement and the question of any transfer of shares or removal of any Founder Directors simply does not arise.

We look forward to hearing from you as a matter of priority and in any event before 5pm on Tuesday, 22 July 2025. In the meantime, all our client's rights remain fully reserved.

Yours faithfully



**RPC**

Copied (by email only): The Board of Directors of Eagle Football Holdings Limited