# EXHIBIT A

# Put Option Agreement

John Textor
Iconic Sports Eagle Investment, LLC

Dated     16 November     2022

# Contents

PARTIES ............................................................................................................................................ 1
AGREED TERMS ........................................................................................................................... 1
  1      Definitions and interpretation ................................................................................. 1
  2      Put Option ................................................................................................................. 3
  3      Completion ................................................................................................................ 3
  4      Default Provisions .................................................................................................... 4
  5      Appointment of proxy .............................................................................................. 6
  6      Iconic warranties ...................................................................................................... 6
  7      Lock in ....................................................................................................................... 6
  8      Remedies ................................................................................................................... 7
  9      Duration of obligations ............................................................................................ 7
  10     Notices ....................................................................................................................... 7
  11     Payments ................................................................................................................... 7
  12     Entire agreement ...................................................................................................... 8
  13     General ...................................................................................................................... 8

SCHEDULES
SCHEDULE I – MINORITY RIGHTS ........................................................................................ 10

**This agreement** is made on 16 November 2022

# Parties

(1) **John Textor**, of 100 Harbor Way, Hobe Sound, 33455, Florida, United States  (**JT**)

(2) **Iconic Sports Eagle Investment LLC**, whose registered office is at Walkers Corporate Limited, 190 Elgin Avenue, George Town, Grand Cayman KY1-9008, Cayman Islands (**Iconic**)

# Agreed terms

## 1  Definitions and interpretation

1.1   In this agreement, unless the context requires otherwise:

**Aggregate Option Price** means the Option Price multiplied by the number of Option Shares to be sold pursuant to the Option.

**Ares** has the meaning given in the Shareholders' Agreement.

**Articles** means the Company's articles from time to time.

**Business Day** means a day other than a Saturday or Sunday on which banks are open for general business in London and New York City.

**Club** has the meaning given in the Shareholders' Agreement.

**Company** means Eagle Football Holdings Limited, a company incorporated in England and Wales with company number 14379286 and whose registered office is at 57-59 Beak Street, London, United Kingdom, United Kingdom, W1F 9SJ.

**Completion** means the performance by Iconic and JT of the obligations assumed by them respectively under clauses 3.2 and 3.3.

**De-SPAC Option** has the meaning given in the Shareholders' Agreement.

**De-SPAC Option Conditions** has the meaning given in the Shareholders' Agreement.

**De-SPAC Transaction** has the meaning given in the Shareholders' Agreement.

**Elmwood** has the meaning given in the Shareholders' Agreement.

**Encumbrance** means any mortgage, charge, security, interest, lien, pledge, assignment by way of security, equity, claim, right of pre-emption, option, covenant, restriction, reservation, lease, trust, order, decree, judgment, title defect (including without limitation any retention of title claim), conflicting claim of ownership or any other encumbrance of any nature whatsoever (whether or not perfected other than liens arising by operation of law).

**Exercise Date** means the date of service of an Option Notice.

**Olympique Lyonnais** has the meaning given in the Shareholders' Agreement.

**Option** has the meaning given in clause 2.1.

**Option Notice** has the meaning given in clause 2.3.

**Option Period** means the period commencing on the date of the first Option Trigger Event and expiring on the date falling three months thereafter (both dates inclusive).

**Option Price** means, subject to clause 4.1(b), a price per Option Share equal to the Subscription Price plus interest on such Subscription Price at eleven per cent. (11%) per annum, accruing from the date of timely delivery of the Option Notice.

**Option Shares** means all of the Ordinary Shares to be issued by the Company to Iconic on the Completion Date (as such term is defined in the Shareholders' Agreement) (or such lesser number of Ordinary Shares for which Iconic has timely exercised the Option).

**Option Trigger Event** means the occurrence of any of the following triggers:

(a)   Iconic has not exercised its De-SPAC Option by 26 April 2023;

(b)   the De-SPAC Transaction has not been completed on or prior to 31 December 2023; or

(c)   there is a material breach by the Company of any of Iconic's minority protection rights as set forth in Schedule I hereto which is not cured within three (3) months following the Company's receipt of written notice of such breach, which notice, to be valid, must be given within thirty (30) days of such breach first occurring.

**Ordinary Shares** means the ordinary shares of £0.01 each in the capital of the Company.

**Regulatory Requirement** has the meaning given in the Shareholders' Agreement.

**Repayment Date** has the meaning given in clause 2.3.

**Shareholders' Agreement** means the shareholders' agreement in respect of the Company entered into on or around the date of this agreement between, amongst others, the Company, JT and Iconic.

**Subscription Price** means the price per share paid by Iconic for the subscription for the Option Shares.

**Tax** has the meaning given to it in the Shareholders' Agreement.

**Transfer Terms** means on the following terms:

(a)   that the entire legal and beneficial interest in all the Option Shares is sold and purchased with full title guarantee free from any Encumbrance and together with all rights attaching to them as at the Exercise Date (other than rights to receive dividends which shall have been paid before then) or at any time after that; and

(b)   that the consideration for the Option Shares is the Aggregate Option Price.

1.2   In this agreement, unless the context requires otherwise:

(a)   words and phrases defined or referred to in or for the purposes of the *Companies Act 2006* as in force at the date of this agreement have the same meanings in this agreement;

    (b)    reference to the singular includes the plural, reference to any gender includes every gender and reference to a **person** includes any individual, firm unincorporated or corporate body and, in each case, vice versa; and

    (c)    reference to a clause or sub-clause is to a clause or sub-clause of this agreement.

1.3    The contents list and headings are for ease of reference only and shall not affect the construction or interpretation of this agreement.

1.4    Reference in this agreement to a party includes, where the context admits, a reference to their personal representatives and successors in title.

1.5    This agreement incorporates the Schedule to it.

1.6    Any reference in this agreement to any time of day or date shall be construed as a reference to that time or date in the United Kingdom.

1.7    For the purposes of this agreement, writing includes any method of representing or reproducing words in a legible form.

## 2    Put Option

2.1    In consideration of the payment by Iconic to JT of the sum of £1 (receipt of which is acknowledged), JT hereby grants to Iconic (but not any of its transferees or assignees) the right (but not the obligation) (the **Option**), upon the occurrence of any Option Trigger Event to require JT (or his nominee) to purchase all of the Option Shares on the Transfer Terms.

2.2    The Option shall only be exercisable on one occasion.

2.3    In order to exercise the Option, Iconic shall deliver an irrevocable written notice (the **Option Notice**) during the Option Period. If Iconic timely exercises the Option, then the purchase of the Option Shares shall occur no later twelve (12) months after receipt of the Option Notice (the date that is twelve (12) months from the receipt of the Option Notice being the **Repayment Date**).

2.4    Notwithstanding anything to the contrary in this agreement, this Option is conditional upon Iconic being issued the Option Shares by the Company, and for U.S. federal income tax purposes, the parties agree that the Option and the Option Shares shall be treated as having been acquired on the same day.

## 3    Completion

3.1    Completion shall take place at the registered office of the Company (or at such other place as may be agreed in writing between the parties) on such date as agreed between the parties or failing such agreement, on the Repayment Date.

3.2    On Completion, Iconic:

    (a)    shall deliver to JT:

        (i)    a duly executed transfer of the Option Shares in favour of JT;

        (ii)    the share certificate in respect of the Option Shares;

   (iii) any form of consent or waiver required from Iconic and (so far as it is able) any other member of the Company, to enable the transfer of the Option Shares to be registered in accordance with the Articles; and

   (iv) a duly executed irrevocable power of attorney (in a form reasonably acceptable to JT) in favour of JT (or such person as may be nominated by JT) generally in respect of the Option Shares and in particular to enable JT (or his nominee) to approve written resolutions circulated and to attend and vote at general meetings of the Company held during the period prior to the name of JT being entered on the register of members of the Company in respect of the Option Shares;

 (b) do such other acts and things and execute such other documents as shall be necessary or as JT may reasonably request to give effect to the sale of the Option Shares on the Transfer Terms.

3.3 Subject to Iconic complying with its obligations under clause 3.2, JT shall, on Completion, pay the Aggregate Option Price to Iconic on or before the Repayment Date.

3.4 If any of the provisions of clauses 3.2 or 3.3 are not complied with on the date agreed for Completion, the party not in default may (without prejudice to their other rights and remedies under this agreement or otherwise) defer Completion to a date not more than 20 Business Days after such date (and so that the provisions of this clause 3.4 shall apply to Completion as so deferred).

3.5 Neither Iconic nor JT shall be obliged to complete the sale and purchase of the Option Shares unless the sale and purchase of all the Option Shares is completed simultaneously, but completion of the sale and purchase of some of the Option Shares will not affect the rights of Iconic or JT with respect to the others.

## 4 Default Provisions

4.1 If JT (or his nominee, as applicable) fails to give effect to the Option and purchase Iconic's Option Shares for the Aggregate Option Price by the Repayment Date in accordance with clause 3.3, the following shall occur:

 (a) Iconic shall be entitled to specific performance on the terms of the Option to the extent permitted by clause 7.

 (b) the deemed interest rate applied to the Subscription Price for the purposes of calculating the Option Price shall increase by one per cent. (1.0%) every three (3) months after Repayment Date (up to a maximum annual interest rate of twenty percent (20%)).

 (c) Iconic shall, be entitled to exercise the proxy set forth in clause 5, subject to the exercise thereof not causing, triggering or accelerating (i) a change of control, (ii) event of default, or (iii) mandatory repayment or prepayment obligation, in each case of (i), (ii), and (iii), in respect of 10% or more of the financial indebtedness of Olympique Lyonnais or its subsidiaries pursuant to the then existing debt financing documentation of Olympique Lyonnais or its subsidiaries.

 (d) Iconic shall be entitled (but not obliged) after consultation with JT to initiate and lead a customary and fair sale process, led by a globally recognised investment bank, which is designed to achieve fair market value for the Option Shares being sold in accordance with clauses 4.2, 4.3 and 4.4 (**"Sale Process"**).

4.2 If Iconic initiates a Sale Process pursuant to clause 4.1(d), JT shall be closely associated to such Sale Process and Iconic shall take into consideration JT's reasonable suggestions in relation to the conduct of the Sale Process, which shall include a full range of monetisation options, including but not limited to:

   (a) a sale of all of the Option Shares held by Iconic;

   (b) a sale of the combined Ordinary Shares held by JT and Iconic; and

   (c) any other reasonable options proposed.

4.3 Where preliminary offers are received for one or several of the Sale Process options (whether those set out in clauses 4.2(a) to 4.2(c) above or otherwise) (each a **Sale Process Option**), Iconic shall consult with JT before deciding which Sale Process Option to pursue provided that it shall not elect to:

   (a) undertake a Sale Process Option which is unreasonable; or

   (b) choose a Sale Process Option which falls within the scope of clause 4.2(b) if Iconic is advised that there is a credible and viable alternative Sale Process Option which provides reasonable certainty on realisation of the Aggregate Option Price within a reasonable timeframe.

4.4 Subject always to clause 4.3:

   (a) Where a Sale Process Option which falls within the scope of clause 4.2(a) is elected by Iconic and a third party is willing to purchase the Option Shares at a price which is lower than the Aggregate Option Price, JT shall pay to Iconic in cash an amount equal to the difference between such sale proceeds received by Iconic and the Aggregate Option Price.

   (b) Where a Sale Process Option which falls within the scope of clause 4.2(b) is elected by Iconic, Iconic shall have the right to drag all Ordinary Shares held by JT on the same terms and at the price proposed by the third party; provided that the proceeds from the sale shall be first allocated to Iconic up to an amount equal to the Aggregate Option Price, with all proceeds in excess of the Aggregate Option Price paid to JT.

   (c) Where a Sale Process Option which falls within the scope of clause 4.2(b) is elected by Iconic, Ares, Elmwood and the Other Equity Investors (as defined in the Shareholders Agreement) shall have the option (but not the obligation), to decide, at the time when the third party purchasers have provided preliminary offers, to sell their Ordinary Shares as part of the Sale Process at the same time and under the same conditions as Iconic (except for the adjustments facilitated by JT that are set forth in the proviso to clause 4.4(b), which allow Iconic to receive at least the Aggregate Option Price); provided, that if the final sale price is lower than the price indicated in the preliminary offers, Ares and/or Elmwood shall be entitled to withdraw from such Sale Process.

4.5 The parties shall procure (to the extent they are legally able) that no provision of the Shareholders' Agreement or the Articles shall prevent the exercise of the Option. In particular, the tag-along right, drag-along right, lock-in, or any pre-emptive right shall not apply as part of the exercise of the Option except as expressly provided for in this agreement.

## 5      Appointment of proxy

In the event that JT fails to comply with his obligation to satisfy the Aggregate Option Price on Completion in accordance with clause 3.3, JT hereby appoints Iconic as his agent and proxy with full power and authority in JT's name and on his/its behalf to vote and exercise control of the Ordinary Shares held by him in the manner which Iconic in its absolute discretion considers reasonably necessary in order for JT to comply with and perform his obligations under clause 4.

5.1    JT undertakes to ratify and confirm whatever Iconic does or purports to do in good faith in exercising the powers conferred on it by clause 5.1.

## 6      Iconic warranties

6.1    Iconic warrants to JT that:

(a)    it is the sole registered holder and beneficial owner of the Option Shares;

(b)    there is no Encumbrance on, over or affecting any of the Option Shares and there is no agreement or commitment to give or create such an Encumbrance or negotiations which may lead to such an agreement or commitment;

(c)    it has full power and authority to exercise and enjoy all rights attaching to the Option Shares without the consent of any other person and to exercise the Option on the terms and conditions of this agreement;

(d)    there is no litigation, arbitration, prosecution, administrative or other legal proceedings or dispute in existence or threatened against Iconic in respect of the Option Shares or Iconic's entitlement to dispose of the Option Shares and, so far as Iconic is aware, there are no circumstances which might give rise to any such proceedings or dispute;

(e)    the Option Shares:

(i)    have been properly allotted and are fully paid up;

(ii)   have not been, and do not represent assets which were, the subject of a transfer at an undervalue (within the meaning of sections 238 or 339 of the *Insolvency Act 1986*) within the last five years; and

(iii)  were not subscribed for or purchased by Iconic with funds derived from the proceeds of crime.

## 7      Lock in

JT undertakes to Iconic that he shall not, and shall not agree to, transfer, assign, create any trust or Encumbrance over, or otherwise dispose of the whole or any part of his legal, beneficial or other interest in any Ordinary Shares held by him to any person from the date on which an Option Notice is given until Iconic has received the Aggregate Option Price.

---

Iconic Put Option Agreement |                                                                                                     DLA Piper | 6

## 8 Remedies

The parties hereby acknowledge and agree that damages alone may not be an adequate remedy for any breach of the obligations set out in this agreement and that a person with rights under this agreement shall be entitled to seek equitable relief (including without limitation specific performance) to the maximum extent available under applicable law.

## 9 Duration of obligations

9.1 This agreement shall terminate immediately (and the Option shall lapse) upon the earlier of the date on which:

(a) a De-SPAC Transaction is completed; or

(b) Iconic sells or otherwise transfers the Option Shares (other than in connection with the exercise of the Option).

## 10 Notices

10.1 Any communication and/or information to be given in connection with this agreement shall be in writing in English and shall either be delivered by hand or sent by international courier or recorded international delivery post or email or other electronic form:

(a) to Iconic at its registered office (or such other address as it may notify to the other parties to this agreement for such purpose); or

(b) to JT at the address shown on page 1,

(or in each such case such other address as the recipient may notify to the other parties for such purpose).

10.2 A communication sent according to clause 10.1 shall be deemed to have been received:

(a) if delivered by hand, at the time of delivery;

(b) if sent by international courier or recorded international delivery post, on the fifth day after posting;

(c) if sent by email or other electronic form, at the time of completion of transmission by the sender,

except that if a communication is received between 5.30 pm on a Business Day and 9.30 am on the next Business Day, it shall be deemed to have been received at 9.30am on the second of such Business Days.

## 11 Payments

11.1 Any payment to be made under this agreement shall be effected by transfer of funds through the account of the payee notified to the payer for this purpose.

11.2    JT shall bear the cost of all stamp duty, notarial fees and all registration and similar transfer Taxes and duties and their equivalents in all jurisdictions (the **Transfer Taxes**) where such Transfer Taxes arise on the grant of the Option, transfer of the Option Shares and/or the agreement for such transfer. JT shall be responsible for arranging the payment of all such Transfer Taxes, including, where JT is legally required to do so, fulfilling any administrative or reporting obligation imposed by the jurisdiction in question in connection with such payment and shall do so promptly where required. JT shall indemnify Iconic promptly on demand against any losses (including, without limitation, Tax) suffered as a result of JT failing to comply with its obligations under this Clause 11.2.

## 12    Entire agreement

12.1    This agreement and the documents referred to or incorporated in it (including the Shareholders' Agreement) constitute the entire agreement between the parties relating to the subject matter of this agreement and supersede and extinguish any prior drafts, agreements, undertakings, representations, warranties and arrangements of any nature whatsoever, whether or not in writing, between the parties in relation to the subject matter of this agreement.

12.2    Each of the parties acknowledges and agrees that it has not entered into this agreement in reliance on any statement or representation of any person (whether a party to this agreement or not) other than as expressly incorporated in this agreement and the documents referred to or incorporated in this agreement.

12.3    Without limiting the generality of the foregoing, each of the parties irrevocably and unconditionally waives any right or remedy it may have to claim damages and/or to rescind this agreement by reason of any misrepresentation (other than a fraudulent misrepresentation) having been made to it by any person (whether party to this agreement or not) and upon which it has relied in entering into this agreement.

12.4    Each of the parties acknowledges and agrees that the only cause of action available to it under the terms of this agreement and the documents referred to or incorporated in this agreement shall be for breach of contract.

12.5    Other than in respect of such a claim, each of the parties acknowledges and agrees that damages alone may not be an adequate remedy for the breach of any of the undertakings or obligations as set out in this agreement. Accordingly, without prejudice to any other rights and remedies the parties may have, the parties shall be entitled to seek the remedies of injunction, specific performance or other equitable relief for any threatened or actual breach of the terms of this agreement.

12.6    Nothing contained in this agreement or in any other document referred to or incorporated in it shall be read or construed as excluding any liability or remedy as a result of fraud.

## 13    General

13.1    Except as required by law or to satisfy the rules or regulations of a regulatory body to which they subject or with the prior written consent of the other party, each party undertakes to the other party to keep the existence of and the terms and subject matter of this agreement confidential at all times and agrees that the terms of clause 14 (*Confidentiality*) of the Shareholders' Agreement shall apply to this agreement mutatis mutandis.

13.2    Each party shall bear its own costs and disbursements incurred in connection with the preparation, negotiation and execution of this agreement.

13.3 This agreement may not be assigned in whole or in part but is binding upon and shall enure for the benefit of the parties' successors in title.

13.4 No variation of this agreement shall be effective unless it is in writing and signed by or on behalf of each party.

13.5 The parties shall use their respective reasonable endeavours to procure that any necessary third parties shall execute and do all such further deeds, documents and things as any party may reasonably require by notice in writing to any other party to carry the provisions of this agreement into full force and effect and (so far as they are able) shall do everything necessary (including, without limitation, exercising their powers as shareholders and as directors of the Company) to give effect to the spirit and intent of this agreement.

13.6 Any date or period mentioned in this agreement may be extended by agreement in writing between the parties but, as regards any date or period (whether or not extended as aforesaid), time shall be of the essence.

13.7 The failure by any of the parties at any time to require performance by any other party or to claim a breach of any term of this agreement shall not be deemed to be a waiver of any right under this agreement.

13.8 This agreement may be executed in any number of counterparts, each of which shall constitute an original, and all the counterparts shall together constitute one and the same agreement. The exchange of a fully executed version of this agreement (in counterparts or otherwise) by electronic transmission in PDF format or by facsimile shall be sufficient to bind the parties to the terms and conditions of this agreement and no exchange of originals is necessary.

13.9 The Company shall have the right to enforce all rights given to it pursuant to this agreement, and Ares, Elmwood and the Other Investors shall have the right to enforce clause 4.4(c), in each case as if they were a party to this agreement. No other person who is not party to this agreement shall have the right under the *Contracts (Rights of Third Parties) Act 1999* to enforce any term of this agreement. This clause does not affect any right or remedy of any person which exists or is available otherwise than pursuant to that Act.

13.10 This agreement shall be governed by and construed in accordance with English law and the parties hereby submit to the exclusive jurisdiction of the English courts.

**In witness** of which the parties have executed this agreement as follows:

## Schedule I – Minority Rights

| | |
|---|---|
| 1 | Board Appointment Rights pursuant to clause 8.3 of the Shareholders' Agreement and article 23.2 of the Articles; |
| 2 | Investor Consent Provisions pursuant to clause 10.2 and schedule 5 of the Shareholders' Agreement; |
| 3 | Tag Along/Drag Along pursuant to articles 16.1 and 17.1 of the Articles; |
| 4 | Pre-emption Right on New Issuances pursuant to article 9 of the Articles; |
| 5 | Pre-emption Right on Share Transfers pursuant to article 12 of the Articles; and |
| 6 | Information Rights pursuant to clause 9 of the Shareholders' Agreement. |

DocuSign Envelope ID: 012EA5D9-FB53-460C-BC40-7D6116844BFD

**Signature page**

Signed for and on behalf of **Iconic Sports Eagle Investment, LLC** by:  )   Signature  _____
7C7FDF919857449...

Name (block capitals)  JAMES G. DINAN
**Manager**

Signed by **John Textor**:  )   Signature  _____

**Signature page**

| | | | |
|---|---|---|---|
| Signed for and on behalf of **Iconic Sports Eagle Investment, LLC** by: | ) ) | Signature | _____ |
| | | Name (block capitals) | _____ |
| | | | **Director/authorised signatory** |

| | | | |
|---|---|---|---|
| Signed by **John Textor**: | ) | Signature | DocuSigned by: *John Textor* F2AC3D9FD449453... |