**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 25-14239-CIV-CANNON**

JOHN TEXTOR,

      Plaintiff,

v.

ICONIC SPORTS EAGLE INVESTMENT
LLC, JAMES G. DINAN and ALEXANDER
KNASTER,

      Defendants.

_____/


**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT
PURSUANT TO FORUM NON CONVENIENS AND FED. R. CIV. P. 12(B)(6)**

## <u>TABLE OF CONTENTS</u>

I.   INTRODUCTION ................................................................................................................. 1

II.  STATEMENT OF FACTS ................................................................................................... 3

III. LEGAL STANDARD ......................................................................................................... 6

IV. ARGUMENT ...................................................................................................................... 8

   A.   Enforcing the Forum Selection Clauses as to Plaintiff's Federal Securities Fraud
       Claim Would Violate the Anti-Waiver Provision of the Exchange Act. ........................... 9

   B.   The FAC States a Claim for Fraud Under Rule 10b-5. ...................................................... 14

       1.   *Defendants Ignore the "Material Omissions" Portion of the FAC.* ....................... 14

       2.   *Defendants' Fraud Was Material, as Opposed to "Puffery".* .............................. 16

       3.   *The FAC Pleads Scienter.* .................................................................................... 17

       4.   *The FAC Pleads Loss Causation.* .......................................................................... 19

       5.   *The FAC States Claims for Florida Securities Fraud and Fraudulent
           Misrepresentation Under English Law.* .................................................................. 19

   C.   If the FAC Is Dismissed for Failure to State a Claim (as Opposed to Forum Non
       Conveniens), Plaintiff Should Be Given Leave to Amend. ................................................. 20

V.  CONCLUSION ................................................................................................................... 20

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Bonny v. Soc'y of Lloyd's*,
  3 F.3d 156 (7th Cir. 1993) ...................................................................................10, 11, 12

*Callen v. Daimler AG*,
  No. 1:19-CV-1411-TWT, 2020 WL 10090879 (N.D. Ga. June 17, 2020)........................7, 14

*Carvelli v. Ocwen Financial Corp.*,
  934 F.3d 1307 (11th Cir. 2019) ...........................................................................................16

*Hartel v. GEO Grp., Inc.*,
  20-CV-81063 (RS), 2021 WL 4397841 (S.D. Fla. Sept. 23, 2021)........................................16

*Lipcon v. Underwriters at Lloyd's, London*,
  148 F.3d 1285 (11th Cir. 1998) ...........................................................................10, 11, 12

*M/S Bremen v. Zapata Off-Shore Co.*,
  407 U.S. 1 (1972)................................................................................................9, 10, 11, 12

*MacPhee v. MiMedx Grp., Inc.*,
  73 F.4th 1220 (11th Cir. 2023) ...............................................................................6, 20

*McClure v. Toyota Motor Corp.*,
  759 F. Supp. 3d 1333 (N.D. Ga. 2024) ...............................................................................7, 14

*McDonald v. Alan Bush Brokerage Co.*,
  863 F.2d 809 (11th Cir. 1989) ...............................................................................................7

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
  473 U.S. 614 (1985).............................................................................................................12

*Mizzaro v. Home Depot, Inc.*,
  544 F.3d 1230 (11th Cir. 2008) ...........................................................................................18

*Morgensen v. Body Cent. Corp.*,
  15 F. Supp. 3d 1191 (M.D. Fla. 2014).................................................................................16

*Morrison v. Nat'l Australia Bank Ltd.*,
  561 U.S. 247 (2010)................................................................................................9, 10, 11, 12

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000)................................................................................................16

*In re Premiere Tech. Securities Litig.*,
  98-CV-1804 (JOF), 2000 WL 33231639 (N.D. Ga. Dec. 8, 2000) ........................................16

*Quail Cruises Ship Mgmt., Ltd. v. Agencia de Viagens CVC Tur Limitada*,
  645 F.3d 1307 (11th Cir. 2011) ...........................................................................................11

*Scherk v. Alberto-Culver Co.*,
   417 U.S. 506 (1974) ...........................................................................................13

*Seafarers Pension Plan v. Bradway*,
   23 F.4th 714 (7th Cir. 2022) .......................................................................10, 12

*Shearson/Am. Exp., Inc. v. McMahon*,
   482 U.S. 220 (1987) ...........................................................................................13

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) .............................................................................................8

*Ziemba v. Cascade Int'l, Inc.*,
   256 F.3d 1194 (11th Cir. 2001) ..........................................................................6, 7

**Statutes**

15 U.S.C. § 78aa(a) ...............................................................................................9

15 U.S.C. § 78cc(a) ...............................................................................................9

15 U.S.C. § 78u-4(b)(1) .........................................................................................7

Securities Exchange Act of 1934 (the "Exchange Act") ...................8, 9, 12, 13, 19

Federal Arbitration Act .........................................................................................13

Private Securities Litigation Reform Act ("PSLRA") ...................................7, 20

**Other Authorities**

Fed. R. Civ. P. 9(b) ...........................................................................................7, 20

Fed. R. Civ. P. 15(a)(2) ..........................................................................................20

## I.  **INTRODUCTION**

As this Court has noted, Plaintiff, a United States citizen and resident of Florida, "has set forth concerning allegations of fraud" with respect to the sale of a security in the United States. ECF No. 45 at 1. The Supreme Court has held that U.S. securities laws apply to such a sale. Those laws, in turn, designate a U.S. District Court as the exclusive forum for claims arising thereunder, and preclude parties from waiving their right to bring such claims. Because the forum selection clauses at issue (which identify England as the exclusive jurisdiction for disputes) would operate as a complete waiver of the right to bring a U.S. securities fraud claim, those clauses are invalid *as applied to that claim*.  Plaintiff recognizes, however, that the parties have already briefed the effect of the U.S. securities laws on the forum selection clauses, and that the Court, in denying Plaintiff's motion for a Temporary Restraining Order and Preliminary Injunction, disagreed with Plaintiff's position.[1] Although Plaintiff respectfully disagrees with the Court's prior ruling, Plaintiff acknowledges that, to the extent the Court adheres to its prior views regarding the proper forum for Plaintiff's claims, then this issue alone is dispositive of Defendants' motion to dismiss. Accordingly, rather than restate his arguments on this point, Plaintiff respectfully highlights the

---

[1] Following this Court's denial of Plaintiff's motion for preliminary injunctive relief, Plaintiff promptly sought emergency injunctive relief in the English proceeding that Defendant ISEI (as defined below) had brought seeking to enforce the fraudulently obtained Put Option Agreement. The relief sought in England was based on grounds entirely distinct from those asserted by Plaintiff in this case. Plaintiff's application for injunctive relief was ultimately resolved by consent between Plaintiff and Defendant ISEI, whereby the parties agreed, at the Judge's instigation, to provide undertakings to the English Court pending the determination of certain preliminary issues in the English proceeding (with Defendant ISEI's undertakings taking substantially the form of the relief Plaintiff sought in his application for injunctive relief). Notwithstanding this development, Plaintiff has not yet had an opportunity to assert any counterclaims in the English proceeding, and, for the reasons set forth herein, will not ever be able to pursue claims (and vindicate his undisputed rights) under the U.S. securities laws in that forum.

most important aspects of his forum-related arguments and focuses on the secondary arguments raised in Defendants' motion to dismiss.

Most importantly, Defendants are wrong that the First Amended Complaint ("FAC") fails to allege fraud with particularity. As discussed more fully below, Defendants' argument is, in essence, that the law required Plaintiff to plead each date, location, and method of communication through which Defendants did ***not*** tell him certain material information.[2] Defendants' argument is wrong. Plaintiff's federal securities claim is premised on a material omission, not solely on a specific affirmative misrepresentation. Defendants therefore miss the point when they argue that none of the alleged "misrepresentations" is pleaded with adequate particularity. A 10b-5 claim based on a material omission does not require a plaintiff to plead all of the infinite times, places, and manners in which a material fact was not communicated. It is enough that the information was never disclosed, was materially misleading under the circumstances, and was omitted with scienter. This is precisely what the FAC pleads. That Plaintiff also identifies certain misrepresentations by Defendants does not convert the fundamental nature of his omission-based 10b-5 claim into a claim based solely on those misrepresentations. Rather, those misstatements form part of the context around which the omission was made—*i.e.*, part of the context showing that the omission was material, misleading, and made with scienter. Defendants do not even acknowledge the omission-based nature of Plaintiff's 10b-5 claim, and so do not (and now cannot) contend that this claim is insufficiently particular under the standard that applies to such claims.

Furthermore, Defendants' arguments with respect to materiality, scienter, and loss causation are also wrong. Defendants apply the wrong legal standard with respect to omission-

---

[2] Namely, that a public offering through Defendants' Special Purpose Acquisition Company ("SPAC") was impossible because the SPAC's investors and board members had deep economic ties to sanctioned Russian individuals, which made obtaining necessary financing impossible.

based claims, disregard the context in which their statements and omissions were made, and instead improperly seek to evaluate each alleged statement in isolation, divorced from the factual circumstances. And the publicly available information Defendants cite did not put Plaintiff on notice that Defendants' SPAC still had improper ties to sanctioned individuals and assets in November 2022. The FAC therefore states a claim for securities fraud.

## II.   <u>STATEMENT OF FACTS</u>

Plaintiff John Textor is the founder, President, Chairman of the board of directors, and majority owner of Eagle Football Holdings Limited ("Eagle"), which is the majority owner of a network of football clubs referred to generally as Eagle Football. FAC ¶ 4. Eagle Football includes FC Florida in the United States; Olympique Lyonnais in Lyon, France; Racing Brussels in Brussels, Belgium; and SAF Botafogo ("Botafogo") in Rio De Janeiro, Brazil. Eagle was formed in December of 2022, and at that time Defendant Iconic Sports Eagle Investment ("ISEI") invested $75 million in Eagle and received 8,520 shares, or approximately 15.7% of the company. *Id.* ¶ 16. That transaction was memorialized in a Subscription and Shareholders' Agreement relating to Eagle Football Holdings Limited ("Subscription Agreement"), dated November 16, 2022, and amended December 9, 2022, which further provided that Eagle and a SPAC named Iconic Sports Acquisition Corp. ("ISAC"), which was owned by the owners of ISEI, would immediately take active steps to prepare for and pursue a business combination (the "De-SPAC Transaction") to take Eagle public using ISAC, at a valuation of approximately $1.2 billion.[3] *Id.* ¶¶ 15-17. The De-SPAC Transaction was subject to ISAC obtaining additional financing. *Id.* ¶ 18.

---

[3] A SPAC is an alternative to an Initial Public Offering ("IPO") as a method for offering shares in a privately held company to the public. A SPAC offers a privately held company a faster path to public trading with lower transaction costs than a traditional IPO. *See id.* ¶ 19.

If the company had gone public via the De-SPAC Transaction, ISEI would have been able to liquidate its investment in Eagle by selling its shares on a public exchange. *Id.* ¶ 25. But ISEI also induced Textor, through false statements made by Defendant Dinan, which were echoed by Defendant Knaster (an investor in and board member of ISAC), to personally sell ISEI an insurance policy—the Put Option Agreement—for the price of 1£. *Id.* ¶ 23. As set forth in the Put Option Agreement, if the De-SPAC Transaction did not occur by a certain date, ISEI could exercise a put option to require Textor to purchase ISEI's shares in Eagle at the original investment price, plus interest (the "Put Option"). *Id.* ¶¶ 23-24.

Defendants told Textor, falsely, that the chances of the De-SPAC Transaction not occurring were very low. Defendants also misrepresented to Textor that he would effectively control whether or not the De-SPAC Transaction occurred. *Id.* ¶¶ 25-27. In light of these representations, Textor believed that the De-SPAC Transaction would occur, and the Put Option would never be exercised. *Id.* ¶ 26. He therefore agreed to sell Defendants the Put Option for 1£. *Id.* He also believed, based on Defendants' same misrepresentations, that the De-SPAC Transaction would occur when he agreed to the Share Charge Agreement, dated December 8, 2022, which provided that if ISEI exercised the Put Option, but Textor did not repurchase its shares, then ISEI would obtain certain rights in Textor's shares in Eagle in specified circumstances. *Id.* ¶¶ 30-33.

What Defendants did not tell Textor, was that they knew, or at the very least recklessly should have known, that the De-SPAC Transaction was extremely unlikely ever to occur. *Id.* ¶ 35. Two of the major investors in ISAC, the publicly traded company that would merge with Eagle to take Eagle public, were Knaster and Edward Eisler ("Eisler"). *Id.* Both of those individuals had deep financial ties to Russian nationals, including Mikhail Fridman, Peter Aven, German Khan, and Alexey Kuzmichev. *Id.* ¶¶ 35-36. After Defendants created ISAC using money from Knaster

and Eisler, but, critically, **before** they negotiated the Put Option Agreement and the Share Charge Agreement (together the "Fraudulently Obtained Agreements") with Textor and represented that they controlled a viable SPAC that could take Eagle public, Russia invaded Ukraine, leading to international sanctions against the above-named Russian nationals and their assets. *Id.*

The sanctions essentially rendered the SPAC non-viable. *Id.* ¶¶ 37-40. One of the necessary preconditions for a De-SPAC Transaction to occur is having in place Private Investment in Public Equity ("PIPE") financing. *Id.* ¶ 34. Unlike shares in other companies, shares in a SPAC come with the right to sell the shares back to the SPAC for the purchase price if the shareholder does not approve of the company being acquired. PIPE financing is necessary so that even if some or all shareholders redeem their shares, the SPAC will still have sufficient funds to close the transaction. *Id.* Knaster's and Eisler's close financial ties with sanctioned individuals and assets made obtaining PIPE financing practically impossible, because no respected financial institution would be willing to commingle its funds with Knaster's or Eisler's funds. *Id.* ¶ 37. To do so would be to commingle its funds with funds associated with sanctioned Russian individuals—a risk no respected financial institution would take. *Id.*

Defendants never disclosed the depth of their economic ties to sanctioned individuals and assets, nor did they disclose that they were having any problems obtaining financing. *Id.* ¶ 38. To the contrary, Defendants knowingly misrepresented that they were having no difficulties conducting business with respected financial institutions or obtaining financing. *Id.* Had Plaintiff been aware of the extent of Knaster's or Eisler's close financial ties with sanctioned Russian individuals, and the difficulties those ties caused Knaster and Eisler (and entities in which they invested such as ISAC) in obtaining financing for the SPAC, Plaintiff would have realized that the

De-SPAC Transaction was highly unlikely to occur, and for that reason he would not have agreed to the Fraudulently Obtained Agreements. *Id.* ¶¶ 40-41.

Predictably, given Knaster's and Eisler's ties, ISAC was unable to obtain PIPE financing, and the SPAC failed. *Id.* ¶ 45. ISEI purports to have exercised the Put Option. Textor has not purchased ISEI's shares in Eagle, and ISEI has now purported to exercise certain rights in the Share Charge Agreement. *Id.* ¶ 29, 33. On July 3, 2025, ISEI filed a claim in the English Commercial Court, seeking to force Textor to purchase ISEI's shares in Eagle pursuant to the Put Option Agreement. *Id.* On July 4, 2025, Plaintiff filed the Complaint in this case, seeking rescission of the Fraudulently Obtained Agreements pursuant to U.S. securities law. The Complaint alleged that when Defendants induced Plaintiff to enter into those agreements, they committed federal securities fraud in violation of section 10b-5 of the Exchange Act, Florida state law securities fraud, and fraudulent misrepresentation under the laws of England. On July 11, 2025, Plaintiff filed the FAC, asserting these same claims. For the reasons set forth above and in the FAC, Textor was defrauded into signing the Fraudulently Obtained Agreements, and he therefore seeks rescission of the Fraudulently Obtained Agreements under U.S. securities law.

### III.   <u>LEGAL STANDARD</u>

"At the motion to dismiss stage, [the court] must accept all well-pleaded facts contained in the operative complaint as true and construe all reasonable inferences in the light most favorable to the plaintiff." *MacPhee v. MiMedx Grp., Inc.*, 73 F.4th 1220, 1228 (11th Cir. 2023). To state a claim under § 10(b) and Rule 10b–5, a plaintiff must plead the following: "(1) a misstatement or omission, (2) of a material fact, (3) made with scienter, (4) on which plaintiff relied, (5) that proximately caused his injury." *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001) (internal citation and quotation marks omitted). "A showing of severe recklessness satisfies

the scienter requirement." *Id.* (citing *McDonald v. Alan Bush Brokerage Co.*, 863 F.2d 809, 814 (11th Cir. 1989)). "Severe recklessness" includes conduct that "present[s] a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *McDonald*, 863 F.2d at 814 (internal quotation marks and citation omitted).

To survive a motion to dismiss, Plaintiff's claims of fraud under § 10(b) and Rule 10b–5 also must satisfy the requirements of Fed. R. Civ. P. 9(b). Rule 9(b) provides that "the circumstances constituting fraud or mistake shall be stated with particularity." "While a claim for fraudulent misrepresentation is typically premised on an affirmative misrepresentation involving a specific statement made at a specific place and time, fraudulent concealment or omission is premised on the defendant's failure to speak and is by its very nature, difficult to plead with particularity." *Callen v. Daimler AG*, No. 1:19-CV-1411-TWT, 2020 WL 10090879, at *15 (N.D. Ga. June 17, 2020) (internal quotation marks and citation omitted). Therefore, the Rule 9(b) requirement "functions differently in the context of omission-based fraud claims." *McClure v. Toyota Motor Corp.*, 759 F. Supp. 3d 1333, 1357 (N.D. Ga. 2024). For omission-based fraud claims, "it is enough for a plaintiff to allege that a fact was material and that it could have, and should have, been disclosed prior to the time plaintiffs acted upon the omission." *Id.* (internal citation and quotation marks omitted).

Furthermore, the Private Securities Litigation Reform Act ("PSLRA") requires a complaint to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). Although Fed. R. Civ. P. 9(b) permits a plaintiff to allege scienter generally, the PSLRA requires the complaint to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* § 78u-4(b)(2)(A). A "strong inference" of scienter means an inference that is "cogent and at least as

compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). Because the strong-inference inquiry asks "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard," "courts must consider the complaint in its entirety." *Id.* at 322-23. Moreover, the inquiry is "inherently comparative" because courts "must take into account plausible opposing inferences." *Id.* at 323. "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences' . . . Yet the inference of scienter must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations." *Id.* at 324. "In sum, the reviewing court must ask: When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Id.* at 326.

## IV. ARGUMENT

*First*, Plaintiff has properly brought his claim for securities fraud pursuant to the Securities Exchange Act of 1934 ("Exchange Act") in this Court, notwithstanding the forum selection clauses in the Fraudulently Obtained Agreements, because a U.S. District Court is the only court in which he can bring such a claim, and the ability to bring such a claim cannot be waived. *Second*, Plaintiff has adequately pleaded a 10b-5 claim because (1) Defendants' 10b-5 claim is based primarily on information Defendants omitted to tell Plaintiff; (2) the information Defendants omitted to tell Plaintiff was material; (3) the allegations, taken together, give rise to strong inference of scienter; and (4) taking the allegations as true, Defendants' omission caused Plaintiff's loss. *Furthermore*, because Plaintiff has adequately pleaded a claim under Rule 10b-5, he has necessarily pleaded claims under Florida Securities law and English law.

**A. Enforcing the Forum Selection Clauses as to Plaintiff's Federal Securities Fraud Claim Would Violate the Anti-Waiver Provision of the Exchange Act.**

In arguing for dismissal based on forum non conveniens, Defendants never dispute the core jurisdictional issue as pleaded by Plaintiff: "the sale of the security that is the subject of this action was consummated in this District, and a substantial part of the acts of omissions giving rise to this action occurred in this District." FAC ¶ 11. Accordingly, the pleaded claim under the Exchange Act, even if it involved overseas entities, falls squarely within the extraterritorial reach of the Exchange Act and is properly brought in this District. *See Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 273 (2010). This is a critical distinction between this case and those cited by Defendants. Unlike in those cases, the sale of securities in this case occurred in the United States, and there is therefore no doubt that the Exchange Act, including its anti-waiver provision, applies to the transactions at issue.

Defendants rely on the Supreme Court's decision in *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 9 (1972), which sets forth the circumstances under which a court should decline to enforce a forum selection clause. (ECF No. 46 at 9.) But the *Bremen* test, formulated in a non-securities case, should not apply to Plaintiff's federal securities claim because "the district courts of the United States . . . shall have exclusive jurisdiction of violations of" the Exchange Act "or the rules and regulations promulgated thereunder." 15 U.S.C. § 78aa(a). Therefore, a forum selection clause specifying a court other than U.S. District Court would constitute a waiver of the right to bring a claim under the Exchange Act, which would violate the Act's anti-waiver provision. The anti-waiver provision provides that "[a]ny condition, stipulation, or provision binding any person to waive compliance with any provision of this chapter or of any rule or regulation thereunder, or of any rule of a self-regulatory organization, shall be void." 15 U.S.C. § 78cc(a). The Seventh Circuit found that this anti-waiver provision invalidated a forum selection

9

clause specifying Delaware Chancery Court as the exclusive forum for a plaintiff's claims. *See Seafarers Pension Plan v. Bradway*, 23 F.4th 714, 717 (7th Cir. 2022). Otherwise, the forum selection clause would operate essentially as a waiver of the obligation to comply with U.S. securities laws because the aggrieved party would have no right to bring securities fraud claims, which can be brought only in federal court. *Id.* at 723-24.

To be sure, courts have applied the *Bremen* test to forum selection clauses specifying an international forum notwithstanding the Exchange Act's anti-waiver provision. *See* ECF No. 45 at 8-9. But those cases involve transactions that occurred outside the United States, leading to concerns about the consequences of U.S. securities laws applying to the sale of any and all securities sold anywhere in the world. *See Bremen*, 407 U.S. at 9 ("We cannot have trade and commerce in world markets and international waters exclusively on our terms, governed by our laws, and resolved in our courts."); *Bonny v. Soc'y of Lloyd's*, 3 F.3d 156, 159 (7th Cir. 1993) (quoting *Bremen*); *Lipcon v. Underwriters at Lloyd's, London*, 148 F.3d 1285, 1291 (11th Cir. 1998) (same). It was this concern that animated the Supreme Court's later decision in *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 273 (2010), which held that "Section 10(b) reaches the use of a manipulative or deceptive device or contrivance only in connection with the purchase or sale of a security listed on an American stock exchange, and the purchase or sale of any other security in the United States." 561 U.S. at 273. The *Morrison* Court, like the *Bremen* Court, was concerned that the United States "has become the Shangri-La of class-action litigation for lawyers representing those allegedly cheated in foreign securities markets." *Morrison*, 561 U.S. at 270.

*Morrison* resolved the concerns animating the pre-*Morrison* decisions that enforced international forum selection clauses notwithstanding the Exchange Act's anti-waiver provision. *Seafarers*, 23 F.4th at 726 n.4 (collecting decisions enforcing foreign forum selection clauses and

stating that they "seem generally consistent with the Supreme Court's later decision in [*Morrison*] which limited extraterritorial application of United States securities laws"). In other words, those earlier cases from the various Courts of Appeal were animated by the then-broad extraterritorial application of federal securities statutes and the parties' need to contract around that broad reach. But that necessity disappeared after *Morrison*, given the Supreme Court's narrowing of the Exchange Act's extraterritorial reach. Pre-*Morrison*, one way to avoid the problem of inhibiting "trade and commerce in world markets and international waters" was to allow the parties to contractually specify an international forum, notwithstanding the anti-waiver provision. *Bremen*, 407 U.S. at 9. Another way to accomplish the same goal is to have a securities law regime where U.S. securities laws do not apply to securities transactions that occur outside the territory of the United States. *Morrison* accomplishes the latter—it provides a bright-line test for determining when U.S. securities law apply. *Quail Cruises Ship Mgmt., Ltd. v. Agencia de Viagens CVC Tur Limitada*, 645 F.3d 1307, 1310 (11th Cir. 2011) (citing *Morrison*, 561 U.S. at 270).

On one side of *Morrison*'s line are transactions that occur outside the United States, and on the other side are transactions that occur within the United States or involve a security traded on a United States exchange. Had *Morrison* been decided before *Bonny* or *Lipcon*, those cases would necessarily have been resolved on the grounds that Rule 10b-5 did not apply to the transactions at issue in those cases at all, because those transactions occurred outside the United States. *See Bonny,* 3 F.3d at 158 ("Plaintiffs traveled to England and executed" the contracts at issue); *Lipcon*, 148 F.3d at 1288 ("to become a Name one must travel to England to acknowledge the attendant risks of participating in a syndicate by signing" the contract at issue). In other words, after *Morrison*, the question of whether the Exchange Act's anti-waiver provision invalidates a forum selection clause choosing a foreign forum when the transaction occurred outside of the

United States—the question answered by *Lipcon* and a number of pre-*Morrison* cases—is moot, because the Exchange Act does not apply to such a transaction at all. Thus, what remains relevant from *Lipcon* is its clear statement that "[plaintiffs]-appellants' argument" against enforcement of the forum selection clause "finds strong support in the plain language of the [Exchange Act's] anti-waiver provisions." 148 F.3d at 1292.

Conversely, because the Fraudulently Obtained Agreements were executed ***within*** the United States, the Exchange Act, including its anti-waiver provision, applies. Thus, the forum selection clauses in the Fraudulently Obtained Agreements should not apply to Plaintiff's federal securities fraud claim, and the *Bremen* test for whether that clause is enforceable is inapplicable. *See Seafarers*, 23 F.4th at 725 (declining to apply the *Bremen* test because *Bremen* "did not involve any claim under a federal statute, let alone a federal statute with a non-waiver provision like Section 29(a) of the Exchange Act"); *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 637 n.19 (1985) ("in the event the choice-of-forum and choice-of-law clauses operated in tandem as a prospective waiver of a party's right to pursue statutory remedies for antitrust violations, we would have little hesitation in condemning the agreement as against public policy"). The concern animating the pre-*Morrison* decisions such as *Bonny* and *Lipcon*—the public policy ramifications of forcing disputes over every transaction around the world to be litigated in U.S. courts under U.S. law—has been satisfied by *Morrison* and no longer applies.

Finally, in its decision denying the motion for injunctive relief, the Court adopted Defendants' assertion that "Plaintiff filed for the same emergency relief in the English Proceeding, evidencing his understanding that the same relief is available in the contracted-for forum." ECF No. 45 at 11. Defendants' assertion was incorrect in several respects. First, the only claims in the English case at this point in time are by ISEI against Textor. Plaintiff has not at this stage filed any

claims against Defendants in England. Second, Textor did not seek any injunctive relief in the Courts of England until July 29, 2025, *after* this Court denied his motion for injunctive relief on July 28, 2025.[4] Third, the emergency injunctive relief Textor did ultimately seek in England—which is the only relief he has sought there because he has not at this stage filed any claims or counterclaims against Defendants—is not the same relief sought in this case (rescission), nor is rescission pursuant to U.S. securities law a remedy that is available in England, because the Exchange Act itself states that a claim under the Exchange Act cannot be brought in the Courts of England.[5] Rather, Textor has sought emergency injunctive relief in the Courts of England on the basis that, because ISEI did not comply with certain requirements set forth in the Put Option Agreement, it does not have the rights it purports to have under the Share Charge Agreement—an argument that Textor recognized in prior briefing in this case that he cannot make in this Court because of the forum selection clauses in the Fraudulently Obtained Agreements.

---

[4]  To keep the Court fully apprised of the status of the English case, the injunctive relief Plaintiff sought in England was on grounds entirely separate from the claims asserted in this case—specifically, that ISEI had failed to satisfy the conditions precedent to declaring a default under the Put Option Agreement, meaning that it does not have the rights it purports to have under the Share Charge Agreement. On August 5, 2025, in an agreement memorialized in an order issued by the English court, ISEI undertook, among other things, that pending an August 13 hearing it would not exercise any rights it would have had under the Share Charge Agreement in certain circumstances if there had been a default. At the August 13, 2025 hearing, in an agreement similarly memorialized in an order issued by the English court, ISEI undertook to continue under the same conditions until the English court rules on certain preliminary issues relevant to the determination of that issue after a trial that is scheduled to take place in London on September 29 and 30, 2025.

[5]  Pre-*Morrison* precedent in the Supreme Court involving the Exchange Act's anti-waiver provision permitted *arbitration* under domestic U.S. law, recognizing the dictates of the Federal Arbitration Act ("FAA") to respect the arbitral process in those circumstances. *See Shearson/Am. Exp., Inc. v. McMahon*, 482 U.S. 220 (1987) (permitting arbitration under FAA where arbitral forum will fully respect rights under the Exchange Act); *Scherk v. Alberto-Culver Co.*, 417 U.S. 506 (1974) (same, where arbitration, even if held overseas, was governed by domestic U.S. law and can honor parties' statutory rights). Plaintiff cannot bring an Exchange Act claim in the Courts of England and has not done so.

**B.  The FAC States a Claim for Fraud Under Rule 10b-5.**

*1.  Defendants Ignore the "Material Omissions" Portion of the FAC.*

Defendants' motion to dismiss ignores that the securities fraud alleged in the FAC is based primarily on information Defendants ***omitted*** to tell Textor. ECF No. 46 at 14-17 (titling this section of their brief "The Amended Complaint Does Not Sufficiently Plead a Material Misrepresentation" and leaving out any reference to material ***omissions***). Defendants reference isolated statements attributed to them by the FAC and argue why each one, individually, does not constitute "an actionable misrepresentation of material fact." ECF No. 46 at 14-17. But even if those statements are not actionable as misrepresentations standing alone—and as discussed below, they are—they give context for why Defendants' ***failure*** to tell Textor about the depth of Knaster's and Eisler's ties to sanctioned Russian individuals was material and, therefore, state a claim.

Rule 9(b)'s requirement that a party state with particularity the circumstances constituting fraud or mistake "functions differently in the context of omission-based fraud claims." *McClure*, 759 F. Supp. 3d at 1357. "By the very nature of fraudulent concealment, plaintiffs cannot be expected to point to the time, place, and precise substance of what should have been disclosed" *Id.* (internal citation and quotation marks omitted). "Instead, it is enough for a plaintiff to allege that a fact was material and that it could have, and should have, been disclosed prior to the time plaintiffs acted upon the omission" *Id.* (internal citation and quotation marks omitted). "While a claim for fraudulent misrepresentation is typically premised on an affirmative misrepresentation involving a specific statement made at a specific place and time, fraudulent concealment or omission is premised on the defendant's failure to speak and is by its very nature, difficult to plead with particularity." *Callen*, 2020 WL 10090879, at *15 (internal quotation marks and citation omitted).

The information Defendants omitted to tell Textor is set forth with specificity in paragraphs 35-38 and 46 of the FAC. None of the three Defendants in this action, including ISEI, which acted through Dinan, told Textor that two of the major investors in ISAC (the SPAC that Defendants represented both could and would merge with Eagle in order to take Eagle public) had close financial ties to sanctioned Russian individuals. FAC ¶¶ 35-38. The FAC specifically describes the omitted information—"Defendant Knaster's London-based investment firm, Pamplona, and Eisler's London-based hedge fund management firm, Eisler Capital, received significant funding prior to 2022 from sanctioned individuals, including Mikhail Fridman, Petr Aven, German Khan, and Alexey Kuzmichev, via an investment firm in Luxembourg known as LetterOne Holdings in which the sanctioned individuals were major shareholders." FAC ¶ 36. Defendants can dispute whether ISAC's investors in fact received such funding, they can dispute whether they omitted to tell Textor that information, or they can try to argue that the information was not material. But they are not entitled to dismissal on the basis that the allegations are insufficiently specific.

Additionally, the FAC alleges that at "no point did Defendants disclose to Textor any difficulties that Knaster, Eisler, or ISAC were encountering with obtaining financing, or even securing an investment bank sponsor (underwriter) for the De-SPAC transaction, as a result of their ties to sanctioned individuals and assets, nor did they raise with him the possibility that there would be an issue obtaining PIPE financing." *Id.* ¶ 38. At "no point" is as specific as any Plaintiff can be with respect to a material omission. No Defendant ever disclosed to Plaintiff any difficulties with obtaining financing for the De-SPAC Transaction. Again, Defendants can dispute whether they were having difficulty obtaining financing, whether they informed Plaintiff of the difficulty obtaining financing, and whether difficulty obtaining financing is material to the price of the

insurance policy. What they cannot do is avoid liability for securities fraud by requiring Plaintiff to list the dates on which he was ***not*** told material information.

### 2. *Defendants' Fraud Was Material, as Opposed to "Puffery".*

Defendants' inability to obtain financing for the De-SPAC Transaction, and Defendants' lies and omissions surrounding that inability, are not, as Defendants contend, mere "puffery" because Defendants, once again, ignore context. ECF No. 46 at 17. In "considering a motion to dismiss a securities-fraud action, a court shouldn't grant unless the alleged misrepresentations— puffery or otherwise—are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Carvelli v. Ocwen Financial Corp.*, 934 F.3d 1307, 1320 (11th Cir. 2019) (cleaned up). Defendants cite *Morgensen v. Body Cent. Corp.*, 15 F. Supp. 3d 1191, 1212 (M.D. Fla. 2014), for the proposition that "generalized, non-verifiable optimistic statements" are not actionable. But, *Morgensen* continues, "[s]tatements that might be considered puffery in one context can be actionable in another, ***especially when defendants allegedly knew or recklessly disregarded facts contradicting their statements***." *Id.* (emphasis added); *see also Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000) ("Here, the complaint alleges that the defendants did more than just offer rosy predictions; the defendants stated that the inventory situation was 'in good shape' or 'under control' while they allegedly knew that the contrary was true"); *Hartel v. GEO Grp., Inc.*, 20-CV-81063 (RS), 2021 WL 4397841, at *10 (S.D. Fla. Sept. 23, 2021) (statements about the Company's access to future capital "are more than mere puffery. Plaintiffs have pled that access to financing was critical to GEO's operations, particularly given its structure as a REIT. Thus, most investors would consider this information material"); *In re Premiere Tech. Securities Litig.*, 98-CV-1804 (JOF), 2000 WL 33231639, at *15 (N.D. Ga. Dec. 8, 2000) (defendants' optimistic public statements about company's infrastructure,

personnel, and management held to be actionable because the defendants allegedly knew or recklessly disregarded facts contradicting those statements).

The statements that it was "highly unlikely" the De-SPAC Transaction would not occur, that Textor had "the most control" over whether it would occur, and that Knaster's ties with sanctioned Russian individuals posed no issue for obtaining financing are part of Defendants' efforts to defraud Plaintiff, because Defendants knew or recklessly disregarded facts contradicting those statements. And in the context of the 10b-5 claim, these statements provide context showing both that the omission of information about the ties between Defendants' SPAC and sanctioned Russian individuals was material, and that Defendants intentionally concealed that information in order to induce Plaintiff to agree to the Fraudulently Obtained Agreements.

### 3.  *The FAC Pleads Scienter.*

The FAC pleads that Defendants' motivation for concealing Knaster's and Eisler's ties with sanctioned Russian individuals was to induce Textor to agree to the Put Option Agreement by making him believe that the SPAC was viable. This scheme allowed them to invest in Eagle and either: (1) obtain a guaranteed return of their entire investment plus 11% annual interest or, if Textor did not buy ISEI's shares, rights to Textor's shares in Eagle; or (2) obtain an even greater return on their investment if Plaintiff was able to take Eagle public through an IPO, notwithstanding the failure of the De-SPAC Transaction, all in consideration for a mere £1.  FAC ¶ 47. Defendants assert that the logic of this alleged motive is flawed and pose a question in their brief—"why would ISEI invest $75 million in a company that it knew was doomed to fail?" ECF No. 46 at 18. But the company in which ISEI invested $75 million was *Eagle*, not ISAC. And although the De-SPAC Transaction failed, Eagle did not. Eagle continues to own and operate soccer clubs all over the world. FAC at ¶ 4. And, as the Court is aware from the briefing on

Plaintiff's Motion for a Temporary Restraining Order, Defendants have used the Fraudulently Obtained Agreements to attempt to acquire a majority stake in Eagle.

As the FAC alleges, had Plaintiff been aware of the extent of Knaster's or Eisler's close financial ties with sanctioned Russian individuals, and the difficulties that those ties caused in obtaining financing for the SPAC, "he would not have agreed to sell the put option for £1." FAC ¶ 41. And therein lies Defendants' motivation—they tricked Plaintiff into selling a very valuable insurance policy for a nominal amount of money by convincing him that the scenario against which the policy guarded was unlikely to occur.

Defendants also argue that the FAC fails to articulate how each Defendant knew that ISAC's ties to sanctioned Russians would make the De-SPAC Transaction impossible. ECF No. 46 at 18. This is wrong in various respects. First, Defendants knew because they were in fact failing to get financing for the De-SPAC Transaction. The FAC alleges that Defendants were having difficulty securing financing and conducting business with respected financial institutions, yet they failed to disclose that difficulty to Textor. FAC ¶ 38. Second, that financial institutions would be unwilling to commingle their money with that of sanctioned Russian individuals by providing ISAC financing would be obvious to Dinan and Knaster, who, as alleged in the FAC, are sophisticated financiers. FAC ¶¶ 5, 8. Although Defendants may dispute this allegation during later phases of this litigation, at this stage, all reasonable inferences must be drawn in Plaintiff's favor, and this is such an inference. Contrary to Defendants' assertions, this is not a case like *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230 (11th Cir. 2008), where the plaintiff was unable to plead that senior management was aware of the fraud. Here, Dinan negotiated and signed the Put Option Agreement on behalf of ISEI, and Knaster was involved in that negotiation as well. The senior leaders of ISEI were the ones committing the fraud.

#### 4.   *The FAC Pleads Loss Causation.*

Defendants argue that because information about Knaster's and Eisler's Russian ties was publicly available, Plaintiff cannot plead loss causation. ECF No. 46 at 18. But Plaintiff has not alleged that the material omission was the mere fact that such ties, at some level, had ever existed. Rather, as alleged, Defendants omitted to tell Plaintiff "***the extent*** of Knaster's or Eisler's close financial ties with sanctioned Russian individuals, ***and the difficulties that those ties caused Knaster and Eisler (and entities such as ISAC) in conducting business with respected financial institutions, or obtaining financing for the SPAC.***" FAC ¶ 41 (emphasis added). Plaintiff refers the Court to the Bloomberg and Financial Times articles attached as Exhibits F and G to Defendants' Motion. These articles do ***not*** reveal the information that, at the time the Fraudulently Obtained Agreements were executed in November and December of 2022, those ties even still existed, much less were causing Knaster and Eisler problems. *See* ECF No. 46-7 (March 2022 article stating "[a]lready, Pamplona Capital Management, which oversees almost $3 billion of LetterOne's money, said last week it 'has begun the process' of redeeming the firm's partnership interests. Ed Eisler's eponymous hedge fund, which was started with more than $100 million from LetterOne, on March 10 returned all capital affected by international sanctions"); ECF No. 46-8 (July 2022 article stating that Knaster's firm, Pamplona Capital Management, "is trying to cut ties" with LetterOne and that Pamplona wanted "to end all 'direct or indirect exposure to any Russian capital'"). If anything, these articles would have given Plaintiff the false impression that these issues had been ***resolved***.

#### 5.   *The FAC States Claims for Florida Securities Fraud and Fraudulent Misrepresentation Under English Law.*

As Defendants concede, the elements of a Florida securities fraud claim under Section 301 are identical to those under Rule 10b-5 of the Exchange Act, except that the scienter requirement

is satisfied by a showing of mere negligence, and Plaintiff does not need to prove loss causation. ECF No. 46 at 19. Similarly, as Defendants concede, the English fraud claim has the same elements as the federal securities law claim, again with a more liberal standard for scienter. *Id.* at 20. Therefore, if Plaintiff has stated a federal securities fraud claim, by definition he has also stated a Florida securities fraud claim and an English fraud claim.

### C. If the FAC Is Dismissed for Failure to State a Claim (as Opposed to Forum Non Conveniens), Plaintiff Should Be Given Leave to Amend.

Although the FAC complies with the heightened pleading standard of Rule 9(b) and the PSLRA, in the event the Court dismisses this action for failure to plead with sufficient specificity (as opposed to on *forum non conveniens* grounds),[6] Plaintiff respectfully requests leave to file a Second Amended Complaint. Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires"); *MacPhee*, 73 F.4th at 1250 ("[A]fter a complaint is dismissed the right to amend under Rule 15(a) terminates, [but] a plaintiff may still move the court for leave to amend, and such amendments should be granted liberally, [unless] the court has clearly indicated either that no amendment is possible or that dismissal of the complaint also constitutes dismissal of the action.") (cleaned up). Indeed, Defendants' own request that the complaint be dismissed with prejudice relates solely to *forum non conveniens*, not to any failure to state a claim. ECF No. 46 at 20.

### V. CONCLUSION

For the reasons set forth above, Defendants' motion to dismiss the FAC should be denied.

---

[6] Plaintiff acknowledges that, to the extent the Court adheres to its prior reasoning regarding *forum non conveniens* and dismisses on that basis alone, then such dismissal should be with prejudice.

Dated: August 22, 2025

Respectfully Submitted,

/s/ *Tamara Van Heel*
Tamara Van Heel
Florida Bar No. 107104
TVanHeel@wiggin.com
Wiggin and Dana, LLP
251 Royal Palm Way, Ste. 601
Palm Beach, FL 33480
Telephone: (561) 701-8706

Paul Tuchmann (admitted PHV)
PTuchmann@wiggin.com
Daniel Passeser (admitted PHV)
DPasseser@wiggin.com
Wiggin and Dana, LLP
One Century Tower
265 Church Street
New Haven, CT 06510

Nathan Denning (admitted PHV)
NDenning@wiggin.com
Wiggin and Dana, LLP
437 Madison Avenue, 35th Floor
New York, NY 10022

Julie Edelstein (admitted PHV)
JEdelstein@wiggin.com
Wiggin and Dana, LLP
600 Massachusetts Ave., NW, Suite 375
Washington, DC 20001

*Attorneys for Plaintiff John Textor*