Claim No. [ ]

**IN THE HIGH COURT OF JUSTICE**

**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**

**COMMERCIAL COURT (KBD)**

**BETWEEN:**

**ICONIC SPORTS EAGLE INVESTMENT, LLC**

**Claimant**

-and-

**JOHN TEXTOR**

**Defendant**

---

**PARTICULARS OF CLAIM**

---

**Executive summary**

1. This is a claim for specific performance in respect of a put option agreement dated 16 November 2022 (the "Put Option Agreement") between the Claimant ("Iconic") and the Defendant ("JT").

2. By way of summary:

    (1) Pursuant to the Put Option Agreement, Iconic had the right to sell certain shares (the "Option Shares") to JT for a specified price (the "Aggregate Option Price") upon the occurrence of a specified event (an "Option Trigger Event") by delivering a written notice (an "Option Notice") to JT within a specified timeframe.

    (2) On 26 July 2023, Iconic delivered an Option Notice to JT. In breach of the Put Option Agreement, JT has failed to purchase the Option Shares from Iconic. In particular, JT has never been ready and willing to pay the Aggregate Option Price to Iconic.

    (3) Accordingly, Iconic seeks an order for specific performance of JT's obligation to purchase the Option Shares (including an order for payment of the Aggregate Option Price). As at 2 July 2025, the Aggregate Option Price is US$93,640,960.14.

**The parties**

3. Iconic is a company incorporated in the Cayman Islands. It carries on business as an investment vehicle for a consortium of experienced investors (Jamie Dinan, Alexander Knaster and Edward Eisler), all of whom have previously founded their own investment funds and are well known to participants in the financial markets.

4. JT is an entrepreneur residing in Florida.

5. Iconic and JT are among the shareholders of Eagle Football Holdings Limited, a company incorporated in England and Wales (the "Company"). The Company holds equity interests in several football clubs around the world.

6. JT is the Company's single largest shareholder (holding a total of 33,243 ordinary shares). Iconic is the holder of 8,520 ordinary shares issued by the Company, which it purchased for the sum of US$75 million. In addition to Iconic and JT, the Company has a number of other shareholders.

7. The Company and its shareholders are parties to a subscription and shareholders' agreement dated 16 November 2022 (the "Shareholders' Agreement"), which was amended by an amendment letter dated 9 December 2022.

**The Shareholders' Agreement**

8. The Shareholders' Agreement contemplated that the Company might enter into a transaction known as a "De-SPAC Transaction". As to this:

   (1) In the financial markets, the term "SPAC" refers to a special purpose acquisition company. A SPAC is typically founded by one or more experienced investors (who agree to manage or advise the SPAC) and listed on a public stock exchange. The SPAC raises capital from new investors, and such capital is used to acquire or merge with one or more private companies (selected by those managing or advising the SPAC) – thereby taking the relevant private companies public. The latter process is known as a "de-SPAC".

(2) Clause 15 of the Shareholders' Agreement contemplated that the Company might enter into a "De-SPAC Transaction". This term referred to a potential merger of the Company with Iconic Sports Acquisition Corp, which was a SPAC founded by Iconic's investors (and listed on the New York Stock Exchange).

(3) To this end, Clause 15.5 of the Shareholders' Agreement conferred a right on Iconic known as the "De-SPAC Option":

> "*If the De-SPAC Option Conditions are satisfied on or before 26 April 2023, Iconic shall have the option (the De-SPAC Option), in its full discretion, following a presentation to the Board to confirm the De-SPAC Option Conditions have been met, to procure that the Company enter into the Agreed-Form BCA and effectuate the De-SPAC Transaction.*"

(4) Clause 15.7 of the Shareholders' Agreement provides as follows:

> "*The De-SPAC Option shall terminate and cease to be exercisable if the De-SPAC Option Conditions have not been satisfied, or if the De-SPAC Option has not been exercised for any reason, on or before 26 April 2023.*"

9. Pursuant to Clause 15.5, Iconic had "*full discretion*" to decide whether to exercise the De-SPAC Option (and had no obligation to exercise that option in any circumstances).

10. Iconic did not exercise the De-SPAC Option by the deadline of 26 April 2023, and Iconic Sports Acquisition Corp was subsequently delisted from the New York Stock Exchange.

**The Put Option Agreement**

11. JT and Iconic entered into the Put Option Agreement in order to confer on Iconic a right to sell its shares in the Company to JT in certain circumstances (the "Put Option"), including (in particular) in the event that Iconic decided not to exercise the De-SPAC Option under the Shareholders' Agreement. This ensured that Iconic would be able to realise value from its investment in the Company come what may, either by the exercise of the De-SPAC Option or by the exercise of the Put Option.

12. The Put Option Agreement is governed by English law and subject to the exclusive jurisdiction of the English Court (pursuant to Clause 13.10).

13. So far as material, Clause 2 of the Put Option Agreement provides as follows:

3

"*2.1 In consideration of the payment by Iconic to JT of the sum of £1 (receipt of which is acknowledged), JT hereby grants to Iconic (but not any of its transferees or assignees) the right (but not the obligation) (the Option), upon the occurrence of any Option Trigger Event to require JT (or his nominee) to purchase all of the Option Shares on the Transfer Terms.*

*2.2  The Option shall only be exercisable on one occasion.*

*2.3 In order to exercise the Option, Iconic shall deliver an irrevocable written notice (the Option Notice) during the Option Period. If Iconic timely exercises the Option, then the purchase of the Option Shares shall occur no later twelve (12) months after receipt of the Option Notice (the date that is twelve (12) months from the receipt of the Option Notice being the Repayment Date).*"

14. The term "Option Shares" is defined in the Put Option Agreement as follows:

"*Option Shares means all of the Ordinary Shares to be issued by the Company to Iconic on the Completion Date (as such term is defined in the Shareholders' Agreement) (or such lesser number of Ordinary Shares for which Iconic has timely exercised the Option).*"

15. The term "Option Trigger Event" is defined as follows:

"*Option Trigger Event means the occurrence of any of the following triggers:*

*(a) Iconic has not exercised its De-SPAC Option by 26 April 2023;*

*(b) the De-SPAC Transaction has not been completed on or prior to 31 December 2023; or*

*(c) there is a material breach by the Company of any of Iconic's minority protection rights as set forth in Schedule I hereto which is not cured within three (3) months following the Company's receipt of written notice of such breach, which notice, to be valid, must be given within thirty (30) days of such breach first occurring.*"

16. For present purposes, the Option Trigger Event under limb (a) is relevant. The term "De-SPAC Option" is defined by reference to the Shareholders' Agreement (and the relevant definition has already been set out above).

17. The term "Option Period" is defined as follows: "*Option Period means the period commencing on the date of the first Option Trigger Event and expiring on the date falling three months thereafter (both dates inclusive)*".

18. The term "Transfer Terms" is defined as follows:

"*Transfer Terms means on the following terms:*

*(a) that the entire legal and beneficial interest in all the Option Shares is sold and purchased with full title guarantee free from any Encumbrance and together with*

4

*all rights attaching to them as at the Exercise Date (other than rights to receive dividends which shall have been paid before then) or at any time after that; and*

*(b) that the consideration for the Option Shares is the Aggregate Option Price.*"

19. The term "Aggregate Option Price" is defined as follows: "*the Option Price multiplied by the number of Option Shares to be sold pursuant to the Option*".

20. The term "Option Price" is defined as follows: "*subject to clause 4.1(b), a price per Option Share equal to the Subscription Price plus interest on such Subscription Price at eleven per cent. (11%) per annum, accruing from the date of timely delivery of the Option Notice*".

21. The term "Subscription Price" is defined as follows: "*the price per share paid by Iconic for the subscription for the Option Shares*". The Subscription Price was US$75 million divided by 8,520 = US$8,802.8169 per share.

22. Clause 3 deals with "Completion", which is defined as "*the performance by Iconic and JT of the obligations assumed by them respectively under clauses 3.2 and 3.3*". As to this:

    (1) Clause 3.1 provides that "*Completion shall take place at the registered office of the Company (or at such other place as may be agreed in writing between the parties) on such date as agreed between the parties or failing such agreement, on the Repayment Date*".

    (2) Clause 3.2(a) requires Iconic to deliver certain documents to JT on Completion (e.g. a stock transfer form, a share certificate and a power of attorney). Clause 3.2(b) provides that, on Completion, Iconic shall "*do such other acts and things and execute such other documents as shall be necessary or as JT may reasonably request to give effect to the sale of the Option Shares on the Transfer Terms*".

    (3) Clause 3.3 provides: "*Subject to Iconic complying with its obligations under clause 3.2, JT shall, on Completion, pay the Aggregate Option Price to Iconic on or before the Repayment Date*".

    (4) On the true construction of the Put Option Agreement, the obligations imposed on Iconic by Clause 3.2 and the obligations imposed on JT by Clause 3.3 are concurrent conditions. It was therefore a term of the contract that JT was required to be ready and willing to perform his obligations under Clause 3.3 on the date for Completion determined pursuant to Clause 3.1. If JT is not ready and willing to perform his

5

obligations under Clause 3.3, then Iconic is not required to tender performance under Clause 3.2 (until such time as JT is ready and willing to perform). In other words, the obligation to provide the documents set out in Clause 3.2(a) only arises if JT is ready and willing to countersign them (where relevant) and pay the Aggregate Option Price.

(5) The matters pleaded in sub-paragraph (4) above are to be analysed as express terms of the Put Option Agreement. In the alternative, they are to be analysed as implied terms which are necessary to give business efficacy to the contract and/or so obvious as to go without saying.

23. Clause 4 deals with the consequences of a default by JT. Clause 4.1 provides as follows:

> "*If JT (or his nominee, as applicable) fails to give effect to the Option and purchase Iconic's Option Shares for the Aggregate Option Price by the Repayment Date in accordance with clause 3.3, the following shall occur:*
>
> *(a) Iconic shall be entitled to specific performance on the terms of the Option to the extent permitted by clause 7.*
>
> *(b) the deemed interest rate applied to the Subscription Price for the purposes of calculating the Option Price shall increase by one per cent. (1.0%) every three (3) months after Repayment Date (up to a maximum annual interest rate of twenty percent (20%)).*
>
> *(c) Iconic shall, be entitled to exercise the proxy set forth in clause 5 …*
>
> *(d) Iconic shall be entitled (but not obliged) after consultation with JT to initiate and lead a customary and fair sale process, led by a globally recognised investment bank, which is designed to achieve fair market value for the Option Shares being sold in accordance with clauses 4.2, 4.3 and 4.4 ("Sale Process")*."

24. As to this:

(1) Iconic is entitled to exercise all or any of the rights conferred by Clause 4.1 in the event that JT fails to give effect to the Put Option and defaults on his obligation to purchase Iconic's Option Shares for the Aggregate Option Price by the Repayment Date in accordance with Clause 3.3.

(2) There is no contractual deadline or time limit for the exercise of any of the rights conferred by Clause 4.1.

(3) By initiating a Sale Process under Clause 4.1(d), Iconic does not thereby waive any other right that it may have, including the right to seek specific performance under Clause 4.1(a).

(4) The cross-reference in Clause 4.1(a) to Clause 7 is a typographical error. Clause 4.1(a) should cross-refer to Clause 8, which provides as follows:

> "*The parties hereby acknowledge and agree that damages alone may not be an adequate remedy for any breach of the obligations set out in this agreement and that a person with rights under this agreement shall be entitled to seek equitable relief (including without limitation specific performance) to the maximum extent available under applicable law.*"

(Similar provisions entitling Iconic to seek specific performance are set out in Clauses 4.1(a) and 12.5.)

25. The provisions referred to above are identified by way of summary, and Iconic will rely on the full terms of the Put Option Agreement.

**Exercise of the Put Option**

26. As pleaded above, Iconic did not exercise its De-SPAC Option by 26 April 2023. Accordingly, an Option Trigger Event occurred under the Put Option Agreement (pursuant to limb (a) of the definition). This was the first Option Trigger Event that took place under the Put Option Agreement, and it occurred on 27 April 2023. The Option Period therefore expired on 27 July 2023.

27. On 26 July 2023, Iconic delivered an Option Notice to JT in accordance with the terms of the Put Option Agreement. So far as material, the Option Notice stated as follows:

> "*This notice is an Option Notice for the purposes of the Put Option Agreement.*
>
> *We hereby give you irrevocable notice of the exercise of our Option and accordingly we require you to purchase all of our Option Shares on the terms set out in the Put Option Agreement.*
>
> *By exercising the Option on this day, we kindly remind you in particular that, pursuant to the terms of the Put Option Agreement:*
>
> *i. you (or your nominee) shall purchase our Option Shares in the Company before 26 July 2024, failing which, inter alia, (x) a Sale Process can be initiated by us which might lead to the sale of the combined Ordinary Shares held by you and us in the Company; and (y) we will be entitled to specific performance of the Option;*

7

> *ii. an interest rate of eleven per cent (11%) per annum applies on the Subscription Price as from the date hereof, and will be increased by one per cent (1%) every three (3) months after 26 July 2024 if we have not received the Aggregate Option Price by such date;*
>
> *iii. you may not, and may not agree to, transfer, assign, create any trust or Encumbrance over, or otherwise dispose of any Ordinary Shares held by you in the Company until we have received the Aggregate Option Price."*

28. The Option Shares consisted of Iconic's entire shareholding in the Company, amounting to 8,520 ordinary shares.

29. The Option Notice was delivered within the Option Period. By virtue of the Option Notice (combined with Clause 2.3 of the Put Option Agreement), JT was required to purchase the Option Shares by a date falling no later 12 months after receipt of the Option Notice (the Repayment Date). The Repayment Date was therefore 26 July 2024.

30. JT did not respond to the Option Notice. On 19 December 2023, Iconic wrote to the Company's board of directors to "*provide the board of directors of the Company (the "Board") with the background to the exercise of the Put Option on the Exercise Date and to formally inform the Board of our firm intention to sell our shares and exit the Company*". Amongst other things, the letter stated:

    > "*Since exercise of the Put Option, we have received no direct communication from either Mr. Textor [JT] or the Company on the plan for the repayment of our investment in accordance with the Put Option Agreement. We find this extremely confusing given the significant strategic implications for the Company under the Put Option obligations and the consequences of a potential default. We understand that there is currently a fund-raising effort ongoing at the Company, but again we have not been informed if the buy-out of our stake is being considered and/or catered for as part of this transaction.*"

31. On 27 March 2024, Iconic wrote a further letter to the Board. Amongst other things, the letter stated:

    > "*The purpose of this second letter to the Board is twofold:*
    >
    > *1. to inform the Board that, despite the Put Option having been exercised approximately 8 months ago, we have received no clear update from Mr. Textor or the Company as to how our shares will be acquired in accordance with the Put Option Agreement; and*
    >
    > *2. to reiterate to the Board our very firm intention to sell our shares and immediately exit the Company using, if and as required, all of the legal rights and remedies available to us under the Put Option and the SSHA [the Shareholders' Agreement].*

> *In this respect, we kindly remind the Board that, pursuant to the terms of the Put Option Agreement, Mr. Textor is required to purchase all of our shares in the Company (at the entry valuation plus a deemed 11% interest rate applying from the Exercise Date) before 26 July 2024. Upon a default, we fully intend to exercise the remedies to which we are entitled under the Put Option Agreement, including to appoint an investment bank and initiate a sale process which may lead to the sale of a majority stake in the Company, being all of the shares in the Company held by us and all of the shares in the Company held by Mr. Textor, which are currently pledged to us by way of security for enforcement of the Put Option.*"

32. On 10 July 2024, Iconic wrote a third letter to the Board. Amongst other things, the letter stated:

    > "*The purpose of this final letter to the Board is to confirm that, as we have not had any written update from Mr. Textor in respect of the Put Option, we assume that our shares will be repurchased on or before 26 July 2024 in line with the terms of the Put Option Agreement.*
    >
    > *We would therefore like to thank the other members of the Board for their time and consideration since we invested in December 2022 and wish the Company every success in the future.*
    >
    > *As we have made very clear in all correspondence, our intention has always been to exit the Company and to exercise our contractual rights to do so if required. On that basis, we feel it is important to reiterate that in the unlikely event of a default, 12 months after we excised the Put Option, we will seek to enforce our rights. This would include appointing an investment bank and initiating a sale process which may lead to the sale of a majority stake in the Company, being all of the shares in the Company held by us and all of the shares in the Company held by Mr. Textor, which are currently pledged to us by way of security for enforcement of the Put Option.*"

33. After this letter was sent, JT requested a meeting with Jamie Dinan and Alexander Knaster (on behalf of Iconic) which was subsequently held on 15 July 2024. At the meeting, JT stated (amongst other things) that he had no ability or intention to pay the sums required under the Put Option Agreement.

34. The parties did not agree to defer the date of Completion pursuant to Clause 3.1. Accordingly, the date of Completion was the Repayment Date (viz. 26 July 2024).

35. On 26 July 2024, JT did not purchase or take any steps to purchase the Option Shares, or to pay the Aggregate Option Price, in whole or in part. It is averred that JT was not ready and willing to purchase the Option Shares or to pay the Aggregate Option Price on 26 July 2024 or at any material time before or after that date.

36. In the premises, JT breached his obligations under Clauses 2.3 and 3.3 of the Put Option Agreement (and was in anticipatory breach of contract since at least 15 July 2024). Further, the default provisions under Clause 4 of the Put Option Agreement were engaged, since JT "*fail[ed] to give effect to the Option and purchase Iconic's Option Shares for the Aggregate Option Price by the Repayment Date in accordance with clause 3.3*" within the meaning of Clause 4.1.

37. On 27 July 2024, Iconic sent a letter to JT (the "Default Notice"). Amongst other things, the Default Notice stated:

    "*Clause 3 of the Put Option Agreement required you to purchase our Option Shares by the Repayment Date, being 26 July 2024 (see clause 2.3 of the Put Option Agreement). You failed to meet this deadline and are in breach of your obligations under clause 3 of the Put Option Agreement.*

    *Clause 4.1 of the Put Option Agreement sets out the effect of you being in breach, which include: (i) the deemed interest rate applied to the Subscription Price for the purposes of calculating the Option Price shall, as from 26 July 2024, increase by one per cent. (1.0%) every three (3) months (up to a maximum annual interest rate of twenty percent (20%)); (ii) we are entitled to exercise the proxy set out in Clause 5 of the Put Option Agreement if we choose to do so; and (iii) we are entitled to specific performance on the terms of the Option.*

    *In addition, we have the right (pursuant to clause 4.1(d) of the Put Option Agreement), to initiate and lead a Sale Process which shall include a full range of monetization options, including a sale of the combined Ordinary Shares held by you and us.*

    *We intend to avail of ourselves of these rights and launch a Sales Process. However, before doing so, we would like to consult with you as to how that process should be conducted. We propose to meet and discuss by way of videoconference at any of the following dates and times …*"

38. In early November 2024, Iconic appointed Perella Weinberg, a globally recognised investment bank, to conduct a Sale Process under Clause 4.1(d) of the Put Option Agreement. JT was given the opportunity to, and indeed did, provide comments on the Sale Process, which were taken into account by Perella Weinberg in the Sale Process. However, the Sale Process failed to identify any buyer for the Option Shares at any price.

39. On 25 June 2025, Iconic wrote to JT to notify him that Iconic had elected to seek specific performance of the Put Option. In addition, the letter quantified the Aggregate Option Price in the sum of US$93,640,960.14 as at 2 July 2025 (comprising a principal sum of US$75 million plus interest calculated in accordance with Clause 4.1(b)). The calculation of the Aggregate Option Price is set out in the table below:

|  | Amount | Interest Rate | Date | Days |
|---|---|---|---|---|
| Aggregate Option Price (excluding interest) | $75,000,000.00 |  | 26-Jul-23 |  |
|  | 83,273,806.06 | 11.0% | 26-Jul-24 | 366 |
|  | 85,686,825.46 | 12.0% | 26-Oct-24 | 92 |
| Aggregate Option Price (including accrued interest) | 88,367,532.74 | 13.0% | 26-Jan-25 | 92 |
|  | 91,269,161.93 | 14.0% | 26-Apr-25 | 90 |
|  | 93,640,960.14 | 15.0% | 02-Jul-25 | 67 |

40. After 2 July 2025, the Aggregate Option Price will continue to increase (for every day that it is unpaid) by virtue of the accrual of interest pursuant to Clause 4.1(b).

41. By a letter dated 30 June 2025, JT responded to Iconic. JT sought to suggest that Iconic had failed to perform its obligations under Clause 3.2 on 26 July 2024. This is denied:

    (1) Iconic was ready and willing to transfer the Option Shares to JT on 26 July 2024 and was ready and willing to perform all of the steps required by Clause 3.2. Amongst other things, Iconic was ready and willing to obtain a share certificate from the Company in respect of the Option Shares (which could be issued by the Company, which JT himself controlled, at any time) and to transfer the same to JT.

    (2) However, JT was not ready and willing to perform his obligations under Clauses 2.3 and 3.3. In the premises, Iconic did not (and was not required to) transfer the Option Shares to JT or take the other steps contemplated by Clause 3.2 on the date when Completion should have taken place. Iconic remains ready and willing to take these steps in the event that JT is ready and willing to pay the Aggregate Option Price.

42. Iconic is entitled to specific performance of the Put Option. As to this:

    (1) For the reasons set out above, JT is in breach of his contractual obligation to purchase the Option Shares for the Aggregate Option Price.

    (2) Damages are not an adequate remedy for the said breach. Iconic relies on the terms of the Put Option Agreement which expressly entitle Iconic to apply for specific performance (as pleaded above). In any event, regardless of those express provisions, the Option Shares are equity securities issued by a private company for which no other buyer has been identified (and damages are not, therefore, an adequate remedy for JT's breach of his obligation to purchase the Option Shares).

43. Accordingly, Iconic is entitled to (and claims) an order for specific performance of the Put Option. Iconic seeks an order requiring JT to pay Iconic a sum equal to the Aggregate Option Price (amounting to US$93,640,960.14 as at 2 July 2025 and increasing daily pursuant to Clause 4.1(b)), subject to Iconic's undertaking to perform its obligations under Clause 3.2.

AND THE CLAIMANT CLAIMS:

(1) An order for specific performance of the Put Option (on the terms set out in paragraph 43 above);

(2) Costs; and

(3) Such further or other relief as the Court thinks fit.

RYAN PERKINS

SOUTH SQUARE

## STATEMENT OF TRUTH

The Claimant believes that the facts stated in this Particulars of Claim are true. The Claimant understands that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

*RBoynton*

……………………………………………
**Richard Boynton**
*Partner, Kirkland & Ellis International LLP*